**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ANDERSON DIVISION**

| | |
|---|---|
| First Quality Tissue SE, LLC, | |
| Plaintiff, | C.A. No. 8:11-cv-2457-KFM |
| vs. | |
| Metso Paper USA, Inc., | **DEFENDANT METSO PAPER USA,** |
| Defendant, | **INC.'S MEMORANDUM IN SUPPORT** |
| and | **OF ITS MOTION FOR SUMMARY** |
| Clearwater Paper Corporation, | **JUDGMENT** |
| Defendant-Intervenor. | |

Defendant Metso Paper USA, Inc. ("Metso") respectfully submits this Memorandum in

Support of its Motion for Summary Judgment.  Metso seeks summary judgment now because

Plaintiff First Quality Tissue, SE, LLC ("FQT") could not possibly prevail at trial given the

admissions of FQT's senior management and its in-house counsel in their depositions, together

with the plain language of the restrictive covenant at issue in this case.  There are no facts in

dispute with respect to the unavoidable conclusion that the restrictive covenant FQT seeks to

enforce is the epitome of the facially overbroad restriction that violates New York and South

Carolina public policy and that New York and South Carolina courts refuse to enforce.[1]

---

[1]  The choice of law in the FQT/Metso Contract at issue in this case is New York law.  In asking a South Carolina court to enforce Article 23(A), however, FQT must show both that Article 23(A) passes muster under New York law and that it also satisfies the requirements of South Carolina law.  *See Stonhard, Inc. v. Carolina Flooring Specialists, Inc.*, 366 S.C. 156, 159, 621 S.E.2d 352, 353 (2005); *Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 728 (D.S.C. 2007) ("[A] choice-of-law clause in a contract will not be enforced if application of foreign law results in a violation of South Carolina public policy.").

More specifically, the sweeping restrictive covenant in this case, Article 23(A) of the Metso/FQT Contract (the "Contract"),[2] fails as a matter of law because under both New York and South Carolina law a plaintiff may not enforce a restrictive covenant unless it can show that the restriction is necessary to serve the plaintiff's legitimate interest and is drawn as narrowly as possible to serve that interest.

FQT's witnesses have now testified that, contrary to earlier representations, Article 23(A), which precludes not only the sale of TAD machines using the unique configuration sold to FQT, but broadly precludes sales of any TAD machine (even the Metso "standard" model) or component, was actually designed to protect FQT's intellectual property rights and to ensure available resources.  Accepting FQT's recent testimony regarding the purpose of the clause as true, FQT witnesses made concessions conclusively establishing that Article 23(A) is the antithesis of a provision "narrowly tailored" to serve FQT's stated interests and is overbroad in multiple dimensions:

1.  they admit that other targeted provisions in the Contract, including Article 23(E), which precludes Metso from selling machines using the unique configuration that Metso sold FQT, protect FQT's stated interests in what FQT's own experts concede is the industry-accepted manner, making it impossible for FQT to demonstrate that the clause was even necessary as a threshold matter;

2.  they admit that FQT has no interest in the "sales" activity that Article 23(A) expressly prohibits, caring only about actual "deliveries";

---

[2] The Metso/FQT Contract that is at issue in this case was finalized in late October 2010 and bears an "effective date" of June 10, 2010.  (Contract, Dkt. 21-2 at 28; *see also* Dep. Ex. 24, October 25, 2010 letter from M. Oppenheim to T. Auffant, transmitting signed contract) (These and all other exhibits referenced herein may be found in the Appendices to this memo).

3.  they admit that Article 23(A) prevents Metso from selling standard components that are not even a part of FQT's TAD machine, and it facially restricts the sale of standard machines, in addition to unique machines like the one FQT purchased; and

4.  they admit that Article 23(A) precludes Metso from selling TAD machines – and even TAD machine components – in regions where FQT has made no sales and would never consider putting a plant.

Mr. Kambiz Damaghi, FQT's founder and Managing Member, in fact admitted that Article 23(A) amounted to a "belt and suspenders" approach to protecting the rights he claimed the provision was designed to serve.  That testimony alone cannot be reconciled with a legal framework that requires restrictive covenants to be drawn as narrowly as possible.

In short, by FQT's own admissions, this is a clause that is unnecessary at its core and is, as a matter of law, overbroad in virtually every respect.  Additionally, even if Article 23(A) were enforceable, *and* Metso were found to be in breach of Article 23(A), it could not result in any damage to FQT.  FQT asks this Court to enjoin Metso's sale of a TAD tissue machine to Clearwater Paper.  But FQT's witnesses have conceded that Clearwater could have purchased a TAD machine from Metso's competitor, the Andritz Group ("Andritz"), the company that supplied the TAD machines at FQT's Lock Haven, Pennsylvania mill.  And those witnesses also conceded that the impact on FQT from the sale of a TAD Machine to Clearwater would be the same, whether that TAD machine were made by Metso, or made by Andritz.  What is more, FQT's founder and most senior executive, Kambiz Damaghi, admitted at his deposition that he knew that Clearwater had announced plans for a TAD tissue mill in North Carolina months before FQT signed the Contract at issue in this case.

## I.    GENERAL OVERVIEW AND PROCEDURAL BACKGROUND

This case involves a restrictive covenant, Article 23(A), in a contract between Metso and FQT for the purchase of a TAD tissue machine.  Article 23(A) prevents Metso from selling or delivering TAD machines, components of TAD machines and TAD automation systems, in the United States, Canada and Mexico for not less than three years and four months for sales (and four years and three months for deliveries), subject to exceptions that are provided in Article 23(C) and 23(D).  Metso contends that its sale of a TAD machine to Clearwater Paper Co. ("Clearwater"), which FQT challenges in this case, is permitted under several exceptions in Article 23(C), and that in any event, Article 23(A) is unenforceable because it restrains competition in violation of public policy.

The parties have taken numerous depositions of both expert and fact witnesses, because the application of the Article 23[3] potentially implicates a host of complex technical issues regarding matters ranging from the development of TAD technology since the 1970s to the legal effect of foreign and domestic corporate transactions completed long ago.  Metso does not seek summary judgment on its contention that Article 23's exceptions[4] apply to the sale to Clearwater – which would allow the sale even if Article 23(A) were found enforceable – because this contention involves factual issues that cannot be resolved on summary judgment.

But there is no material-fact issue as to the purpose of Article 23(A).  During the first few months of this litigation, FQT admitted that Article 23(A) was intended to protect FQT from competition.   In pleadings and briefs to this Court, FQT said that its purpose in insisting on the

---

[3]   The relevant parts of the restrictive covenant, Article 23 of the June 2010 Contract between Metso Paper USA, Inc. and First Quality Tissue SE, LLC, are reproduced at pp. 10-11 *infra.* Article 23 in its entirety can be found in Appendix A at Bates pp. METSO031271-METSO031273.

[4]   Article 23(C) provides that Metso may sell TAD machines, components and automation systems, *inter alia*, to Kimberly-Clark, Procter & Gamble, Georgia-Pacific and SCA; existing customers and to one potential customer and their respective successors, affiliates and affiliates' successors.

restrictions in Article 23(A) was to preserve FQT's "competitive position" by restricting other tissue manufacturers from entering the market during FQT's "start up" period.  FQT readily and repeatedly admitted in court papers that the purpose of Article 23 was to limit competition from such other manufacturers.  For example, in its Amended Complaint, FQT claimed that the only harm from a sale to Clearwater Paper was harm to FQT's competitive position.  On this point, FQT alleged:

> Clearwater is a direct competitor of FQT.  If Clearwater acquires a complete TAD machine, then FQT's competitive position will not be as bargained for in its contract with Metso.  FQT will suffer irreparable harm and there are no adequate damages or remedy at law.

