**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ANDERSON DIVISION**

First Quality Tissue SE, LLC,

                Plaintiff,

vs.

Metso Paper USA, Inc.,

                Defendant,

and

Clearwater Paper Corporation,

                Defendant-Intervenor.

C.A. No. 8:11-cv-2457-KFM

**FIRST QUALITY TISSUE SE, LLC'S**
**OPPOSITION TO MOTION FOR**
**SUMMARY JUDGEMENT**

## I.      INTRODUCTION

On two separate occasions, as part of two separate contracts, Metso Paper USA, Inc. ("Metso") negotiated and agreed to the contractual provision at issue in this lawsuit. Metso did so because it was well aware that First Quality Tissue SE, LLC ("First Quality") would not have risked over $100 million to purchase two Thru-Air Dried™ ("TAD") tissue machines from Metso without it. Not once during the negotiations over that provision did Metso hint that it thought the provision was in any way overbroad or unreasonable, let alone unenforceable. To the contrary, Metso senior executives actively participated in its drafting and negotiated for several exceptions that, as Metso's witnesses admit, allow Metso to continue to conduct significant business throughout the limited time the provision is in effect, including with all existing clients and with the four tissue and towel manufacturers who comprise more than 80% of the North American TAD market.

The purpose and effect of Article 23 was to limit Metso's sales of TAD machines in North America only for a limited period of time and only with respect to those companies to whom Metso had *not* previously sold a TAD machine, and even then with an exception for "one but only one specific potential customer." Nevertheless, within months of finalizing its agreements with First Quality, Metso sold complete TAD machines to two new TAD customers, Clearwater Paper Corporation ("Clearwater") and K.T.G. (USA) LP ("Kruger"). It is the sale to Clearwater that is the subject of this lawsuit.

Metso seeks to avoid a trial in this matter by arguing that the very provision to which it agreed in persuading First Quality to partner with Metso is unenforceable as a matter of law, an argument premised upon a straw-man mischaracterization of First Quality's rationale for seeking Article 23. In its motion, Metso repeatedly defines the business interests that First Quality sought to protect with Article 23 as limited to: (i) the protection of intellectual property, and (ii) ensuring access to Metso's limited resources. *See* MSJ at 6. From this false premise, Metso goes on to argue that Article 23 is unnecessarily overbroad — principally because, Metso argues, other contractual provisions sufficiently address these interests – and thus should be struck down by the Court as violating public policy.

Metso's argument fails because it ignores First Quality's primary business interest in wanting Article 23, which was to provide a limited period of time during which First Quality could implement its substantial and strategic capital investment that *doubled* its manufacturing capacity with state of the art technology to bring premium-quality tissue products to value consumers. It is undisputed that no private label manufacturer had ever made a commitment to TAD technology on the scale that First Quality did with Metso. Throughout negotiations, Metso understood and assured First Quality that not only did Metso expect to be unable to serve

multiple first-time customers for its TAD machinery, but that it would agree to contractual limitations on sales to new customers while it worked with First Quality to bring this new capacity fully on line. First Quality relied on these commitments when it agreed to retain Metso as its process and machine technology supplier for its new facility in Anderson, South Carolina.

Metso's position that Article 23 is unenforceable because its sole purpose is to limit competition (MSJ at 6) is contrived for this litigation and a belated attempt to re-write history. It is also the exact same argument Metso proffered in its failed motion to dismiss. First Quality has never argued that it sought to limit competition in the North American tissue and towel market. Nor would First Quality be able to do so, considering that it has a market share of less than 5%. Metso's attempt to reframe First Quality's legitimate business reasons for seeking the protections of Article 23 as an unlawful desire to limit competition is false and based on selective excerpts of legal briefings. To the contrary, First Quality's legitimate business purpose was clearly explained in its preliminary injunction papers and, since then, numerous First Quality witnesses have fleshed out this concept and explained its importance.

As this Court noted during the hearing on Metso's motion to dismiss, limiting competition is not improper "in and of itself." Rather, the relevant inquiry is whether Article 23 is reasonable in light of business interest it seeks to protect. Metso's false characterization of First Quality's purposes for wanting Article 23 is no basis for summary judgment, particularly when a more complete record reflects that those business purposes were far more complex, multi-faceted, and aimed at preventing *unfair* competition. The evidence will show that not only is Article 23 aimed at *unfair* competition, but that the result of First Quality's business strategy has been to *increase competition* by expanding the market, improving the quality of private label products, and providing consumers with more (and more affordable) choices.

3

Having ignored the primary business purpose behind Article 23, Metso falls back on arguments that Article 23 is purportedly overbroad in other ways, including, most notably, geographically. Those arguments are equally without merit. First Quality has provided an abundance of evidence (including sales data) proving that the geographic scope is reasonable and no broader than necessary to protect First Quality's business interests. Metso fails to mention any of this evidence; rather, its arguments depend entirely on a narrow view of selective portions of the record and flawed legal analysis. None of Metso's arguments, however, provide a basis for the Court to strike down Article 23 as overbroad, particularly on the eve of trial, when a complete record will be presented to the Court. For these reasons, and as explained in greater detail below, Metso's motion for summary judgment should be denied.

## II.    FACTUAL BACKGROUND

### A. *Metso's Sale of Tissue Machines*

Metso is the wholly owned subsidiary of Metso Corporation, a global conglomerate with roughly $8.86 billion in sales during 2011. Metso is essentially the North American sales arm for its European affiliates, which produce a variety of tissue making machines. *See* Decl. of Donald Beaumont at ¶ 3, Doc No. 52-1.

The vast majority of Metso's sales consist of conventional tissue machines, which Metso witnesses have estimated to comprise anywhere from 60% to 90% of Metso's overall sales. Deposition of Donald Beaumont ("Beaumont Dep.") at 109:6-18, excerpts of which are attached as Exhibit A; Deposition of Marco Marcheggiani ("Marcheggiani Dep.") at 72:1-14, excerpts of which are attached as Exhibit B; Deposition of Jan Larsson ("Larsson Dep.") at 149:12-24, excerpts of which are attached as Exhibit C. Article 23 imposes no restrictions upon Metso's sales of conventional methodologies such as these, which are the mainstay of Metso's business.

4

Metso also sells TAD machines, which do fall within the scope of Article 23. The technology of a TAD machine is superior to that of conventional machines in that product produced by TAD machines is softer and more absorbent. Ludovina Decl. at ¶5, Doc. No. 63-2. For Metso, the sale of a TAD machine is much less common than a conventional machine. In addition to being far more expensive and requiring more resources, the manufacture and installation process is long and complicated and that takes years of coordination and cooperation between supplier and customer to complete. *See* Larsson Dep. at 61:14-62:9, Ex. C. For these reasons, Metso historically has sold, on average, one TAD machine per year, all but one of which were sold to Kimberly Clark, Procter & Gamble and Georgia Pacific, three of the four largest tissue and towel manufacturers in North America. *See id*. at 61:23-62:9, Ex. C; Marcheggiani Dep. at 84:10-18, Ex. B; Metso Prior Sales Chart, attached as Exhibit D. Here again, Article 23 imposes no restrictions upon such sales.

### B. First Quality's Business Strategy as a Private Label Supplier

First Quality manufactures what are commonly referred to as "private label" tissue and paper towel products that compete under retailers' store brand names against the well-known (and heavily marketed) national brands, such as Charmin bathroom tissue and Bounty paper towels. Ludovina Decl. at ¶ 3, Doc. No. 63-2. Historically, these nationally branded products were manufactured and sold in North America by Procter & Gamble, Kimberly-Clark and Georgia Pacific. Those nationally branded products have tended to be TAD products, and therefore have tended to be of higher quality and higher price. Together, these three suppliers dominate the North American tissue market, comprising over 80% of retail sales. *See* Ludovina Decl. at ¶¶ 6-8, Doc. No. 63-2; Beaumont Dep. at 74:18-22, 87:14-88:2, Ex. A; Larsson Dep. at 64:12-65:22, 92:16-20, Ex. C.