(Amended Complaint, Dkt. 30 at ¶ 32).  That is still the only harm that FQT has alleged in its pleadings.

Similarly, in its preliminary injunction brief, in an attempt to more fully describe the purpose behind Article 23, FQT explained that its interest was in reducing competition:

> FQT could not risk that Metso would sell more complete TAD machines than already were present in the market **to FQT's competitors** while FQT was still ramping up its new facility.  (Plaintiff's Memorandum of Law in Support of its Motion for a Preliminary Injunction, Dkt. 21 at p. 5).

> FQT negotiated for the restrictive provisions in Article 23 because it has a legitimate business interest in protecting the significant investment it has made in its tissue manufacturing facility.  Metso understood full well that FQT could not agree, and would not agree, to purchase a second complete TAD machine when it did without Metso's commitment that Mesto [sic] would not **undermine FQT's competitive position** by selling additional complete TAD machines **to FQT's competitors** within the Limitations Period.  (*Id.*, at p. 12).

> The sale to Clearwater . . . creates the untenable danger that FQT will have purchased a second complete TAD machine for which there is insufficient product demand, and would irreparably **harm FQT's competitive position**.  (*Id.*, at p. 23).

> Similarly, here, FQT would be irreparably harmed if Metso is permitted to sell a complete TAD machine to Clearwater because FQT would **lose some of its customer base** to Clearwater.  (*Id.*, at p. 24)

(emphasis added).

Metso opposed FQT's Motion for Preliminary Injunction, and explained that, as a matter of law, in order to be enforceable a restrictive covenant must have a legitimate purpose; and, Metso showed that limiting competition is *not* a legitimate purpose under either South Carolina or New York law.  (Metso's Opposition to FQT's Motion for Preliminary Injunction, Dkt. 52, at pp. 18-23).  After the briefing on the preliminary injunction motion, FQT changed its position.  It outright disclaimed any suggestion that the purpose of Article 23 was to limit competition.  When directly asked at his deposition whether Article 23 was intended to limit competition, FQT's founder and Managing Member, Kambiz Damaghi, testified, quite emphatically – "Absolutely not."  Deposition of Kambiz Damaghi, February 14, 2012 ("Damaghi Dep.") at 150:1-151:15.[5]  Instead, Mr. Damaghi and the other FQT witnesses now say that the purpose of Article 23(A) is to protect FQT's intellectual property and its "learnings" and to ensure the availability of qualified Metso personnel at the FQT site.[6]

Even accepting FQT's newly professed "intellectual property" rationale, deposition testimony and the language of the Contract on its face demonstrate that Article 23(A) is unenforceable on its face because it is far broader than necessary to serve any legitimate purpose.

---

[5]  Mr. Damaghi's testimony in full was as follows:

> Q.     So am I correct in understanding then that your purpose in entering into Article 23 with Metso was not to insulate FQT from competition generally?
>
> A.     Absolutely not.  Competition has other choices if they want to get into -- they -- the TAD business.
>
> Q.     So you weren't at all trying to protect yourself from competition?
>
> A.     Absolutely not.
>
>                    ****
>
> …And we don't have a problem with Clearwater being in the TAD business.  Who are we to have any concerns about or say about that?

(Damaghi Dep. at 150:1-151:15).

[6]  Metso acknowledged in its Preliminary Injunction briefs that protection of intellectual property rights was a legitimate purpose, for which parties can craft a narrowly tailored covenant *if necessary* to protect such rights.

Indeed, as will be discussed below, Mr. Damaghi and others acknowledged that Contract elsewhere already contains other clauses that directly address in detail the parties' strict non-disclosure obligations with respect to each other's confidential information.  Specifically, FQT acknowledges that the agreement contains narrowly-tailored provisions designed to protect FQT's confidential information, including its intellectual property, and any "shared learning" resulting from the development, installation and start-up of the machine at Anderson.  (*See, e.g.*, Damaghi Dep. at 209:22-211:8; Deposition of Frank Ludovina, February 24, 2012 ("Ludovina Dep.") at 131:17-21; 133:5-16; Deposition of Moshe Oppenheim, March 1, 2012 ("Oppenheim Dep.") at 196:5-198:20; 203:5-22)

As discussed below, even FQT's industry expert, Frederic Christiansen, explained that proprietary rights have been historically protected in the industry through non-disclosure and other such provisions, not through broad restrictive covenants.  (Deposition of Frederic A. Christiansen, February 28, 2012 ("Christiansen Dep.") at 31:7-32:6; 37:15-38:10).  In fact, he acknowledged that he has never seen a provision like Article 23 in his decades-long career.  (*Id.* at 30:8-15).  In short, Article 23(A) is not only vastly overbroad, but, as a threshold matter, it is not necessary at all.

## II.    UNDISPUTED FACTS

### A.    Metso's Tissue Business

As the Contract acknowledges, Metso had a long history and a wealth of experience in the TAD tissue industry prior to its relationship with FQT.[7]  Metso sells tissue machines to

---

[7]    Article 4.8 provides:  "Metso Paper acknowledges that while [FQT] has assembled a team of knowledgeable personnel to cooperate with Metso Paper, it is agreed and understood that [FQT] is relying on Metso Paper's knowledge and experience and that Metso Paper's obligations set forth herein shall in no way be abrogated or reduced based on the fact that [FQT], its employees or its representatives may have certain related knowledge or experience or may have provided Metso Paper with suggestions, approvals or advice related to the Equipment."  Metso and its predecessors had delivered more than forty TAD tissue machines before it sold a tissue machine to FQT.

companies that manufacture tissue products, primarily bathroom tissue and paper towels.  The

majority of the components of the tissue-making machinery are made by a Metso affiliate in

Sweden.  Metso sells a variety of tissue machines, one of which is commonly referred to as a

"TAD" machine.

A TAD machine produces bathroom tissue or paper towels using through-air drying

technology to extract water from the pulp, chemical, and water mixture, rather than the

conventional method of pressing the water out of the web as it passes between heated rolls.

Much of a TAD machine is virtually identical to a conventional tissue machine, but TAD

machines have some components that are uniquely "TAD," notably the "TAD Roll," which dries

the tissue with hot air, rather than by pressing it.  The TAD technology produces a much softer,

more absorbent bathroom tissue or paper towel than is produced using the conventional,

mechanical extraction methods.  In addition to Metso, TAD tissue machines are also

manufactured by the Andritz Group ("Andritz") and Toscotec Spa ("Toscotec").  (Damaghi Dep.

at 31:12-17).

### B.    FQT's Purchase of TAD Machines from Andritz and Metso

FQT manufactures tissue and paper products using TAD machines purchased from third-

party suppliers like Metso.  FQT built its first plant in Lock Haven, Pennsylvania, where it owns

and operates two TAD tissue machines, the first of which became operational in approximately

January 2005.  (Damaghi Dep. at 18:6).  FQT purchased those machines from Andritz.

In January 2010, FQT entered into its first contract with Metso for the purchase of a TAD

tissue machine for the new facility to be located in Anderson, South Carolina.[8]  At the time it was

negotiating with Metso, FQT was unable to fill its customer demands.  (*See* Ludovina Dep. at

---

[8]   The first agreement to purchase a Metso TAD machine was actually between Metso and First Quality Tissue,
LLC, an affiliate of Plaintiff.

39:18-21; Deposition of Scott Crownover, March 13, 2012 ("Crownover Dep.") at 31:7-18;

32:10-17).  FQT believed that once its first Anderson machine was operating at full capacity it

would be effectively "sold out."  (*See* Crownover Dep. at 269:11-270:11; Ludovina Dep. at 41:1-

7).  Not surprisingly under these circumstances, in the fall of 2010, FQT entered into the

Contract at issue for a second TAD machine at the Anderson facility.  This machine would be

FQT's fourth TAD tissue machine.