Private label products, in contrast, although less expensive, have tended to be of lesser quality because they were manufactured principally with conventional tissue manufacturing machines or machines that produced only partial TAD products. *See* Ludovina Decl. at ¶¶ 6-8, Doc No. 63-2. Historically, this was true because acquiring state-of-the-art TAD manufacturing capacity was an enormously expensive and complex undertaking and one that only the largest brand name manufacturers were willing to risk. Consequently, before First Quality entered the market in 2005 with the first fully-TAD private label product for national retailers, private label manufacturers produced lower quality conventional products on a largely regionalized level. *Id.* at ¶ 5.

First Quality was the first private label manufacturer to enter the market with private label premium 2-ply TAD tissue and towel products. Those products were designed for sale by major national retailers to compete nationally with the major branded products. Deposition of Kambiz Damaghi ("Damaghi Dep.") at 24:15-25:13, 48:10-16, excerpts of which are attached as Exhibit E. As First Quality's Expansion Manager, Frank Ludovina, has explained:

> FQT conducted extensive analysis and determined that FQT could structure its business in such a way so as to utilize the higher technology of the brand name suppliers, namely TAD technology, and apply it to a private label marketing strategy. Previously, it was unheard of for a private label manufacturer to make the significant capital costs associated with acquiring TAD technology. However, FQT determined a strategy to utilize the TAD technology in the context of private label tissue products, thereby increasing competition for private label products.

Ludovina Decl. at ¶ 6, Doc. No. 63-2; *see also* Deposition of Frank Ludovina ("Ludovina Dep.") at 24:19-27:18, excerpts of which are attached as Exhibit F; Deposition of Scott Crownover ("Crownover Dep.") at 216:2-217:12, excerpts of which are attached as Exhibit G; Damaghi Dep. at 46:12-48:9, Ex. E; Larsson Dep. at 41:9-42:6, Ex. C (acknowledging that, prior to First

Quality, no private label manufacturer had produced a 2-ply premium TAD tissue or towel product).

As First Quality's President explained at his deposition, the idea was to attract the customer through a high quality premium product but at a lower price, thereby providing a real value to consumers. Damaghi Dep. at 24:15-25:13, Ex. E. Indeed, Metso's own expert witness has acknowledged that Procter & Gamble, Kimberly-Clark, and Georgia Pacific are "FQT's largest competitors in the TAD tissue and towel markets." Perkowski Report at 17 and n. 49, excerpts of which are attached hereto as Exhibit H. Thus, First Quality's strategy was to do what no private label manufacturer had ever done: to compete head-to-head, on a national scale, by providing a product that is comparable to, but less expensive than the nationally branded products. In this way, First Quality's competitive advantage would be to fill the quality gap that existed between private label and branded products, but at *lower* prices, thereby increasing the options available to the consumers of those products.

Not only was First Quality dedicated to bringing a higher quality private label product to market, it did so on a scale that was previously unheard of in the industry. First Quality has devoted an enormous amount of time, money and resources to this concept. Since 2004, First Quality and its Pennsylvania affiliate have spent over $1.2 billion investing in premium TAD private label tissue and towel products. First Quality has spent over $600 million to date on the Anderson facility alone.

First Quality's strategy was not only to bring a higher quality private label product to market but to supply these products throughout North America, a strategy that no private label manufacturer had ever successfully implemented. Historically, tissue and towel manufacturers operated under a "rule of thumb" limiting delivery of their products to anywhere from 300 to

1,000 miles from a manufacturing facility.  Perkowski Report at 13-14, Ex. H; Beaumont Decl. at ¶ 5, Doc. No. 52-1.  First Quality, however, "has a markedly different business strategy.  Its goal has been to pursue the business wherever it may be....  Accordingly, FQT has invested significant resources in developing the private label market for these products on a national level."  Ludovina Decl. at ¶ 8, Doc. No. 63-2.  Thus, Metso cannot dispute that First Quality currently and regularly ships products to large retailers nationwide, as well as to Canada and Puerto Rico, from its facility in Lock Haven, Pennsylvania.  *Id.* at ¶ 7.  The Anderson facility will take – and has begun taking – this same approach.  *Id.*

Prior to implementing this plan, First Quality was told repeatedly by industry veterans that 2-ply TAD tissue and towel products could not be shipped beyond 1,000 miles and that "this is the way the industry has to work."  Crownover Dep. at 229:16-17, Ex. G.  First Quality, however, refused to accept this proposition.  Instead, it "built a model that works, with a premium private label product that fits in many marketplaces, that other experts that have been in the business that had a paradigm, and [it] shifted that paradigm.  [First Quality] shifted it with two-ply paper towels, [it] shifted it with premium bathroom tissue, and [it] shifted it with the zone.  And [it] ha[as] been very effective [at] doing [that.]"  *Id.* at 229:12-18.

### C.  *Contract Negotiations Between First Quality and Metso*

First Quality decided to take the risk and undertake this aggressive strategy notwithstanding the fact that it was, and still is, a relatively small player in the overall North American market tissue and towel product markets.  According to Metso's own expert, First Quality is just "a second-tier company with a U.S. market share of less than 2%."  Perkowski Report at 10, Ex. H.  First Quality's new business strategy was successful enough, however, that it soon encountered problems meeting customer demand.  Thus, soon after launching its first

TAD facility in Pennsylvania, First Quality began talks with Metso about expanding to a second facility, which was eventually located in Anderson, and thereby essentially *doubling* its existing manufacturing capacity.    Metso aggressively pursued this new business with First Quality, proposing that the parties enter into what Metso repeatedly referred to as "full partnership" together.  *E.g.*, October 2007 Presentation at 5, attached as Ex. I; *see also* Marcheggiani Dep. at 38:16-18, Ex. B; Marco Marcheggiani email dated Dec. 21, 2007, attached as Ex. J.

First Quality carefully outlined its business strategy, objectives and requirements to Metso.  In considering whether to partner with Metso, First Quality asked that Metso explain how it could help First Quality meet these business objectives and ensure that its strategy was successful.   On June 4, 2007, Metso's senior management, at the direction of its President, responded to First Quality with an email that laid out the commitments, resources and experience that Metso would bring to the table.  Metso explained that it was "strategic that Metso develop a business relationship with FQT and support FQT in the development of TAD products for North America."  Don Beaumont email dated June 4, 2007, attached as Exhibit K; *see also* Marco Marcheggiani email dated June 4, 2007, attached as Exhibit L.  Metso assured First Quality that it was "prepared to invest in this relationship with FQT as a long term partnership, and give FQT priority in allocation of resources and capacity for TAD equipment and process development."  Beaumont June 4, 2007 email, Ex. K.  Metso then set forth the basic framework for what eventually became Article 23.  *See id.*

First Quality was concerned about the substantial risk of making such a large and complex expansion into TAD technology, particularly with the purchase of two TAD machines almost simultaneously.  First Quality expended significant time, resources and money and took on unprecedented risk developing its strategy and determining that Metso was the appropriate

partner to help make that strategy successful.  First Quality understood that other private label manufacturers could recognize the viability of First Quality's strategy and seek to ride on First Quality's coattails by emulating that strategy quickly *with Metso* at the same time that Metso was supposedly committed to helping First Quality double its existing capacity.  Article 23, therefore, was designed to protect against this possibility, while still affording Metso the ability to continue serving its existing customers.  First Quality would not have entered into any serious commercial or technical discussions with Metso had it not been for the assurances, promises and commitments made to First Quality by Metso's senior management, as evidenced in this email.