> ### C.    The Metso Contract

FQT bases its claims in this case on Article 23 of the June 2010 Contract (the

"Contract"), which, subject to certain exceptions, broadly prohibits Metso from selling,

licensing, booking orders for, or otherwise distributing any TAD machines, TAD machine

automation systems, or even TAD machine components, anywhere in the United States, Canada,

and Mexico (the "Territory") for two years after the second TAD machine is "finally delivered"

to FQT ("Limitations Period").  And, for another year after that, although Metso can then make

sales, it still prohibits Metso from *delivering* a TAD machine, TAD machine components, and/or

TAD machine automation systems anywhere in the Territory.  So, in short, Article 23 prohibits

both "sales" to customers in the Territory (regardless of where the delivery takes place) and

"deliveries" to locations within the Territory (regardless of where the machine, or component, is

sold).  And it prohibits sales and deliveries of all Metso TAD machines and components,

including both the "Metso standard" machines and the unique configuration that Metso sold to

FQT.  It also, as FQT's counsel conceded, covers the entire United States, including its territories

such as Guam and Puerto Rico, and all of Mexico and Canada, including portions where Mr.

Damaghi conceded that neither he, nor  "anyone in their right mind" would locate a TAD tissue

plant.  (Damaghi Dep. at 112:17- 113:9; Oppenheim Dep. at 134:16-135:5).  Specifically, Article

23(A) provides:

A.    Subject to the exceptions set forth in Subsections C and D below, Metso
Paper agrees that for a period commencing on the Effective Date and
ending twenty-four (24) months after final delivery of the Equipment to
Buyer (the "Limitations Period"), Metso Paper will not sell, license, book
orders for, or otherwise distribute within the United States, Canada and
Mexico ("Territory") any complete TAD machines (i.e., from headbox to
reel), TAD machine components and/or TAD machine automation
systems.  Metso Paper further agrees that it will not deliver any TAD
machines, TAD machine components or TAD machine automation
systems to any third party within the Territory until twelve (12) months
after the end of the Limitations Period.  Notwithstanding the foregoing, in
the event final delivery of the Equipment is delayed by Buyer, or those
under Buyer's control, the Limitations Period set forth above shall expire
on September 30, 2013.  "Final delivery" as used herein shall mean the
complete delivery of all components of the Equipment.

(Contract, Dkt. 21-2, at Art. 23(A)).

Article 23 also contains provisions that protect the unique features of the configuration of

the TAD components on the machine that FQT purchased from Metso.  Article 23(E) provides

that during the Limitations Period, Metso may not "provide" a "substantially similar TAD

machine configuration/combination" as "offered to [FQT]" to anyone, anyplace in the world:

E.    Under all circumstances, during the Limitations Period, Metso Paper will
not provide to any third party a substantially similar TAD machine
configuration/combination of components offered to Buyer.

(Contract, Dkt. 21-2, at Art. 23(E)).[9]

While the Contract does not provide a specific definition of "substantially similar,"

FQT's top technical officer, Frank Ludovina, explained that the concept was to ensure that the

special, newly designed configuration that Metso sold to FQT, would not be sold to any other

purchasers.  (Ludovina Dep. at 145:5-19; 149:18-150:1).   And he testified that a "Metso

standard" TAD machine would not be considered substantially similar for purposes of Article

23(E).  (*Id.* at 150:2-5).  He admitted that he had no knowledge whatsoever of any aspect of the

Clearwater machine that was substantially similar to FQT's.  (*Id.* 152:4-8).  When asked, as

[9] In this Motion, Metso does not challenge the enforceability of Article 23(E).

FQT's senior technical person involved in negotiating the Contract, whether it was necessary to protect FQT's interest to have a global prohibition on Metso's sale of a "substantially similar" machine (Article 23(E) is not limited to the Territory), he testified that he simply could not say. (*Id.* at 143:2-9). It is not clear that FQT seriously contends that the components and configuration of the Clearwater machine is "substantially similar" to the FQT machine.

The Contract also contains numerous specific targeted provisions to protect FQT's confidential information and trade secrets, with no time limitations or territorial restrictions. For example, Article 23(F) provides:

> F.     Notwithstanding anything set forth above to the contrary, Metso Paper acknowledges and agrees that at no time and/or under no circumstances shall Metso Paper provide any Contract IP, Buyer's IP or Process Improvements (as defined below) to a third party without Buyer's express written consent which consent shall be provided at Buyer's sole discretion.

(Contract, Dkt. 21-2, at Art. 23(F)). Article 24 provides the definitions applicable to Article 23(F) and clearly delineates the parties' ownership interest in the intellectual property and trade secrets involved in the sale to FQT:

> 24.1     All drawings, operating and maintenance manuals, documents, designs, plans, records, instructions, know-how, prints and specifications which are pre-existing the Effective Date and furnished by Metso Paper to Buyer in connection with the work to be performed under this Contract ("Metso's IP") shall remain the exclusive property of Metso Paper . . .

> 24.2     All drawings, documents, designs, plans, records, instructions, know-how, prints and specifications which are pre-existing the Effective Date and furnished by Buyer to Metso Paper in connection with the work to be performed under this Contract ("Buyer's IP") shall remain the exclusive property of Buyer . . .

> 24.3     All drawings, operating and maintenance manuals, documents, designs, plans, records, instructions, prints and specifications delivered by Metso Paper to Buyer under this Contract which are not pre-existing the Effective Date which arise out of or result from this Contract ("Contract IP"), whether patentable or not, which are prepared, provided or procured by Metso Paper, either solely or jointly with others shall be owned exclusively by Buyer and Metso Paper hereby assigns the entire right, title and interest to all such Contract IP to Buyer. . . .

11

(*Id.* at Art. 24).

Article 24.4 also provides specific protection for what is referred to as "Buyer's IP."  It lays out a detailed process by which the parties are to agree on a list that will specifically identify what information belongs to FQT, and what information belongs to Metso.  That provision states:

> Metso Paper acknowledges that during the course of this project, [FQT] may develop additional intellectual property or share innovative ideas and solutions on how to modify or operate the Equipment.  [FQT] shall submit a list of these ideas and solutions to Metso Paper during the course of this project, which list shall be called and identify Buyer's "Process Improvements".  If Metso Paper objects to a process improvement being owned by [FQT], Metso Paper shall provide [FQT] with a written objection within ten (10) days containing Metso Paper's reasoning for its exclusion from the list.  Metso Paper's failure to object to the inclusion of a process improvement to the list as set forth above shall be deemed to be an acceptance.  In the event [FQT] disagrees with Metso Paper's objection, [FQT] shall notify Metso Paper within ten (10) days of receipt of Metso Paper's objection.  Such notification shall include [FQT's] reasoning for its disagreement.  If the parties still disagree, the matter shall be resolved pursuant to Section 20.2.  All undisputed Process Improvements will be owned exclusively by [FQT] and [FQT] hereby grants to Metso Paper a non-transferrable, fully-paid license in the United States to use such Process improvements solely to the extent necessary for Metso Paper to perform its obligations to [FQT] under this Contract and not for any other purpose.  The initial Process Improvements list is attached hereto as Appendix 14.

(*Id.* at Article 24.4).  In this Motion, Metso is not contending that these provisions are unenforceable.