Metso believed First Quality to have "high potential to develop into a major producer of TAD quality tissue in NA [North America]" despite First Quality's relatively small size. October 2007 Presentation at 11, Ex. I.  Metso therefore offered to treat First Quality not as a typical new customer, but rather as Metso treated the major branded TAD producers with whom it had long-term relationships and sole supplier status.  This meant that Metso would give First Quality "priority in terms of resources, engineering, manufacturing or service personnel for instance."  Larsson Dep. at 87:10-88:5, Ex. C; *see also* Beaumont June 4, 2007 email, Ex. K; October 2007 Presentation at 11, Ex. I ("FQT would have priority in allocation of Metso resources and capacity for TAD equipment, process development and services."); Jan Larsson email dated Dec. 21, 2007, attached as Ex. M ("FQT would be serviced by Metso as an established Big 3 TAD producer, thereby *limiting Metso's capacity for other new entries in the NA [North American] market*.") (emphasis added).

The rationale for offering such a prioritization to First Quality was that, if Metso were to sell a TAD machine to First Quality, when combined with Metso's ongoing business with the Big Three producers, Metso was likely to face tightened resources and therefore have limited

capacity for taking on any other new customers.  Larsson Dep. at 102:12-24, 114:10-16, 115:16-116:2, 128:13-129:25, 130:10-20, 146:1-11, Ex. C.  Metso told First Quality that, as a result of any deal with First Quality, it "*would* _expect_ *not to have capacity to serve [other] entry level TAD technology customers in NA [North America]*."  October 2007 presentation at 11, Ex. I (emphasis added).  As one Metso senior executive explained, "I mean we're trying to convince FQT to do business with Metso and then you're saying to FQT, offering [to] FQT we will treat them in the same way as our big established current TAD customers with the same priority as those existing TAD customers.  And then we might not have the capacity to serve other entry level TAD customers."  Larsson Dep. at 146:1-11, Ex. C.

Throughout negotiations, Metso repeatedly acknowledged its understanding of First Quality's concerns about the risk it was taking and expressed its willingness to provide FQT with "a contractual statement to this effect," although this "'exclusivity agreement' would exclude current businesses with major TAD customers and commitments existing before entering into an FQT agreement."  *Id*.; *see also* Beaumont June 4, 2007 email, Ex. K; Larsson Dep. at 115:16-116:2, 128:13-129:25, 133:13-134:18, Ex. C.  Every Metso witness involved in the negotiations has affirmed his understanding that First Quality would not have bought two TAD machines from Metso without the protections of Article 23.  Beaumont Dep. at 57:9-19, Ex. A; Deposition of Tony Auffant ("Auffant Dep.") at 23:5-19, excerpts of which are attached as Exhibit N; Marcheggiani Dep. at 133:14-18, 134:8-12, 137:1-4, Ex. B.

Consistent with Metso's sales presentations, the parties mutually negotiated Article 23 with broad exceptions that allow Metso to continue to sell to what Metso has termed the "Big Four" TAD producers,[1] *plus* any existing customers to whom Metso had sold TAD machines,

---

[1] In prior filings, Metso's lawyers coined the phrase the "Big Four" to reference one of the exceptions to Article 23. This exception allows Metso to continue to sell TAD machines to Procter & Gamble, Kimberly-Clark and Georgia

*plus* "one but only one" specific unnamed existing customer for which Metso could demonstrate having previously made substantial sales efforts. In effect, these exceptions allow Metso the opportunity to continue doing business with its core customers during the short limitation period. *See*, *e.g.*, Beaumont Dep. at 36:19-37:2, Ex. A, Metso Prior Sales Chart, Ex. D. It is undisputed that Article 23 applies only to Metso, and therefore does not restrict the ability of any other TAD machine manufacturer to sell and deliver TAD manufacturing equipment to Clearwater or any other tissue or towel manufacturer in any way for any period of time.

### D. *Other Private Label Manufacturers Seek To Replicate First Quality's Business Strategy*

The record evidence shows that First Quality's concerns were well founded. Metso's industry expert, Frank Perkowski, revealed at his deposition that, *prior* to Clearwater having entered into discussions with Metso, Clearwater hired him for the specific purpose of studying First Quality's business model, and to look in particular at the "profitability, viability and potential of the First Quality private label tissue business." Deposition of Frank Perkowski ("Perkowski Dep.") at 52: 8-15, excerpts of which are attached as Exhibit P.

Mr. Perkowski provided Clearwater with a detailed analysis of First Quality's business model, entitled "Competitive Assessment of First Quality." FQT Competitive Analysis, attached as Exhibit Q. This analysis bears out what First Quality witnesses have stated regarding its innovative business approach and concludes that First Quality is the "[l]eading private label supplier of premium tissue and absorbent products." *Id.* at 13. Mr. Perkowski noted that, at the time he issued the report, while First Quality and Clearwater "competed in the [private label]

---

Pacific, which are the major TAD manufacturers in the North American market. However, the exception also includes SCA, which is not one of the major manufacturers and indeed has no TAD presence in North America. *See* Larsson Dep. at 48:1-14, 157:25-158:4, Ex. C. Nevertheless, Metso pushed for the inclusion of SCA within this exception and, although First Quality was opposed, it eventually acquiesced. *See* Beaumont Dep. at 46:22-47:22, 201, Ex. A; Email from Donald Beaumont dated Nov. 25, 2009, attached as Exhibit O. For ease of reference, however, First Quality has adopted Metso's "Big Four" terminology when referring to this particular exception.

segment quite extensively, [Clearwater] competed with conventional tissue products which the market perceives to be *kind of not quite as good as TAD products* for certain applications." Perkowski Dep. at 49:23–50:2, Ex. P (emphasis added).  As a result, Mr. Perkowski reported that First Quality was "relatively unique in the marketplace" due to, among other things, its "premium product quality positioning" and "private label focus."  FQT Competitive Analysis at 4, Ex. Q.  The report notes that First Quality is "[c]ommitted to employing the best/[State Of The Art] technologies in a way that delivers unique features, benefits, and superior value to the consumer."  *Id*. at 13.

Mr. Perkowski concluded that "FQ strives to offer comparable performance on its products relative to major national brands while offering superior value to the customer and consumer.  We believe that the company does a good job of accomplishing this objective with TAD products that come close to matching premium branded performance levels (knowledgeable individuals [sic] that there is a performance gap) while offering both a lower price point and more square footage on the roll."  *Id*. at 6.  The report also observed that First Quality "has demonstrated a willingness to make relatively large investments, compete directly against larger, more established competitors, and enter established markets where it has little to no experience."  *Id*. at 21.

Unsurprisingly, on the heels of Mr. Perkowski's analysis, Clearwater decided to explore purchasing a TAD machine that would allow it to manufacture a full 2-ply TAD product, comparable to what First Quality was undertaking, and chose to follow in First Quality's footsteps by choosing Metso (First Quality's professed partner) as its supplier.  First Quality's concerns thus materialized when, soon after acquiring two TAD machines from Metso for its new Anderson facility, Metso profited from First Quality's risk (and subsequent success) by

selling TAD machines to Clearwater and Kruger, both of whom now seek follow First Quality's decision to contract *with Metso* to provide 2-ply TAD products on a private label basis.[2]

Metso executed a purchase contract with Clearwater for a TAD machine on November 22, 2010 – a mere five months after agreeing to the limitations in Article 23 in the contract for First Quality to purchase a second machine from Metso for the Anderson facility. Clearwater Contract, attached as Exhibit R. Metso likewise wasted no time in contracting with Kruger – holding a kick-off meeting on November 19, 2010, with the contract officially executed on January 12, 2011. Kruger Contract, attached as Exhibit S. Both contracts call for Metso to install a TAD machine in the United States before the limitations period of Article 23 has expired and well before it has fulfilled its obligations as to First Quality's Anderson facility.