Consistent with Article 24.4, the parties developed a list of agreed "Process Improvements" that belong to FQT and are subject to the various confidentiality restrictions in the Contract.   As Mr. Ludovina explained, that list is designed to reflect "a Know How List of items that First Quality believed are intellectual property, which should not be divulged to anyone else….  We were trying to get very specific with issues that First Quality believed were proprietary to them and document that those items should not be shared." (Ludovina Dep. 131:17-21; 133:5-8; *see also* Dep. Ex. 37, Appendix 14 to Contract entitled "Initial Process

Improvements List" ("Appendix 14")).  Mr. Ludovina testified that he could not think of any items that were not included on the List.  (*Id.* at 134:8-135:3).  Mr. Ludovina was unaware of any instance of Metso disclosing FQT's "Know How" in violation of the Contract, whether to Clearwater or anyone else.  (*Id.* at 135:10-19).

Additionally, Article 17 makes clear that the Contract is subject to the terms of the Non-Disclosure Agreements entered into between the parties.  (Contract, Dkt. 21-2, at Art. 17).  Article 4.4 provides that the separate, detailed Confidentiality provisions contained in Appendix 15 govern the "Metso Automation" systems, and that those provisions bind Metso's affiliate, Metso Automation USA, Inc.  (*Id.* at Art. 4.4 and confidentiality provisions in Appendix 15 (at Bates pages METSO031595-METSO031596)).

With respect to FQT's stated concern regarding the availability of personnel and resources for its project, Article 4.6 establishes a "Dedicated Team" for the project and requires that they acknowledge and comply with the non-disclosure obligations under the "Buyer Non-Disclosure Agreement," attached as Appendix 7 to the Contract.  The provision, of course, also further ensures that FQT's "know how" will be protected.  (*Id.* at Art. 4.4 and Appendix 7).  FQT has never alleged that Metso has violated or will violate any of these provisions related to confidential information, shared learnings, trade secrets, and intellectual property.   Nor has it alleged in this case that even a single bit of information has been improperly shared.

### D.     Metso's Sale to Clearwater

In late 2010 Metso entered into a contract to sell a TAD machine to Clearwater.  The machine Metso sold to Clearwater is, with minor exception, the "Metso standard" model.  None of the exceptions involve special features on the FQT machines.  (*See* Deposition of Donald Beaumont, February 29, 2012 ("Beaumont Dep.") at 154:20-21; 155:6-8).

In early September 2010, more than two months before the sale to Clearwater, Metso's Don Beaumont telephoned FQT's Frank Ludovina to notify him, as Mr. Ludovina recalls the conversation, regarding an impending transaction in the tissue industry that, Mr. Beaumont told Mr. Ludovina, would affect Metso's obligations under the FQT Contract. (Ludovina Dep. 120:10-121:9).[10]  Roughly ten days after that conversation, Clearwater announced its acquisition of Cellu-Tissue, a company that was a part of Metso's customer base.[11]  In response to seeing the Clearwater announcement[12] "right after it was announced," Frank Ludovina called Mr. Beaumont, then understanding that Mr. Beaumont had been referring to the Clearwater acquisition in their earlier conversation.  (*Id.* at 124:12-125:6; 125:17-126:8; Oppenheim Dep. at 151:11-18).  Mr. Ludovina testified that he was uncomfortable once he understood that Mr. Beaumont was referring to Clearwater.  (Luvovina Dep. at 122:6-123:6).

Following that second call, Mr. Ludovina contacted FQT's counsel and had a discussion with him regarding Metso's discussions with Clearwater.  (Ludovina Dep. 127:8-18).  After that discussion, FQT neither wrote to, nor otherwise informed anyone at Metso that FQT believed a sale to Clearwater would be out of bounds, *i.e.*, would violate the Contract.  (Oppenheim Dep. at 151:11-152:14; 153:18-157:7).  On October 25, 2010, FQT sent the executed copy of the Contract to Metso.  (*See Dep. Ex. 24,* October 25, 2010 letter from M. Oppenheim to T. Auffant, transmitting signed Contract).  This may well all be explained by the fact that, as FQT's

---

[10]  While Mr. Beaumont does not recall the call in the same way as Mr. Ludovina, for the purposes of this summary judgment motion, Mr. Ludovina's recollection is being accepted.

[11]  Cellu Tissue (and now Clearwater as a result of its acquisition of Cellu Tissue) falls into the "existing customer" exception of Article 23(C) by virtue of Cellu Tissue (and now Clearwater) owning a TAD tissue machine located in St. Catherine's, Ontario, that was sold by a Metso predecessor company.   The fact that the original sale by the Metso predecessor was actually to Cellu Tissue's predecessor, a Kimberly-Clark entity, also provides a basis for the exception for sales to Kimberly-Clark or its successors or purchasers of its TAD assets.

[12]  The Clearwater announcement was on September 16, 2010. (*See Dep. Ex. 35*, September 16, 2010 Clearwater Paper press release announcing Clearwater Paper to Acquire Cellu Tissue Holdings, Inc.; *see also* Declaration of Donald F. Beaumont In Opposition to Plaintiff's Motion for Preliminary Injunction, Dkt. 52-1 ("Beaumont Decl.") at ¶ 19).

witnesses have now uniformly conceded, they had long known that Clearwater was planning a

TAD facility in North Carolina, that it could purchase a TAD machine from Andritz, and that

there would be no difference in terms of FQT's competitive position whether Clearwater bought

its machine from Andritz or Metso.  (Damaghi Dep. at 133:3-135:3; 150:5-7; Crownover Dep. at

281:14-282:8).

     Although Metso maintains that the sale to Clearwater falls within several of the

exceptions set forth in Article 23(C), this Motion does not raise any issue concerning the

applicability of the exceptions in Article 23(C) to the restrictions in Article 23(A).  This Motion

is focused solely on the enforceability of Article 23(A) under New York and South Carolina law

based on the discovery record in this case, especially FQT's admissions and the language of the

clause itself.

## III.     ARGUMENT

### A.     Standard for Granting Summary Judgment

     "[S]ummary judgment should be granted when the pleadings, responses to discovery, and

the record reveal that there is no genuine issue as to any material fact and . . . the moving party is

entitled to a judgment as a matter of law."  *Collins v. Auto-Owners Ins. Co.*, 759 F. Supp. 2d 728,

735 (D.S.C. 2010) (quotation marks omitted); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986); *Terry's Floor Fashions, Inc. v. Burlington Indus.*, 763 F.2d 604, 610 (4th Cir. 1985).

While the movant bears an initial burden of showing the absence of any genuine issue of material

fact, the non-movant must nevertheless show the existence of each and every element of its case

upon which the non-movant will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322-23;

*Goewey v. United States*, 886 F. Supp. 1268, 1279 (D.S.C. 1995).  "[T]he party opposing

summary judgment may not rest upon mere allegations or denials and, in any event, a 'mere

scintilla of evidence' is insufficient to overcome summary judgment."  *Collins*, 759 F. Supp. 2d

at 735; *Celotex Corp.*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50

(1986) ("If evidence is merely colorable, or is not significantly probative, summary judgment

may be granted."); *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (a non-

movant plaintiff must produce more than a mere scintilla of evidence to support its contentions).