## III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). "In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Highway Express v. Federal Ins. Co.*, 1994 U.S. App. LEXIS 5427, *9 (4th Cir. 1994); *see also Jones v. Hydro Conduit Corp.*, 2012 U.S. Dist. LEXIS 44769, *10-11 (D.S.C. 2012); *Moore v. Simpson*, 2011 U.S. Dist. LEXIS 100814, *13

---

[2] The significance of this report underscores why Metso's motion for summary judgment is not ripe and should not be entertained by the Court. The timing of this motion and Metso's request for a hearing a mere three weeks prior to trial would appear to be a large and unnecessary diversion of resources for all involved, including the Court. This is particularly so given the expedited nature of this case. In addition, because Metso filed its motion prior to the close of discovery, the motion is not ripe as there are a number of outstanding discovery issues remaining, including the upcoming deposition of Clearwater's Rule 30(b)(6) witness. Clearwater is currently refusing to answer <u>any</u> questions about the 2009 FQT Competitive Analysis (which First Quality found out about only during the deposition of Mr. Perkowski), characterizing it as irrelevant. Clearwater has asked the Court to issue a protective order prohibiting it from having to answer questions about this report during deposition. The FQT Competitive Analysis is clearly relevant, as this brief demonstrates. However, the fact that these issues have not yet been settled by the Court is further reason why summary judgment is inappropriate.

(D.S.C. 2011).[3]  Moreover, the party opposing the motion for summary judgment is entitled to have "his version of all that is in dispute accepted, [and] all internal conflicts…resolved favorably to him."  *Brewster of Lynchburg, Inc. v. Dial Corp.,* 33 F.3d 355, 361 (4th Cir. 1994) (quoting *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir. 1979)) (internal quotation omitted).  The Court must deny summary judgment if "the record as a whole could lead a reasonable trier of fact to find for the non-movant."  *Brock v. Entre Computer Centers, Inc.*, 933 F. 2d 1253, 1259 (4th Cir. 1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

## IV.    ARGUMENT

### A.  *Article 23 is Valid Because It is Reasonable*

Metso argues that Article 23 is overbroad in several aspects and, thus, cannot be enforced as a matter of law.  In assessing whether a restrictive covenant is valid, New York law, which governs both contracts between First Quality and Metso, follows the general approach of affording different levels of scrutiny depending upon the type of contract involved – i.e. whether it is  an employment contract, a contract for the sale of a business, or an ordinary commercial contract.  *Baker's Aid v. Hussmann Foodservice Co*., 730 F. Supp. 1209, 1213-14 (E.D.N.Y. 1990); *Schmidl v Central Laundry & Supply Co*., 13 N.Y.S. 2d 817, 823 (1939) ("[I]t is important to take into account the well-recognized distinction between covenants incidental to the sale of a business and covenants incidental to a contract of employment.").

Restrictive covenants in employment contracts are given rigorous examination because they can result in the loss of an individual's livelihood.  *Baker's Aid*, 730 F. Supp. at 1214 ("Because enforcement of employee restrictive covenants may result in the loss of an individual's livelihood, such covenants are 'rigorously examined' and enforced only to protect an employer

---

[3] Per Local Rule 7.05(A)(4), copies of all out of jurisdiction or unpublished cases are attached as Exhibit T.

from unfair competition stemming from -- among other things -- the disclosure of trade secrets.").  In contrast, covenants in the sale of a business are "*routinely enforced* to protect the goodwill paid by the purchaser."  *Id.*  (emphasis added); *see also Town Line Repairs, Inc. v. Anderson*, 90 A.D. 2d 517, 517 (N.Y. 1982).

Restrictive covenants found in ordinary commercial contracts, such as the one at issue here, are the least scrutinized and are analyzed – and routinely upheld – under a simple reasonableness standard.  *See Baker's Aid*, 730 F. Supp. at 1214 (upholding, in part, a ten-year covenant covering multiple countries); *see also Town Line Repairs, Inc. v. Anderson*, 90 A.D. 2d 517, 517 (N.Y. 1982).  Indeed, New York "courts have held that there are situations where it is not only desirable but *essential* to enforce restrictive covenants."  *National Elevator Cab & Door Corp. v. H & B, Inc.*, -- F.Supp.2d --, 2008 WL 207843, *9 (E.D.N.Y. 2008) (emphasis added).[4]

Under New York law, the reasonableness of a restrictive covenant in a commercial contract depends on: (1) the existence of a legitimate business interest; (2) the reasonableness of the covenant; and (3) the degree of hardship that enforcement would bring, bearing in mind the degree to which the party agreed to absorb such hardship when it executed the contract.  *See e.g.*, *Design Strategy Corp. v. Knack Systems, LLC*, No. 07-Civ-0395, 2007 WL 4562926, at *3 (S.D.N.Y. Dec. 18, 2007).  In terms of the first element, the existence of a legitimate business interest, the Court should weigh "the competing public policies in favor of robust competition and the freedom to contract."  *Id.*  As to the second element, New York law provides that a restrictive covenant is reasonable as long "there is a relationship between the scope of the

---

[4] As it has throughout this litigation, Metso cites repeatedly to South Carolina employment case law for the argument that Article 23 somehow violates a fundamental public policy of the State of South Carolina.  Without question, however, New York law controls interpretation of this contract.  Further, Metso never provides any suggestion as to how or why this ordinary commercial contract somehow runs afoul of a public policy of South Carolina. Given that the defendants have produced no evidence of any harm to the public, it is quite a stretch to suggest that the Court should strike down Article 23 as somehow violative of a fundamental public policy of South Carolina.

business of the company sought to be protected." *Markovits v. Venture Info Capital, Inc.*, 129 F. Supp. 2d 647, 659 (S.D.N.Y. 2001). In making this determination, courts look to whether the covenant results in harm to the market or to the general public, rather than harm to an individual competitor. *Enforceability of covenant against competition, ancillary to sale or other transfer of business, practice, or property, as affected by territorial extent of restriction*, 46 A.L.R. 2d 119. And finally, in terms of hardship on the parties, courts consider whether the party now seeking to invalidate the restriction agreed to it "with their eyes wide open, specifically agreed to bear the risk of that hardship and was paid fairly to do so." *DAR & Associates, Inc. v. Uniforce Services, Inc.*, 37 F.Supp.2d 192, 200 (E.D.N.Y. 1999).

Courts are also more likely to uphold a covenant as reasonable when "it is coupled with a specific-activity restriction within an industry or business which has an inherently limited client base." Am. Jur. 2d Monopolies, Restraints of Trade, Unfair Trade Prac. § 844. Here, the restricted client base is quite narrow. Article 23 limits Metso only with respect to the sale of TAD machines, which is a relatively rare occurrence for Metso – ordinarily occurring only once per year. Moreover, Article 23 permits Metso to continue selling TAD machines to the Big Four, to its existing TAD machine customers and to "one but only one specific potential customer." Thus, the only sales that are excluded are sales to a specific small subset of new customers. The narrowness of this restriction is highlighted by the fact that prior to First Quality and Metso agreeing to Article 23, all but <u>one</u> of Metso's prior sales of TAD machines in North America had been to one of the Big Three manufacturers. Metso Prior Sales Chart, Ex. D. In that light, the impact on Metso of Article 23 is quite reasonable and limited.

In this case, after stripping away Metso's mischaracterizations and hyperbole, the record shows, *inter alia*, that: a) First Quality had a legitimate business interest; b) the covenant is

reasonably tailored in terms of geographic scope and duration to satisfy that interest; and c) Metso will suffer no hardship that is not of its own making, because Metso entered the contracts with first Quality fully aware of the implications of Article 23 and decided it was in its best economic interest to agree to the restriction.[5]  As such, the restrictions in Article 23 easily satisfy the standard of reasonableness under New York Law.

### B.    Metso Both Ignores and Misrepresents the Legitimate Business Interests Protected By Article 23

#### 1.    First Quality had a legitimate interest in its first mover advantage

Metso claims that First Quality's articulation of its business interest has morphed over time.  Metso goes to great lengths to suggest that, at the outset, First Quality argued that its only aim with respect to Article 23 was to limit competition.  MSJ at 4-6.  According to Metso, however, during the preliminary injunction phase First Quality backtracked from that argument, and now relies on a combination of: (1) the protection of intellectual property, and (2) concern over Metso's resources.  *See id*. at 6, 2-6, 16-23.  These assertions are patently false.