    **B.**    **FQT Concedes that Article 23(A) Is So Overbroad as to be Entirely Redundant of Other Effective, Industry Standard Provisions – the Antithesis of a Narrowly Tailored Provision.**

        **1.**    **South Carolina and New York Courts Strictly Construe Restrictive Covenants**

Both South Carolina and New York law critically examine restrictive covenants to

prevent unjustified restraints on competition.[13]  It is precisely because they restrain competition

that, under South Carolina law, restrictive covenants are "generally looked upon with disfavor"

and are critically scrutinized and construed against the party seeking enforcement.  *Cafe Assocs.*

*v. Gerngross*, 305 S.C. 6, 9, 405 S.E. 2d 162, 164 (1996); *see also Poole v. Incentives Unlimited,*

*Inc.*, 345 S.C. 378, 381, 548 S.E.2d 207, 209 (2001); *Lampman v. DeWolff Boberg & Assocs.,*

*Inc.*, 319 Fed. App'x 293, 299-300 (4th Cir. 2009) (unpublished opinion).  Accordingly, the

party seeking enforcement has the burden of proving that the restraint is reasonable and the

contract is valid.  *Delmar Studios of the Carolinas v. Kinsey*, 233 S.C. 313, 319, 104 S.E.2d 338,

341 (1958).  The enforcing party satisfies this burden only if it demonstrates that the restriction

satisfies each of five criteria, *i.e.*, that it is

---

[13]  A party seeking to enforce a non-compete clause in a contract, even if governed by foreign law, must also demonstrate that the non-compete clause is enforceable under South Carolina law. *Stonhard, Inc. v. Carolina Flooring Specialists, Inc.*, 366 S.C. 156, 159, 621 S.E.2d 352, 353 (2005) (answering certified question from this Court and holding that "[t]erms in a non-compete agreement may be construed according to the law of another state," but South Carolina courts will not enforce it if, under South Carolina's law, it is "invalid as a matter of law or contrary to public policy in South Carolina."); *Stonhard, Inc. v. Carolina Flooring Specialists, Inc.*, No. 6:03-1908-HFF, 2006 WL 149061, at *2 (D.S.C. Jan. 19, 2006) (granting summary judgment because covenant controlled by New Jersey law was void as against South Carolina public policy); *Standard Register Co. v. Kerrigan*, 238 S.C. 54, 70-71, 119 S.E.2d 533, 541-42 (1961); *Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 728 (D.S.C. 2007) ("[A] choice-of-law clause in a contract will not be enforced if application of foreign law results in a violation of South Carolina public policy.").

A.    *necessary* for the protection of a *legitimate* interest of the enforcing party;

B.    reasonably limited with respect to time and place;

C.    not unduly harsh or oppressive;

D.    reasonable; and

E.    supported by valuable consideration.

*Cafe Assocs.*, 305 S.C. at 9, 405 S.E. 2d at 164 (emphasis added).

The same theme underlies the New York cases. Since restrictive covenants conflict with "'the general public policy favoring robust and uninhibited competition,'" New York courts "'rigorously examine'" restrictive covenants before enforcing them. *American Inst. of Chem. Eng'rs. v. Reber-Friel Co.*, 682 F.2d 382, 387 (2d Cir. 1982) (quoting *American Broadcasting Companies, Inc. v. Wolf*, 52 N.Y.2d 394, 403-404 (1981)). As the court stated in *Baker's Aid v. Hussmann Foodservice Co.*, 730 F. Supp. 1209, 1213 (E.D.N.Y. 1990) ("*Baker's Aid II*"), "Enforceability of the restrictive covenant is a threshold question that must be resolved before it can be determined whether the Agreement has been breached." The first factor New York courts consider when they analyze restrictions like those in Article 23(A) is "whether the party seeking enforcement has demonstrated 'a legitimate business interest that warrants . . . enforcement, . . .'" *Design Strategy Corp. v. Knack Systems, LLC,* Case No. 07-Civ-0395, 2007 WL 4562926, * 3 (S.D.N.Y. Dec. 18, 2007). In South Carolina as well, the restriction will be upheld only when it can be established, as a threshold matter, that it is "*necessary* for the protection of a legitimate interest of the enforcing party." *Cafe Assocs.*, 305 S.C. at 9, 405 S.E.2d at 164 (1996) (emphasis added).

The clause must not only be necessary to protect a legitimate interest, but it must be drawn as narrowly as possible to protect that interest. Under New York law, a restriction is not

enforceable unless "it is reasonable and is *no larger than necessary* to protect legitimate business interests of [the plaintiff]." *Baker's Aid II,* 730 F. Supp. at 1214 (emphasis added). *Baker's Aid II* is particularly instructive. As here, there were two restrictions at issue in *Baker's Aid II*: one that broadly prevented sales of all rack ovens over a wide territory (all of the United States and Canada), and one that only prevented sales of ovens using technology that was developed for, and paid for by, plaintiff. 730 F. Supp. at 1215-16.

On cross-motions for summary judgment, the court in *Baker's Aid II* upheld the restriction that prevented sales of ovens using the technology in "Specifications" that the parties had contractually agreed were developed for, purchased by, and would belong exclusively to, plaintiff. But the court struck down on summary judgment, as a matter of law, the restriction that, like the one here, broadly restricted sales of the entire class of product, including those in which the plaintiff had no proprietary or intellectual property interest. *Id.*

As here, the plaintiff in *Bakers Aid II* argued that the broader restriction was necessary to protect its proprietary interests. The New York court summarized: "Plaintiff maintains that this covenant is reasonably necessary to prevent disclosure of proprietary information and to insure that the Manufacturing Agreement does not become 'an unintended vehicle to create, fund and educate a competitor.'" *Id.* at 1215. The court rejected that justification, explaining that the prohibition on sales of the class of product was unnecessary to protect any legitimate interest in the protection of its proprietary information. The Court concluded: "The limited know-how and proprietary information imparted to defendants, if any, is adequately protected by the proscription of competition based on the Specifications." *Id.* at 1215.

The analogy to this case could hardly be more compelling, as discussed below.

### 2.     Article 23(A) Is So Overbroad as to be Completely Unnecessary, and is Certainly Not Narrowly Tailored to Protect Any of the Interests FQT Now Claims The Clause Was Designed to Serve

After the completion of briefing on FQT's motion for preliminary injunction, which made it plain that limiting competition was not a legitimate,[14] protectable interest, FQT changed its professed rationale for Article 23, disclaiming its earlier submissions to this Court that the clause was intended to protect FQT from competition.[15]  As Mr. Damaghi said, "Absolutely not." (Damaghi Dep. at 150:1-7).  Even if the interest was as FQT now suggests:  to protect its "know how"/intellectual property, and to ensure that sufficient dedicated resources are available to support FQT's project, the clause is vastly overbroad.  Indeed, FQT's professed interests, as discussed below – and as FQT's witnesses acknowledged – are already protected by narrowly tailored, targeted provisions in the Contract, which clauses Metso does not challenge.

The clause that the court struck down on summary judgment in *Baker's Aid II* is a remarkably close parallel.   As in *Baker's Aid II*, FQT attempts to justify its prohibition on Metso's sales of all TAD machines by suggesting it protects its proprietary information.  Also as in *Baker's Aid II*, however, FQT already has the protection of the targeted provision (Article 23(E)), which specifically prohibits the unique configuration that FQT purchased.  Indeed, this case is even more compelling than *Baker's Aid II,* as FQT has not only Article 23(E) to protect its proprietary interests, but also, as discussed below, has the other intellectual property, non-

---

[14]  *See* Metso Paper's Opposition to FQT's Motion for Preliminary Injunction, Dkt. 52 at pp. 19-23.  As the United States Court of Appeals for the Second Circuit explained, unless the covenant is protecting a legitimate business interest, and is not merely an attempt to restrict legitimate competition, the reasonableness of Article 23(A) in terms of its time, space, or scope, or the oppressiveness of its operation, does not even become an issue. *American Inst.*, 682 F.2d at 387.