First Quality's filings – when viewed in their entirety – consistently explain that First Quality's business interest was to protect its competitive advantage as a first mover and innovative business strategy from unfair competition in the period during which Metso was helping to install the two TAD machines in Anderson.  First Quality explained in its preliminary injunction papers, for example, that it was "the first private label manufacturer to invest the time, effort and money to make inroads into the private label TAD industry in that way. FQT has invested significant resources to develop the national market for these products.  It has taken a

---

[5] While Clearwater may face delay if the Court enjoins Metso's sale to Clearwater, that is strictly a result of Metso's decision to proceed with the sale notwithstanding the prohibitions of Article 23.  Any potential harm to Clearwater is not a natural function of Article 23 given that Clearwater admittedly could have acquired TAD manufacturing machinery from an alternative source of supply.  *See* MSJ at 29.

novel business approach that combines aggressive expansion and TAD technology, geared toward *increasing competition* in the tissue market. It was this significant investment and business approach that FQT sought to protect through Article 23." FQT Reply to Preliminary Injunction Opp. at 10-12, Doc. No. 63 (emphasis in original). First Quality executives have explained that, previously, it was unheard of for a private label manufacturer to make the significant capital costs associated with acquiring TAD technology. Ludovina Decl. at ¶ 6, Doc. No. 63-2; Oppenheim Supp. Aff. at ¶ 12, Doc. No. 63-1.

First Quality's position has not only been consistent from the outset of this litigation, it has been borne out by subsequent discovery. Numerous witnesses, including those from Metso, have testified as to First Quality's novel efforts to bring a new higher quality product to market. *See* Ludovina Dep. at 71:2-10, Ex. F; Crownover Dep. at 216:20-217:10, Ex. G; Damaghi Dep. at 303:9-16, Ex. E; Larsson Dep. at 41:25-42:6, Ex. C (acknowledging that, prior to First Quality, no private label manufacturer had produced a 2-ply premium TAD tissue or towel product). Indeed, nearly every witness, including Metso's President, Senior Vice President and General Counsel, has agreed that First Quality would *not* have agreed to make such a significant investment and purchase a second TAD machine from Metso without the protections of Article 23. Auffant Dep. at 23:5-19, Ex. N; Marcheggiani Dep. at 133: 14-18, 134: 8-12, 137: 1-4, Ex. B; Beaumont Dep. at 57:9-19. First Quality required Article 23 to prevent unfair competition by restricting Metso's sales of TAD machines to new customers during the period of time it would be possible for them to free ride on First Quality's coattails and quickly gain the benefits of the lessons Metso learned during the set up, installation and initial operation of the machines First Quality purchased. *See* Deposition of Moshe Oppenheim ("Oppenheim Dep.") at 178:12-179:4, excerpts of which are attached as Exhibit U; Damaghi Dep. at 168:21-169:4, Ex. E.

19

For these same reasons, First Quality submitted expert testimony explaining that it is proper and, in fact, often pro-competitive, to use restrictive covenants such as Article 23 to protect a "first mover advantage." *See generally* Report of Frederick Flyer, attached as Exhibit V; Rebuttal Report of Frederick Flyer, attached as Exhibit W. Dr. Flyer concluded that, far from being necessarily anticompetitive, "Article 23 potentially enhances competition by incentivizing FQT's investment in Metso's TAD technology to provide premium quality tissue as a low price private-label alternative to brand name tissue." Flyer Report at 3, Ex. V. To the extent that First Quality would not have made such a substantial investment without Article 23, the provision is clearly pro-competitive because it resulted in First Quality adding TAD manufacturing capacity.

First Quality's witnesses have explained why the rationale offered by First Quality is a legitimate one and how it has actually resulted in pro-competitive benefits, as noted above. Because Metso has wholly ignored this business rationale, instead framing First Quality's concerns strictly as based on intellectual property and resources, Metso's arguments necessarily fail on their face.

Similarly, there is no basis to Metso's claims that Article 23 is overbroad as a matter of law because First Quality has no interest in preventing the sale of TAD machines that are not based on the same unique configuration provided to First Quality. MSJ at 24-26. Once again, this line of reasoning disregards First Quality's expressed interests in protecting its first mover advantage as described earlier. Metso's position is inaccurate and ignores the evidence.

### 2. Metso has oversimplified First Quality's concerns regarding confidential information

In addition to its concerns over protecting its significant investment and novel business approach, First Quality did indeed have serious concerns as to information being transmitted to Metso and then on to its competitors. But Metso recasts First Quality's business interest in

Article 23 as merely related to "intellectual property" so that it can then claim that that Article 23 is overbroad, because there are other provisions within the agreements that serve to protect intellectual property.

In short, Metso narrowly casts First Quality's concerns in order to undermine them. First Quality's concerns were less with respect to patentable intellectual property or even mere confidential information that First Quality would give to Metso and more with the learned on-the-ground "know how" gained by Metso of its own accord in working during the limitations period to develop and implement the technology necessary to install and ramp up these two machines. *See* Oppenheim Dep. at 64:22-70:8, Ex. U; Ludovina Dep. at 70:21-74:16, Ex F.

Installation of a TAD machine can take years to complete. For example, Section 11.1 and Appendix 2 of the Second Contract require Metso to provide on-site assistance for a period of two years following final delivery of the machine, with the potential to apply for another year. This roughly coordinates with the time limitations for Article 23, which prohibit sales for a two year period following final delivery, along with an additional year prohibition on the delivery of complete TAD machines. *See* Beaumont Dep. at 131:3-134:8, 245:20-248:1, Ex. A; Larsson Dep. at 168:14-169:23, Ex. C. During this time of installation and ramp up, Metso and First Quality would identify and implement solutions to myriad issues, quite apart from any intellectual property or First Quality confidential information communicated to Metso. It would be of significant benefit to First Quality's competitors if they were allowed to free ride on those learnings – using to their advantage the insight developed during this period, at First Quality's operation and at First Quality's expense, in the context of delivering and installing the machine for First Quality. In short, new private label TAD competitors could shorten the TAD machinery installation and ramp up period and thereby reap the benefits of the years and millions of dollars

that First Quality has invested in connection with its purchase of Metso TAD machinery. This is the essence of *unfair* competition.

Notably, First Quality has experienced significant delays in the installation and ramp up of the first machine installed by Metso at its Anderson facility. *See* Larsson Dep. at 175:7-176:19, Ex. C; Crownover Dep. at 101:19-21, 245:3-6, 280:22-281:2, Ex. G. Metso continues to learn, at First Quality's expense, how to address these failures which will help future customers of Metso (and competitors of First Quality) in starting up their machines. While First Quality does not seek to prevent Metso from using such learning at some point, First Quality does have an interest in preventing Metso from using such learning to assist First Quality's competitors during First Quality's start-up phase.

Importantly, Metso does not dismiss First Quality's concerns altogether but rather mischaracterizes and oversimplifies the concerns as related to "confidential information" and "intellectual property" and then argues that the onus should have been on First Quality to negotiate a series of more tailored restrictions.[6] Metso claims that Article 23 is not finely enough tailored to these concerns, given the presence of other preventative measures in the contract, such as the non-disclosure provisions.

As an initial matter, the non-disclosure provisions relate only to a narrow view of concerns regarding intellectual property. They do not address First Quality's broader concerns stated above regarding "know how" or lessons learned at First Quality's time and expense. *See*, *e.g.*, Oppenheim Dep. at 64:22-70:8, Ex. U. Furthermore, it is worth noting that those purportedly sufficient non-disclosure provisions also rely on the voluntary compliance of Metso

---

[6] During contract negotiations, First Quality attempted to incorporate additional contract provisions aiming to protect certain broadly defined "know how" and lessons learned. *See* Email from Dino Noto dated Nov. 5, 2008, attached as Exhibit X. Metso flatly refused to agree to such provisions, even while deciding that it *was* in Metso's economic interest to agree to the provisions of Article 23. It is therefore particularly ironic that Metso now points to the lack of such provisions in an effort to invalidate Article 23.

current and former employees, but Metso has not provided evidence of any steps taken to ensure compliance by its employees with the confidentiality provisions of the agreements.