[15]  As an initial matter, the Court could completely disregard this self-serving testimony because it is so plainly at odds with the position initially taken by FQT.  *See Hamilton v. Dayco Products, LLC*, No. 2:07-2782-PMD-RSC, 2009 U.S. Dist. LEXIS 10545, n.2 (D.S.C. Feb. 10, 2009) ("The Court also notes that because of the circumstances, it must give more credence to Plaintiff's earlier representations than her current representations."). "A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."  *Id.* (citing *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)).

disclosure and confidentiality provisions in other parts of the Contract.   A provision that is admittedly redundant of other targeted provisions in a Contract is the extreme end of overbreadth – the antithesis of the "narrowly tailored" provision that New York and South Carolina courts require.

In this case, in addition to Article 23(E), other provision of the contract, including Articles 4.6, 17, 23(F) and 24, and Appendices 7, 14 and 15, squarely address and protect FQT's confidential information in multiple additional ways.  They preclude the sharing of any confidential information belonging to FQT (Articles 23(F) and 24); they prevent the sale of a machine using FQT's unique configuration (Article 23 (E)); they require the execution of Non-Disclosure Agreements (Article 17); and they require employees to expressly acknowledge and abide by strict non-disclosure obligations (Article 4.6).  Other provisions of the Contract ensure the availability of staff.  (*See, e.g.*, Article 4, identifying and providing for a "Dedicated Team").

FQT's own industry expert acknowledged in his deposition that in his experience, the provisions described above have been the standard way in which tissue makers have historically – and effectively – protected their intellectual property and their need for a dedicated staff in their contracts.  (Christiansen Dep. at 31:7-32:6; 37:15-38:10).  FQT has not asserted any violation of these provisions. (*See* Ludovina Dep. at 135:10-14).

To the extent that FQT has also contended from time to time that Article 23(A) was also intended by FQT to ensure the availability of personnel and resources for timely completion of its project, the clause would be a completely irrational and ineffective way of pursuing such a goal.  Article 23(A) allows Metso to sell an unlimited number of machines to the companies that FQT considers its prime competitors, Kimberly-Clark, Procter & Gamble and Georgia-Pacific, which in theory could consume enormous resources. (Damaghi Dep. at 95:8-14).  Rather than

broadly precluding Metso from selling to others, FQT could have required a contractual commitment from Metso further defining the team to be dedicated to FQT's work and assuring the availability of that team. Indeed, FQT's industry expert, Frederic Christiansen, explained that dedicated teams and availability commitments are the way that desired project staffing is assured. (Christiansen Dep. at 31:7-32:6; 37:15-38:10).

In most of the cases cited by both parties regarding construction of restrictive covenants, the courts will consider whether the provision at interest could have been drawn more narrowly, often in a geographic sense, to reasonably serve the interest at hand. In this case, the court need not even get to that question, because the flaw here is much more fundamental: there are already narrowly drawn provisions that fully serve the professed interest – as in *Bakers Aid II*, Article 23(A) was not necessary at all. FQT's counsel, Mr. Oppenheim, agreed that all of the "learnings," "know how" and other confidential information that FQT now says are its primary concerns are all covered by the protections in Articles 4.6, 23(F) and 24 and Appendices 7 and 15 of the Contract. In fact, Mr. Oppenheim admitted that he could not point to a single kind of confidential information that was not protected under those provisions. (Oppenheim Dep. at 196:5-198:20; 203:5-22). Mr. Damaghi tried nevertheless to explain that Article 23 was a good idea in the same way that one might prefer to have "two locks on the door." He testified:

> A. …[W]hat you see here, if I may use an analogy, is that, you know, you put a door and then you put a lock on the door and then sometimes doors have a bolt lock, you know, they have a secondary lock, so you have to look at these provisions, you have to look at the agreement that Metso and First Quality have made in the proper context and wholistically.
>
> So to put your finger on provision 24.4 and say does it cover it, it covers it to the extent that it's documented, but then we have to go back to the spirit of the relationship and we have to go back to the overall responsibilities of the parties in this agreement and say okay, to the extent that it's not, you have to put some other safety locks and some other safety procedures, safety gates, to protect the information. And that is the concept of the partnership and the cooperation.

> So you – it is extremely difficult to capture everything on the piece of paper, very difficult.  So is this all?  No, it's not all.  Is this part of it?  Yes, it is part of it.
>
> Q.      Is what you're saying that Article 24 and Article 23 work together sort of as what I would call a belt and suspenders?
>
> A.      Yes that's – that's correct.  And it's –
>
> Q.      And you called it two locks?
>
> A.      It's a good – well, belts and suspenders, but – maybe that's a better phrase to use, thank you.

(Damaghi Dep. at 209:22–211:8).

Before even reaching the question of how narrowly tailored Article 23(A) might or might not be, this testimony is fundamentally inconsistent on a very basic level with the requirement that the restriction is "necessary" to protect a legitimate interest.  In short, like the clause in *Baker's Aid II,* Article 23 not only proscribes the sale and delivery of TAD machines in which FQT has a proprietary interest (Article 23(E)), but it also proscribes the sale of Metso TAD machines in general as well as components and automation systems that are not even on FQT's TAD machine.  (Article 23(A)).  Metso is asking the Court to hold unenforceable only so much of Article 23 as the Court in *Baker's Aid* struck down in the clauses before it – the portion (in this case 23(A)) that precludes Metso from selling TAD machines, TAD machine components and TAD automation systems in general, *i.e.*, ones in which FQT has no proprietary interest.

Article 23(A) is – as FQT's senior executives and its industry expert testified – simply not necessary to protect FQT's proprietary interests in its intellectual property or other confidential information.  The testimony of the FQT witnesses and the breadth of the clause itself undercut fundamentally the first gateway inquiry:  whether the scope of the clause is *necessary*

to protect a legitimate interest.  Mr. Damaghi's, Mr. Oppenheim's and Mr. Christiansen's testimony make it plain that that question can be only answered "No."

### 3.    Article 23 is Overbroad in Other Dimensions As Well

Even if one were to overlook the acknowledged overbreadth/redundancy of Article 23 from the standpoint of protection of intellectual property rights, and assume that something of the sort were necessary as a threshold matter, the clause is also drafted far too broadly to reasonably protect any cognizable FQT interest.   These infirmities alone present independent bases on which the clause should be struck down.  In granting summary judgment, the court in *Baker's Aid II*, made it plain that a restrictive covenant can be "no larger than necessary to protect legitimate business interests of [the plaintiff]."  730 F. Supp. at 1214 (citing *Hodge v. Sloan,* 107 N.Y. 244, 17 N.E. 335 (1887)); *Stringer v. Herron*, 309 S.C. 529, 532, 424 S.E.2d 547, 548 (Ct. App. 1992) (restriction is "reasonable" if it covers only area "*necessary* to protect the [enforcing party's] legitimate interest") (emphasis added).

### a.   Article 23 Bars Sales That, FQT Admits, Are of No Interest to FQT.

Article 23 prevents sales that FQT readily admitted it had no interest in preventing.  That is the very antithesis of being "no larger than necessary to protect legitimate business interests." For example, Article 23(A) bars the *sales* of TAD machines and the *sales* of TAD machine components within the Territory.  It also bars *deliveries* of TAD machines and TAD machine components within the Territory.  FQT, however, readily admitted that it is interested in banning only deliveries, not sales.  When asked whether FQT would be concerned with a sale to a customer within the Territory, provided the machine was to be delivered outside the Territory (*e.g.*, in Brazil), Mr. Damaghi explained that as long as the delivery is outside the Territory, FQT has no concern with a sale within the Territory:

Q.     Under this provision 23(a), could Metso book an order and enter into a sales agreement with a company based in Mexico if that company wanted to put the TAD machine outside of Mexico, further south than South America, say, in Brazil?

****

Q.     Metso makes the sale to the customer in Mexico, enters into an agreement with the customer in Mexico, but the customer wants the actual plant built in Brazil.