Moreover, numerous Metso employees admitted that there was nothing to prevent Metso from assigning the same employees to work on both the Clearwater and the First Quality sales. Metso witnesses have also testified that, Metso has typically not included such a provision preventing the same individuals from working on sales to other specific customers.  Larsson Dep. at 73:4–74:14, Ex. C.  To the contrary, several key employees were involved in the sale of both machines – namely Donald Beaumont and Tony Auffant.  *See* Beaumont Dep. at 180:7-181:3, 183:10-184:1, 248:21-249:11, Ex. A; Marcheggiani Dep. at 159:14-160:3.  Notably, neither of these key employees are included within limited number of Metso employees on the First Quality "Dedicated Team" that were required to acknowledge their confidentiality obligations to First Quality.

Under New York law, First Quality must simply show that it had a legitimate and reasonable business purpose for Article 23.  *See e.g.*, *Design Strategy Corp.*, No. 07-Civ-0395, 2007 WL 4562926, at *3.  There is ample evidence of that.

### 3. *Metso's Own Evidence Suggests First Quality Had Reasonable Concerns Over Resources*

To the extent that Article 23 is based upon First Quality's concerns over the availability of Metso's resources, Metso itself gave validity to these concerns.  The manufacture, installation, and ramp-up of a TAD machine is a costly, complicated process that takes years to complete.  As a result and as described previously, Jan Larsson, Metso's Director Sales, explained from the beginning that if Metso were to reach agreement with First Quality, when combined with Metso's ongoing business with the Big Four producers, Metso was likely to face tightened resources and therefore would have limited capacity for taking on any other new TAD customers

beyond First Quality. Larsson Dep. at 102:16-19, 128:13-129:22, Ex. C. In fact, Metso went so far as to state that, if it were to enter into a deal with First Quality, it "would ***expect*** not to have capacity to serve [other] entry level TAD technology customers in NA [North America]." October 2007 presentation at 11, Ex. I (emphasis added); *see also* Jan Larsson email dated Dec. 21, 2007, Ex. M.

For this reason, Metso agreed to give First Quality "priority in terms of resources, engineering, manufacturing or service personnel for instance." Larsson Dep. at 87:4-5, Ex. C. Metso indicated that it was willing to provide FQT with "a contractual statement to this effect" but that this "'exclusivity agreement' would exclude current businesses with major TAD customers and commitments existing before entering into an FQT agreement." October 2007 presentation at 11, Ex. I; *see also* Beaumont email dated June 4, 2007, Ex. K. These initial promises and representations by Metso are reflected in what the parties ultimately agreed to in Article 23. These concerns have come to fruition. As noted, First Quality has experienced significant delays in the implementation and ramp up of the first machine installed by Metso at its Anderson facility, due at least in part to Metso's failures on First Quality's project.

In light of these express representations and promises, it is surprising for Metso to claim now that First Quality never had a legitimate basis for its concerns over Metso's resources. Indeed, even if Metso were correct that First Quality's only interests related to intellectual property, confidential information and availability of Metso's resources, the evidence shows that these interests by themselves are reasonable and sufficient to justify Article 23.

### C. *Article 23 Is Reasonably Tailored In Terms of Geographic Scope*

#### 1. *The geographic scope of Article 23 is valid as long as it is reasonable*

The second prong of the inquiry into the validity of a restrictive covenant is whether the scope, including the geographic scope is reasonable. Metso claims that Article 23 is patently overbroad as it applies to the United States, Canada and Mexico. New York courts, however, have long recognized that a restrictive covenant can be reasonable even with a geographic scope covering the entire United States as long as "there is a relationship between the scope of the business of the company sought to be protected." *Markovits v. Venture Info Capital, Inc.*, 129 F. Supp. 2d 647, 659 (S.D.N.Y. 2001); *see also Innovative Networks v. Satellite Airlines Ticketing Ctrs.*, 871 F. Supp. 709, 728 (S.D.N.Y. 1985) ("[W]hile the geographic scope encompassing the continental United States was rather broad, such a restriction is reasonable in light of the national scope of [Plaintiff's] business."). In fact, New York courts have found that the geographic scope of a restrictive covenant can be considered reasonable even if it extends to the *entire world*. *See Misys Int'l Banking Sys. v. TwoFour Sys., LLC*, 800 N.Y.S. 2d 350 (2004) ("[U]nder circumstances involving a worldwide business, 'a covenant with no geographical limitation may be enforceable.'"); *Business Intelligence Services, Inc. v. Hudson*, 580 F. Supp. 1068, 1073 (S.D.N.Y. 1984) (holding worldwide scope reasonable given international nature of business).

Courts outside of New York have similarly upheld restrictive covenants covering entire countries and continents where the parties had a business interest in these regions. *See, e.g.*, *Proudfoot Consulting Co. v. Gordon*, 576 F. 3d 1223 (11th Cir. 2009) (finding restrictive covenant reasonable as to all of North America and Europe); *RSG, Inc. v. Sidump'r Trailer Co.*, 2010 U.S. Dist. LEXIS 8206 (D. Neb. 2010) (holding restrictive covenant reasonable for North and South America); *Bioquell, Inc. v. Feinstein*, 2011 U.S. Dist. LEXIS 16081 (E.D. Pa. 2011) (granting preliminary injunction for a restrictive covenant covering all of North America and

25

collecting cases upholding similarly geographically-broad covenants); *Graphic Mgmt. Assocs., Inc. v. Hatt*, 1998 U.S. Dist. LEXIS 3949 (E.D. Pa. 1998) (upholding geographic scope of North America where company sold equipment throughout the United States and Canada.); *Curtis v. Ziff Energy Group, Ltd.*, 12 S.W. 3d 114, 119 (Tex. Ct. App. 1999) (enforcing covenant applicable to United States and Canada); *see also Enforceability of covenant against competition, ancillary to sale or other transfer of business, practice, or property, as affected by territorial extent of restriction*, 46 A.L.R. 2d 119 ("Generally speaking businesses of this kind [involving the manufacture of goods] are very likely to extend over a considerable territory and restrictions extending over hundreds or thousands of miles have frequently been upheld as necessary for the protection of the business transferred.").

### 2. *The scope of Article 23 is reasonable because First Quality's business interests extend throughout North America*

Article 23's limited restrictions on Metso's sales of TAD machines to new customers within the United States, Canada and Mexico are wholly consistent with the scope of First Quality's business model, which from the outset has targeted the entire North American market. Metso repeatedly has argued to the Court that the very suggestion that North America is a reasonable scope is "on its face, untenable." Opp. to Motion for Preliminary Injunction, Doc. No. 52 at 24. First Quality witnesses, however, have testified that the company routinely ships throughout North America. First Quality also produced documentation of all shipments made by First Quality or its Pennsylvania affiliate to Mexico, Canada and all states west of the Mississippi over the last five years. Direct Shipment Chart, attached as Exhibit Y; Volume Shipment Chart, attached as Exhibit Z. These charts demonstrate that, within the last five years, First Quality or its affiliate made direct shipments to every state west of the Mississippi except for Montana, including more than $5 million of products to California alone in each of the last three years.