A.     If the plant is in Brazil, First Quality does not have any issue with that.

Q.     So really what First Quality cares about is where is the plant?

A.     Yes.

Q.     So really it's just where is it delivered?

A.     Yes.

*****

Q.     …[A]s long as Metso complied with everything else in the agreement, would a sale to a customer anywhere in North America violate 23(a) so long as the plant is delivered outside of North America? . . .

A.     Outside of the territory?

Q.     Yes.

A.     We – First Quality wouldn't have any issue with that.

(Damaghi Dep. at 228:20-232:10).  In short, FQT admits that its only concern is where the machine is <u>delivered</u>, but the Contract on its face precludes Metso from selling machines to U.S. purchasers even if the delivery would be in Europe or South America.  The entire prohibition on "sales" within the Territory is acknowledged by FQT to be irrelevant to it.  By FQT's own admission, the restriction on sales (as opposed to deliveries) serves no purpose at all.  This alone is ample basis for holding Article 23(A) unenforceable.

**b.  FQT Has No Interest In Restricting Sales and Deliveries of Standard TAD Machines or TAD Components or Automation Systems That Are Not Even On Its Equipment**

24

Article 23 is also unenforceable because it (i) restricts sales and deliveries of TAD components and automation systems that are not a part of FQT's machine or its automation system, and (ii) restricts Metso from selling its standard TAD machines and components. As Mr. Oppenheim, FQT's counsel confirmed, Article 23 prohibits the sale and delivery of standard Metso TAD components, even when those components are not a part of the machinery that FQT purchased from Metso. (Oppenheim Dep. at 106:21-107:17; 214:18-215:9). And, it also prevents the sale and delivery of Metso's standard automation equipment, even when that equipment is not a part of the automation system sold to FQT. (*Id.*) Its text refers to "complete TAD machines" and applies to Metso's standard TAD machine in addition to the unique TAD machine FQT purchased from Metso.

Like the plaintiff in *Baker's Aid II*, FQT has no interest in restricting the sale of all TAD machines, even Metso's standard TAD machine. FQT's expert witnesses could not identify any protectable FQT interest in preventing sales and deliveries of equipment that it did not purchase from Metso. Mr. Christiansen's testimony on this point was plain:

> Q.     * * * So if someone is building a new TAD facility in the United States and they're getting a machine from Andritz, and the person they've hired to do it has come from one of the big players who used to work with Metso's TAD equipment, and in the course of building this new facility he wants to buy a TAD component from Metso and it happens to be a TAD component that's not even used at the FQT facility, that would – FQT doesn't have any legitimate interest in stopping the sale of that TAD component, does it?

> MR. EWING:
>     Object to the form.

> EXAMINATION RESUMED BY MR. PARR:
>     You may answer.

> A.     I don't know because of the hypothetical question.
> Q.     Well, experts answer hypothetical questions.
> A.     The answer is I guess if it has nothing to do with that machine, then there is no problem.

(Christiansen Dep. at 44:3-24)

> Q.    … Someone is building a new TAD facility in the United States and they have chosen to buy a machine from Andritz, and they decide they want to use the Metso hardware for automation.  FQT has no reason to be concerned about Metso selling that, do they?
>
> A.    I don't think so.
>
> Q.    And if someone is building an Andritz machine and they decide they want to get one of the TAD reels that's one of the Metso's stock TAD reels, not one specially designed for FQT but just a stock one, FQT has no reason to be concerned about that, do they?
>
> A.    I don't think so.

(Christiansen Dep. at 46:2-15).  Article 23(A), in barring sales and deliveries of standard TAD machines as well as TAD components that are not even on FQT's TAD machines, is anything but narrowly tailored to protect a  legitimate interest.  For that reason alone, Article 23(A) is unenforceable under both New York and South Carolina law.  *See, e.g.*, *Cafe Assocs.*, 305 S.C. at 9, 405 S.E.2d at 164; *Baker's Aid II*, 730 F. Supp. at 1214.

### c.    Article 23 Bars Transactions in the Far Reaches of Canada, the United States Territories in the Caribbean, the United States Territories in the South Pacific and the Southern Extremes of Mexico, Although FQT Can Articulate No Legitimate Interest in Preventing Sales or Deliveries in Any of Those Places

FQT has also admitted that the provision is geographically far broader than is necessary to protect its legitimate interest.  Its conceded geographical overbreadth alone requires the court to invalidates the restriction here.   The Fourth Circuit made clear *Lampman v DeWolff Boberg & Assocs., Inc.,*  319 Fed. App'x 293(4th Cir. 2009) that "[t]o be considered reasonable, **a territorial restriction must not cover an area any broader than is necessary**" to protect the interest involved.  *Id.* at 302 (emphasis added).  In *Lampman,* the Fourth Circuit found a restrictive covenant invalid because it "would prohibit [the defendant] from working for a

'competitor' in Zimbabwe, even though [the plaintiff did] not provide services in that country and [had] no legitimate interest in prohibiting [the defendant] from working there." *Id.*

The clause here bars sales and deliveries throughout the United States, as well as in all of Canada and all of Mexico. Mr. Damaghi admitted that FQT sells only a few truckloads of TAD products in Mexico and Canada. (Damaghi Dep. at 120:6-16; 121:21-122:4). He admitted that no one "in their right mind would put their plant" in northwestern Canada. (*Id.* at 112:22-113:1). He also admitted that FQT had never considered putting a plant in either Canada or Mexico (*Id.* at 107:8-14; 112:14-16; and 113:15-114:8). And Mr. Crownover admitted that FQT had not sold any tissue at all in Mexico since 2009, and that he did not believe that they had ever sold or even called on any customer south of Mexico City. (Crownover Dep. at 30:3-21; 236:14-19).[16] Similarly the sales to Canada have been miniscule, and limited to eastern Canada.

Moshe Oppenheim, testified that the restrictions reach even the territories and possessions of the United States. Mr. Oppenheim testified:

Q. If Guam is part of the United States, is a sale and delivery in Guam prohibited?

A. If you're asking me another hypothetical about a sale, if there was a sale to any part of the United States during the limitation period, within the territory, which would include any part of United States, and it did not fall within the exceptions, the answer is yes.

Q. So any part of United States includes the 50 states, the District of Columbia, territories and possessions?

A. Any part of United States, yes, sir.

---

[16] As regards Mexico, in FQT's contract to buy TAD machines from Andritz only the area north of Mexico City was included in the restricted Territory. (*See* Deposition of Moshe Oppenheim (Attorneys' Eyes Only) March 1, 2012 ("Oppenheim AEO Dep.") at 62:18-63:3). FQT offers no rationale for expanding in its contract with Metso the territory as regards Mexico. Indeed, including any of Mexico is uncalled for due to all the reasons set forth above.

(Oppenheim Dep. at 134:16-135:5).[17] FQT's industry expert's testimony made it plain that FQT had no interest in restricting sales or deliveries in the United States territories such as Guam. Mr. Christiansen testified:

> Q. Now, if somebody was – if someone decided to have a TAD plant in Guam and they wanted to buy a machine from Metso, FQT has no reason to worry about that, do they?
>
> MR. EWING:
>     Object to the form. You can answer.
>
> [MR. CHRISTIANSEN]:
>     I don't see why.

(Christiansen Dep. at 46:16-23).[18] The same concession would apply to other Pacific territories of the United States, such as American Samoa and the Northern Mariana Islands, that are included in the Territory subject to Article 23(A)'s restriction.