26

In addition to direct shipments throughout North America, First Quality's products are sold in every state in the continental United States, as well as in Alaska, Hawaii, Puerto Rico, Canada and Mexico.  Through products supplied to the distribution centers of large-scale national retailers, First Quality supplies TAD tissue and/or towel products to every Sam's Club, Walgreens and CVS in the United States, including Alaska and Hawaii (in the case of Sam's Club).  First Quality also supplies TAD tissue and/or towel products to more than 90% of all Wal-Mart stores in the continental United States, as well as in Alaska, Hawaii, Puerto Rico and Canada.  Wal-Mart Chart, attached as Exhibit AA; Sam's Club Chart, attached as Exhibit BB; Crownover Dep. at 244:1 –253:5, Ex. G.[7]

### 3.   *Metso Ignores Evidence of FQT's Business Interests in Canada and Mexico*

Forced to concede the scope of First Quality's business operations, Metso nevertheless suggests that the geographic scope of Article 23 is overbroad and unlawful because First Quality purportedly has had limited sales to Canada and Mexico and because First Quality has not considered setting up a plant in those locations.  MSJ at 26-27.

Whether or not First Quality has ever considered building a plant in Canada or Mexico is wholly irrelevant to the reasonableness of the geographic restrictions in Article 23.  The question is whether First Quality has a reasonable justification for limiting the sale of a Metso machine there, not whether First Quality itself has considered building a plant there.  The record is replete with evidence that First Quality has active business interests in both Canada and Mexico.  First Quality has shipped significant amounts of product into Canada, with nearly half a million

---

[7] Indeed, First Quality's sales of TAD tissue and towel product blanket North America based on its sales to two customers alone.  *See* Chart of FQT Customer Locations, attached as Exhibit CC.

dollars in shipments for 2008 and 2009. Direct Shipment Chart, Ex. Y.[8] First Quality likewise has shipped products to Mexico. *Id*. Moreover, First Quality markets its products in Mexico "on a regular basis." Crownover Dep. at 31:1-4, Ex. G. First Quality makes regular sales proposals to a large potential customer with over 109 locations throughout Mexico. *Id*. at 31:16, 35:4-9.

In addition to First Quality's own operations, the scope of North American is reasonable because another private label tissue manufacturer could easily set up a TAD facility with Metso machines within North America and ship products to the same locations serviced by First Quality. This is evidenced by the fact that other tissue and towel manufacturers already have TAD facilities in Canada and Mexico, including a TAD facility for Kimberly Clark in Bajio, Mexico, for which Metso was the machine manufacturer. *See* Metso Prior Sales Chart, Ex. D. Considering First Quality's innovations in expanding the geographic shipping areas, a TAD manufacturing facility in the United States, Canada or Mexico using Metso machinery could ship throughout North America, competing in the exact same market as First Quality.[9] In fact, according to Defendants' own expert, Clearwater has now adopted a similar national shipping strategy from its Las Vegas facility. Deposition of Robert Tollison ("Tollison Dep.") 126: 24 – 127:17, excerpts of which are attached as Exhibit EE. The zone of competition therefore extends throughout North America.

---

[8] First Quality also recently signed a contract for the supply of TAD tissue and/or towel products to a large customer in Canada, with shipments expected to begin later this year. *Id*. at 124: 12–126:2. And First Quality has had discussions with other customers regarding further potential expansion into Canada. *Id*. at 40:18-42:16.

[9] That this is not a hypothetical scenario is illustrated by the fact that Clearwater has purchased TAD rolls from a facility located in Mexico. See Clearwater Mexico email, attached as Exhibit DD. It is, in fact, relatively common for companies to ship internationally. Metso's expert witness, Frank Perskowsi, acknowledged that roughly 40,000 tons of tissue were exported from South America into North America in 2009, with more than 100,000 tons of tissue exported from Asia into North America during this same time period. Perkowski Dep. at 168-69, Ex. P.

#### 4.  *Metso's Additional Arguments Regarding Overbreadth Have No Merit*

Next, Metso argues that Article 23 should be struck down because First Quality does not supply products to every single remote corner of North America, such as Guam or the Yukon region of far northwest Canada.  MSJ at 26-29.  To state the proposition is to refute it.  Again, the standard is one of reasonableness.  The reason that neither First Quality – nor any other tissue producer, for that matter – has operations in Guam or the Yukon is because *no one* "in their right mind would put their plant up there." Damaghi Dep. at 112:22-113:1.  To do so would be utterly futile and impractical.  Even assuming Guam falls within the definition of the United States, it is an isolated 30-mile long island in the central Pacific that experiences occasional earthquakes due to its proximity to two tectonic plates.  There is no evidence that *any* TAD tissue machine manufacturer (including Metso) has *ever* considered selling a machine to a company located in such remote areas.  Thus, Metso's argument reduces to the proposition that Article 23 is overbroad because it restricts Metso's sales in obscure regions in which *no* tissue manufacturers have operations or would even consider having operations.  This makes no sense and is inconsistent with the relevant legal standard, which requires only that the restriction be *reasonably* tailored, not finely tuned to exclude areas where the restriction would have no effect.  For that reason, Metso has failed to cite a single case invalidating a restrictive covenant on such grounds.

As further argument that Article 23 is overbroad, Metso claims that Article 23 improperly limits both the *sale* and *distribution* of TAD machines within the covered territory, whereas First Quality's only interest is in preventing the *delivery* of TAD machines within this region.  MSJ at 23-24.  Metso claims that the provision is overbroad because First Quality has no interest in

preventing the sale of a TAD machine to a company located within North America if delivery were scheduled to take place elsewhere.  *Id*.

Once again, Metso makes much ado about nothing.  It is not unreasonable for the parties crafting the provision to assume that a company seeking a Metso TAD machine that could supply the North American market would purchase the machine through a North American subsidiary, much like how Metso, as the North American sales arm for its European affiliates, handles the sale of Metso TAD machines in North America, even though those machines are manufactured in Europe.  Such unsupported hypotheticals hardly warrant the Court striking Article 23 as a matter of law.

### 5.  *The Court Can Modify Article 23 to Address Any Concerns of Overbreadth*

Even if the Court were to find that Article 23 were overbroad in some sense, New York law allows the Court to modify the provision to make it more reasonable.  "[I]f a particular restriction is considered unreasonable, it can be pared or severed and the covenant in its corrected form can be enforced."  *Town Line Repairs, Inc. v. Anderson*, 90 A.D.2d 517, 518 (N.Y. 1982); *see also Meteor Industries, Inc. v. Metalloy Industries, Inc*., 149 A.D.2d 483, 486 (N.Y. App. Div. 1989).  Thus, as the *Baker's Aid* case demonstrates, "[w]here a restrictive covenant contains both reasonable and overbroad provisions, this Court may 'make use of the tool of severance, paring an unreasonable restraint down to appropriate size and enforcing it.'" *Baker's Aid*, 730 F. Supp. 1209, 1216 (E.D.N.Y. 1990) (severing portion of covenant) (citing *Karpinski v. Ingrasci*, 28 N.Y. 2d 45, 52 (N.Y. Ct. App. 1971)); *see also Payment Alliance Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477, 485 (S.D.N.Y. 2007) (noting that, if duration were found to be unreasonable, the  court would modify the terms upon issuance of a permanent injunction); *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220 (N.Y. Ct. App. 1999) (finding lower court erred in

refusing to partially enforce a restrictive covenant).  Regardless of how the Court were to modify the provision to make it even more limited than it currently is, the proposed sale to Clearwater a mere 90 miles away from First Quality's Anderson facility would fall within such modified restriction.

### D.  Balancing the Harms and Benefits of Article 23 Strongly Favors Enforcement

In terms of the final element – harm as a result of enforcement – Article 23 on its own does not result in any real harm to any of the parties, much less the greater public.  First, Metso and Clearwater have not submitted <u>any</u> evidence that Article 23 harms competition.  *See* Flyer Report at 3, Ex. V.  While Metso and Clearwater suggest that Article 23 is harmful to competition, they "confuse possible harm to a competitor or supplier with harm to competition." *Id*.  Harm to individual suppliers is not the equivalent of harm to competition, for which "one would need to reliably show a reduction in consumer welfare." *Id*.