Whether the unwarranted geographic scope is just Zimbabwe, or is northwestern Canada and/or Guam, and/or southern Mexico, the Fourth Circuits's opinion in *Lampman* makes clear that this acknowledged overbreadth, standing alone, is a basis for invalidating Article 23(A) as a matter of law. *Baker's Aid II also* makes clear that, under New York law, where a more narrowly tailored provision adequately protects the legitimate interest, the overly broad provision will be unenforceable as a matter of law. 730 F. Supp. at 1215-16. South Carolina state courts have similarly confirmed that a territorial restriction is "reasonable" only if it is limited to the area "*necessary* to protect the [enforcing party's] legitimate interest." *Stringer v. Herron*, 309

---

[17] In response to Metso's Requests for Admissions, FQT admitted that it did not do business in Hawaii or Alaska. FQT later tried to change its response and claim that it did business in those states. However, admissions can be changed only by court order, Fed. R. Civ. P. 36(b), and FQT has never sought a leave to retract its admissions.

[18] Notably, in the Andritz contract, which contained the antecedent to Article 23, the Territory is limited to the "Continental United States." When questioned about the coverage of Article 23, Moshe Oppenheim, FQT's counsel during the negotiation of Article 23, testified that in Article 23 the "United States" means all of the 50 states, the District of Columbia and the territories and possessions of the United States. (Oppenheim Dep. at 134:14-135:5).

S.C. at 532, 424 S.E.2d at 548.  Therefore, even if a fact-finder could reasonably believe FQT

that this action is about protecting confidential information, the undisputed facts show that the

restrictions in Article 23(A) go well beyond what is even arguably necessary to protect that

information.

> **C.      Even if the Restrictive Covenant Had a Legitimate Purpose, FQT Will
> Suffer No Damages From the Sale**

FQT's permanent injunction claim also fails as a matter of law on the entirely

independent basis that the undisputed evidence reveals that Clearwater could have obtained a

TAD machine from one of Metso's competitors, and, therefore, Metso's sale of a TAD machine

to Clearwater will not damage FQT.

To obtain a permanent injunction, a plaintiff "must satisfy a four-factor test before a court

may grant such relief.  A plaintiff must demonstrate:  (1) that it has suffered an irreparable

injury; (2) that remedies available at law, such as monetary damages, are inadequate to

compensate for that injury; (3) that, considering the balance of hardships between the plaintiff

and defendant, a remedy in equity is warranted; and (4) that the public interest would not be

disserved by a permanent injunction."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391

(2006).  In this case, the Court need go no further than the first factor because FQT's admissions

make it clear that the Clearwater sale will not cause any injury at all to FQT.

In short, FQT not only cannot demonstrate that it was irreparably harmed, it also cannot

show that it was harmed at all.  Metso is not the only manufacturer of TAD machines.  In fact,

"[s]everal leading companies, including the Andritz Group and Toscotec SpA manufacture and

sell competing TAD machines." (Expert Witness Report of Frederic A. Christiansen, p. 15).  In

his deposition, Mr. Damaghi acknowledged that "[FQT's] [c]ompetition has other choices if they

want to get into – they – the TAD business."  (Damaghi Dep. at 150:5-7; *see also* Christiansen

Dep. at 49:5-12).  Accordingly, FQT could have purchased a TAD machine from any one of Metso's competitors.  FQT's expert, Mr. Christiansen, confirmed: "Clearwater is free to pursue any of these options without running afoul . . . of Article 23."  (Expert Witness Report of Frederic A. Christiansen, p. 15-16).

Thus, to the extent FQT claims that Clearwater will take FQT sales by obtaining a TAD machine, FQT would lose those sales regardless of whether Clearwater bought its machine from Metso or from someone else.  Indeed, FQT knew that Clearwater was planning to open a TAD tissue facility in Shelby, North Carolina, before FQT signed the Contract with Metso for its second Anderson TAD machine.  (*See* Damaghi Dep. at 133:3-135:3).  And FQT cannot claim that the competitive threat from Clearwater operating a Metso machine would be any greater than from Clearwater operating an Andritz machine.  FQT has acknowledged that it expects that the product it manufactures at its Lock Haven facility on Andritz machines to be indistinguishable from the product made in Anderson on Metso machines.  (Damaghi Dep. at 84:2-19; Crownover Dep. at 237:11-17).  And Mr. Crownover candidly acknowledged that he knew of no difference between the competitive threat that Clearwater would pose to FQT with a Metso machine as opposed to an Andritz machine.  (Crownover Dep. at 281:14-282:8).  Thus, as Clearwater will have no advantage from having a Metso as opposed to an Andritz TAD machine, FQT is not suffering any damage.

Finally, even if, in light of all of the foregoing testimony, FQT could plausibly claim it would lose more sales as a result of Clearwater having a Metso machine as opposed to an Andritz machine, it still would have no irreparable injury justifying a permanent injunction. Assuming FQT would actually lose some amount of sales, it has provided no evidence to suggest that the amount would be incalculable or that monetary damages would otherwise be inadequate.

Without that evidence, FQT cannot obtain the extraordinary remedy of a permanent injunction as a matter of law. *See Prudential Sec. v. Plunkett*, 8 F. Supp. 2d 514, 519 (E.D. Va. 1998) (finding no irreparable injury where the only injury a plaintiff would suffer from the breach of a non-compete agreement would be the loss of customer accounts to a competitor, because this injury could be adequately compensated by monetary damages).

## IV.    CONCLUSION

For the foregoing reasons, Defendant requests that the Court grant Defendant's Motion for Summary Judgment.

Dated:  March 27, 2012                    Respectfully submitted,


s/Henry L. Parr, Jr.
Henry L. Parr, Jr. (02984)
David H. Koysza (09893)
WYCHE, P.A.
44 East Camperdown Way
Greenville, South Carolina 29601
Telephone: (864) 242-8209
Facsimile:  (864) 235-8900
Email:hparr@wyche.com; dkoysza@wyche.com
*Attorneys for Defendant Metso Paper USA, Inc.*


*Of Counsel*

Michael Evan Jaffe
Deborah B. Baum
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, N.W.
Washington, D.C.  20037-1122
Telephone: (202) 663-8000
Facsimile:  (202) 354-5261
Email: mjaffe@pillsburylaw.com; deborah.baum@pillsburylaw.com

Jason S. Bell
Smith, Gambrell & Russell, LLP
Promenade II, Suite 3100
1230 Peachtree Street N.E.
Atlanta, GA  30309-3592
Telephone:  (404) 815-3619
Facsimile:   (404) 685-3619
Email:  jbell@sgrlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 27 day of March 2012, I caused to be served by hand-delivery to counsel for FQT at the Womble Carlyle Sandridge & Rice, PLLC law firm and electronically filed the foregoing Metso Paper USA, Inc.'s Motion for Summary Judgment and the accompanying Memorandum in Support and Affidavits with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Samuel W. Outten, Esq.
Catherine R. Atwood, Esq.
Megan Hanley Baer, Esq.
WOMBLE CARLYLE SANDRIDGE & RICE
A Professional Limited Liability Company
550 South Main Street, Suite 400
Greenville, SC  29601
soutten@wcsr.com
catwood@wcsr.com
mbaer@wcsr.com

Michael A. Brille, Esq.
Neal C. Hannan, Esq.
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Suite 800
Washington, D.C.  20015
mbrille@bsfllp.com
nhannan@bsfllp.com

*Attorneys for First Quality Tissue SE, LLC*

Beattie B. Ashmore, Esq.
BEATTIE B. ASHMORE P.A.
650 E. Washington Street
Greenville, SC  29601
beattie@beattieashmore.com

Jeffrey S. Cashdan, Esq.
Sarah E. Statz, Esq.
King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, GA  30309
jcashdan@kslaw.com
sstatz@kslaw.com

*Attorneys  for Clearwater Paper Corporation*

s/Henry L. Parr, Jr.
Henry L. Parr, Jr.