Second, in considering the potential harm that will result from enforcement of Article 23, the Court is to weigh any such potential harm against the benefits inuring to the parties, which includes the benefit of additional sales generated from the contracts containing the restrictive covenant.  Courts therefore consider whether the party now seeking to invalidate the restriction agreed to it "with their eyes wide open, specifically agreed to bear the risk of that hardship and was paid fairly to do so." *DAR & Associates, Inc. v. Uniforce Services, Inc.*, 37 F.Supp.2d 192, 200 (E.D.N.Y. 1999).

As noted above, the sale of a TAD machine is relatively rare.  Metso has sold on average one TAD machine per year over the past fifteen years (and all but one of those was sold to the Big Three who are excluded from Article 23's restrictions).  Larsson Dep. at 61:23-62:9, Ex. C; Marcheggiani Dep. at 84:10-18, Ex. B; Metso Prior Sales Chart, Ex. D.  In the two contracts that

each included the limited restrictions of Article 23, Metso sold two additional complete TAD machines to First Quality – which Metso characterized as having "high potential to develop into a major producer of TAD quality tissue in NA [North America]" – and generated more than $100 million in revenue as a result. *See* October 2007 Presentation at 11, Ex. I. The benefits of those sales and revenues have to be weighed against Article 23's two-year restrictions Article 23 on sales to a limited number of new customers. It is of particular significance, in weighing these costs and benefits, that Article 23 allowed Metso to continue doing business with its existing customers and to continue selling conventional machines, which are the mainstay of its business. *See*, *e.g*., Beaumont Dep. at 36:19-37:2, Metso Prior Sales Chart, Ex. D.

As Dr. Tollison, Defendants' own expert testified this is precisely the analysis that any rational actor would undertake:

> Q. What benefit did Metso get from sign -- from entering the contract with First Quality?
>
> A. It got to install the two machines in Anderson under the agreed upon price.
>
> Q. And it wouldn't have gotten that ability to install or the agreed upon price without the -- entering in the contract; correct?
>
> A. That's correct.
>
> Q. And again, it weighed the costs and benefits of doing that installation and the benefit of getting the -- the revenue against the cost of the other provisions in the contract including the covenant; correct?
>
> A. That would have been the rational thing to do.
>
> Q. Do you have any reason to believe that they didn't do that?
>
> A. No.

Tollison Deposition 138: 9-25, Ex. EE; *see id.* at 234: 5-11.

In fact, Metso's witnesses have admitted that Article 23 *was* in Metso's economic best interest. *See* Beaumont Dep. at 46:10-13, 59:17-60:5, Ex. A ("Economic or other – we're in the business of selling machines, so it was in our interest to make a sale."). Metso is a sophisticated company that is part of a multi-billion global enterprise. It made this determination after significant back and forth negotiations over the terms of Article 23 and based on full consultation with counsel. In other words, Metso agreed to Article 23 "with its eyes wide open." In essence, then, the only harm to Metso is the harm of abiding by a restriction it bargained for and agreed to after weighing the pros and cons of doing so.

Finally, Article 23 does not limit the ability of First Quality's competitors to acquire *any* TAD manufacturing capacity. Article 23 prohibits only *Metso* from selling to new customers during the time in which Metso was helping First Quality ramp up its TAD production from the Metso machines. As defendants readily admit, however, Clearwater "could have obtained a TAD machine from one of Metso's competitors." MSJ at 29. First Quality would have had no quarrel with that outcome.

Assuming harm to Clearwater is relevant, any injury to Clearwater is merely a result of either a) Metso's failure to inform Clearwater of Article 23's restrictions or b) Clearwater's decision to purchase a TAD machine from Metso notwithstanding Article 23. If Metso failed to inform Clearwater of Article 23's restrictions, Clearwater may have a claim against Metso. If Clearwater bought from Metso despite knowing of the restriction, Clearwater took the risk that the restriction would be enforced and the sale would be enjoined. But, in either case, the harm to Clearwater of the costs of delay or need to reconfigure its facility is not the natural result of Article 23's restrictions but instead the result of Metso's and/or Clearwater's actions in contravention of that restriction.

First Quality, on the other hand, would be irreparably harmed by a failure to enforce Article 23. As noted throughout, First Quality was concerned that a competitor would recognize the viability of its business strategy, would seek to emulate that strategy more quickly than First Quality has been able to, and would reap the benefits of the lessons Metso learned while installing First Quality's machines – essentially riding on First Quality's coattails without having invested the significant groundwork laid by First Quality. Moreover, First Quality knew that Metso had limited resources with respect to TAD machines and that, by Metso's own words, as a result of any deal with First Quality, Metso "would expect not to have capacity to serve [other] entry level TAD technology customers in NA [North America]." October 2007 presentation at 11, Ex. I. Accordingly, Clearwater's decision to work with another TAD machine supplier would not have the same effect as its decision to work with Metso.

## V.    CONCLUSION

From the outset of this litigation, First Quality consistently has explained its legitimate business interests in Article 23, as well as the full and active role Metso took in negotiating and drafting the provision from which it now seeks to escape. The record as a whole buttresses First Quality's arguments and shows why summary judgment is inappropriate, particularly in an expedited case with only a few weeks remaining before trial.

Accordingly, First Quality respectfully requests that the Court deny Metso and Clearwater's Motion for Summary Judgment.[10]

---

[10] On March 29, 2012, Clearwater filed a two-page Motion for Summary Judgment (Doc. No. 151), incorporating in full and joining in Metso's Motion for Summary Judgment. This Opposition is therefore directed toward both Metso and Clearwater's Motions for Summary Judgment.

Respectfully submitted, this the 9th day of April, 2012

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**


_____s/Samuel W. Outten_____

Samuel W. Outten (Fed. ID No.: 2943)
  Email: soutten@wcsr.com
Catherine R. Atwood (Fed. ID No.: 10385)
  Email: catwood@wcsr.com
Womble Carlyle Sandridge & Rice, LLP
550 South Main Street, Suite 400
Greenville, South Carolina 29601
Telephone: (864) 255-5421
Fax: (864) 239-5852

B. Chad Ewing (cewing@wcsr.com)
Megan Hanley Baer (mbaer@wcsr.com)
Womble Carlyle Sandridge & Rice, LLP
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, NC  28202
Telephone: (704) 331-4900
Fax: (704) 444-8169

Michael A. Brille (mbrille@bsfllp.com)
William C. Jackson (wjackson@bsfllp.com)
Neal C. Hannan (nhannan@bsfllp.com)
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, N.W.
Suite 800
Washington, DC 20015
(202) 237-2727

*Attorneys for First Quality Tissue SE, LLP*

## CERTIFICATE OF SERVICE

I hereby certify that on 9th day of April 2012, I have served copies of First Quality Tissue SE, LLC's Opposition to Motion for Summary Judgment via e-mail and the court's electronic filing system upon the following attorneys of record:

**Attorneys for Defendant Metso Paper USA, Inc.**
Henry L. Parr, Jr., Esq.
David H. Koysza, Esq.
Wyche, P.A.
44 East Camperdown Way
Greenville, South Carolina 29601

Of Counsel
Michael Evan Jaffe, Esq.
Deborah B. Baum, Esq.
Pillsbury Winthrop Shaw Pittman LLP
2300 N. Street, N.W.
Washington, D.C. 20037-1122

Jason S. Bell, Esq.
Smith, Gambrell & Russell, LLP
Promenade II, Suite 3100
1230 Promenade II, Suite 3100
1230 Peachtree Street N.E.
Atlanta, GA 30309-3592

**Attorneys for Defendant/Intervenor Clearwater Paper Corporation**
Beattie B. Ashmore, Esq.
Beattie B. Ashmore P.A.
650 E. Washington Street
Greenville, SC 29601

Jeffrey S. Cashdan, Esq.
Sarah E. Statz, Esq.
King & Spalding, LLP
1180 Peachtree Street
Atlanta, Georgia 30309-3521


_____/s/ Megan Hanley Baer_____
Megan Hanley Baer, Esquire