# EXHIBIT V

## EXPERT REPORT OF FREDERICK A. FLYER, PH.D.

I.    OVERVIEW

    A.    **Qualifications**

    1.    I am an economist and Senior Vice President at Compass Lexecon. Prior to joining Compass Lexecon in 1999, I was on the economics faculty at New York University's Stern School of Business, and served as a visiting professor in economics at Northwestern University and as a lecturer at the University of Chicago. I earned a Ph.D. in economics from the University of Chicago and an M.S. in labor and industrial relations from the University of Illinois. I am the recipient of numerous fellowships, grants, and honors, and have published papers on microeconomic theory, applied econometrics, industrial organization, and antitrust analysis in leading scholarly journals. I also have presented my work at universities and research organizations around the world and have acted as a referee for numerous academic journals.

    2.    Additionally, I have been retained to offer economic analysis of the competitive and antitrust implications of various business arrangements by corporations including Pfizer, Philip Morris, Microsoft, Verizon, EBay, PepsiCo, Reuters PLC, Whirlpool, Monsanto, Walgreens, and the Tribune Corporation. Further, I have been retained as a competition expert by the U.S. Federal Trade Commission on several occasions to assess and testify on the competitive implications of specific economic transactions. I also have provided economic analyses to the U.S. Department of Justice ("DOJ") as well as regulatory agencies in other countries. A copy of my curriculum vitae, which details my professional experience, including a list of all publications I authored within the last ten years and all of the cases in which I testified, is included as Appendix A to this report. Compass Lexecon bills my time for this matter at $745 per hour.

B.    Outline of Task

3.    I have been asked by counsel for First QualityTissue SE, LLC. ("FQT") to evaluate the allegations by Metso Paper, Inc. ("Metso") and Clearwater Paper Corporation ("Clearwater") that the Contract of Supply of Machinery, Equipment and Services for a Thru-Air Dried ("TAD") Tissue Machines with Auxillary Equipment ("the contract") contains terms that if enforced would result in a "[w]holesale unjustified restricting of competition." [1] In this report, I evaluate whether the contractual terms contained in Article 23 of the contract are, as Metso alleges, necessarily "anti-competitive" (meaning harmful to competition), and whether Metso or Clearwater have, to date, offered any meaningful economic substantiation of that allegation. [2] I also discuss how contractual provisions, like Article 23, in many instances, provide economic incentives that enhance competition, and discuss examples of such restrictions in other contexts. In addition, I have been asked to evaluate any analysis offered by Metso, Clearwater, or their experts on the impact of Article 23 on competition. To date, no such analysis has been provided to me, however my work is ongoing, and therefore I may update my opinions as new information becomes available.

4.    In undertaking my work, I and my staff under my direct supervision have reviewed business documents, market analyses by third-party providers, court filings, and statements made by business representatives of FQT. I understand that discovery in this matter is ongoing and that the Scheduling Order in this case requires me to submit this report before fact discovery is

---

[1] Metso Paper USA, Inc.'s Opposition to Plaintiff's Motion for Preliminary Injunction, November 22, 2011, p.3.

[2] As I understand, Article 23 places certain restrictions on Metso's ability to sell TAD equipment in the United States, Canada, and Mexico for a period of time following delivery of TAD machines by Metso to FQT.  See Metso Paper USA, Inc.'s Opposition to Plaintiff's Motion for Preliminary Injunction, November 22, 2011, p.2, for characterization of Article 23 as "anti-competitive."

complete. A list of the materials upon which I have relied so far is provided in Appendix B.

C.    **Summary of Main Conclusions**

5.    Based on my review of the economic evidence to date, I conclude that:

i.    The restrictions on Metso sales of TAD Tissue Machines specified in Article 23 of the contract do not necessarily lead to a reduction in competition, as Metso alleges. To the contrary, Article 23 potentially enhances competition by incentivizing FQT's investment in Metso's TAD technology to provide premium quality tissue as a low price private-label alternative to brand name tissue.[3] Such arrangements have been widely recognized in economics literature as potentially enhancing competition.

ii.    Putting aside the potential procompetitive benefits that Article 23 encourages by incentivizing investments in and promotion of the TAD technology, I have seen no evidence or analysis by Metso or Clearwater that would reliably support their allegation that Article 23 harms competition.

iii.    Metso's allegations appear to confuse possible harm to a competitor or supplier with harm to competition. Namely, delaying delivery to Clearwater of a TAD Tissue Machine from Metso for the duration of the limitations period might possibly result in reduced profits for both Metso and Clearwater. However, for there to be harm to competition, one would need to reliably show a reduction in consumer welfare, which is distinct from harm to a competitor or supplier. Neither Metso nor Clearwater to date has provided any such analysis.

II.    BACKGROUND INFORMATION ON THE CONTRACT

6.    I have been asked by counsel for FQT to assume that Article 23 specifies the restrictions and exceptions to which Metso and FQT agreed for TAD machine-related sales and services by Metso. I also have been asked to assume that the implication of the article is that Metso would not sell a complete TAD machine in North America to customers other than those meeting clearly defined exceptions for a period of two years following delivery of a second TAD

---

[3] I understand this technology produces higher quality tissue products compared to conventional machines.

3

machine to FQT, and that Metso would not deliver a machine other than to those same customers in North America for one additional year. I also have been asked to assume that the exceptions would allow Metso to sell complete TAD machines at any time to the four largest tissue manufacturers (Kimberly Clark, Proctor & Gamble, Georgia-Pacific and SCA), as well as to one potential customer for whom Metso had invested substantial sales efforts prior to the contract with FQT. I also have been asked to assume that Metso could have sold other tissue manufacturing machines, including conventional machines, without any restriction.

     7.     Article 23 provides limited time and geographic restrictions on Metso's sales of TAD machines. Specifically, Metso sales of TAD equipment would be permitted in the United States, Canada and Mexico two years after final delivery of the second TAD machine to FQT. Specific contract language follows:

> A. Subject to the exceptions set forth in Subsections C and D below, Metso Paper agrees that for a period commencing on the Effective Date and ending twenty-four (24) months after final delivery of the Equipment to Buyer (the "Limitations Period"), Metso Paper will not sell, license, book orders for, or otherwise distribute within the United States, Canada and Mexico ("Territory") any complete TAD machines (i.e., from headbox to reel), TAD machine components and/or TAD machine automation systems. Metso Paper further agrees that it will not deliver any TAD machines, TAD machine components or TAD machine automation systems to any third party within the Territory until twelve (12) months after the end of the Limitations Period, Notwithstanding the foregoing, in the event final delivery of the Equipment is delayed by Buyer, or those under Buyer's control, the Limitations Period set forth above shall expire on September 30, 2013. "Final delivery" as used herein shall mean the complete delivery of all components of the Equipment.

> B. In the event Start-Up is delayed by Metso Paper or those under Metso Paper's control, the Limitations Period set forth in Subsection A above shall be extended for the same period as the delay in Start-Up hereunder.

> C. Notwithstanding the foregoing, Buyer acknowledges that Metso Paper may engage in the following activities before, during and after the Limitations Period:

> (i) Metso Paper may provide individual replacement components for any TAD machines manufactured by Metso Paper or unaffiliated third parties existing at any time during the Limitations Period.

(ii) Metso Paper may sell complete TAD machines (or components thereof) or automation systems to Kimberly Clark, Procter & Gamble, Georgia-Pacific, SCA and any entity that after the Effective Date acquires the TAD manufacturing assets of any of the four aforementioned companies and any existing customers which Metso Paper can demonstrate having provided and continue to provide complete TAD machines to within the Territory, or any one, but only one, specific potential customer Metso Paper can reasonably demonstrate through documentary evidence as having previously invested substantial sales efforts to sell Metso Paper's TAD process and equipment within the Territory prior to the date hereof, or any of their respective successors, wholly-owned affiliates or affiliates' successors.

D. Nothing in this Article shall restrict Metso Paper's right to sell stock preparation equipment, tissue machine services such as roll service, field service and spare parts, or tissue machine goods not specifically excluded hereby.

E. Under all circumstances, during the Limitations Period, Metso Paper will not provide to any third party a substantially similar TAD machine configuration / combination of components offered to Buyer.

F. Notwithstanding anything set forth above to the contrary, Metso paper acknowledges and agrees that at no time and/or under no circumstances shall Metso Paper provide any Contract IP, Buyer's IP or Process Improvements (as defined below) to a third party without Buyer's express written consent which consent shall be provided at Buyer's sole discretion.

8. I understand that Article 23 was an important aspect of the agreement for FQT. A similar provision was also included in the contract between FQT and Metso (entered into on January 2010) for the first TAD machine FQT purchased for its new facility in Anderson, South Carolina. I further understand that those provisions incentivized FQT to invest in building two new Metso TAD machines, at close to $100M in machine costs alone. And that the limited restrictions in Article 23 were critical to FQT's decision to purchase Metso TAD machines. That is, Article 23 incentivized FQT to aggressively expand its production capabilities and hence, position itself as a more vibrant competitor in the tissue marketplace without providing a readily-available blueprint for competitors seeking to free-ride on FQT's investment in developing such a successful business model.

9.     Based on the facts as I understand them, Metso derived economic benefits from its agreements with FQT, and that the restrictions in Article 23 were an important aspect of Metso obtaining FQT as a customer.  I have reviewed a 2007 Metso presentation that I understand was provided to FQT as part of Metso's efforts to persuade FQT to purchase Metso's equipment.  In that presentation, Metso stated that they understood that for FQT to invest in Metso technology (and expand Metso's customer base substantially), FQT would need a period of time during which Metso would not add additional customers.[4]  Thus, FQT's willingness to enter into the transactions with Metso appears to be premised at the outset upon the restrictions embodied in Article 23.  My understanding is that FQT was ahead of the other principally private-label competitors in choosing to invest in Metso technology, and it expected to obtain future, but difficult to quantify, benefits of being a first mover in using Metso's TAD technology among private label producers.

III.     REASONABLE RESTRICTIONS SUCH AS THOSE IN ARTICLE 23 CAN ENHANCE COMPETITION BY SPURRING INVESTMENT.

A.     The Incentives for First-Moving Firms to Make Investments that Potentially Increase Market Competition Depend on Expected Returns

10.     A basic tenet in economics is that firms' incentives to invest depend on expected returns emanating from those investments.  This principle provides an economic rationale for firms being granted exclusivity rights, to varying degrees, in numerous types of investments. This concept is present in the context of exclusivity awarded via patents where, for example, Carlton and Perloff state: "By imposing costs on potential imitators, patents can give market power to patent holders.  The resulting profits can be a strong inducement to be the first to invent

---

[4] "FQT / Metso Business Relationship Discussions," October 9, 2007, p. 10. See also email re: Metso, from Donald Beaumont to Kambiz Marcheggiani, June 4, 2007.

a new product ... By granting these exclusive rights through patents, society encourages more inventions."[5] In other words, economic theory teaches that consumers are made better off by incentivizing firms to make investments that improve product quality or availability, even though these incentives arise from restrictions that may limit the ability of other firms to compete in the short run.

11.    Based on my understanding, Article 23 was crafted to protect, for a limited period of time, FQT's expected first-mover advantages. An advantage to FQT from being the first mover in implementing the TAD technology among private label tissue manufacturers creates greater incentives for FQT to invest. Increasing the level of effective investment in production capabilities improves FQT's competitive position as a private label provider of tissue products. In turn, an improved competitive positioning of FQT, all else equal, increases market competition. The effects of increased competition benefits not only FQT customers, but also those consumers that purchase competing products in the relevant antitrust market(s) in which FQT's offerings compete. These customers include those who purchase competing "branded" offerings by the major tissue manufactures. In short, the increased investments made by FQT as a result of Article 23 can provide procompetitive benefits to consumers in the form of better quality products and/or lower prices.

12.    Thus, it is incorrect to allege, as Metso and Clearwater do, that exclusivity restrictions (which might limit some aspect of competition in the short run) necessarily reduce overall competition in the market.[6] Instead, the overall effect in the market of such exclusivity

---

[5] Carlton & Perloff, Modern Industrial Organization, 4th Edition, p. 536.

[6] I highlight the point that exclusivity agreements are not *necessarily* anticompetitive. The economic literature has identified some instances in which exclusivity agreements can be anticompetitive because consumers are harmed by these arrangements.

restrictions can and often do ultimately benefit consumers, especially when these restrictions incentivize firms to innovate and improve product offerings. Simply looking at one side of an exclusivity restriction, such as the fact that Clearwater will be delayed in gaining access to Metso's TAD equipment, provides an incomplete picture of the competitive effects associated with limitations such as those in Article 23. Therefore, Metso's claim that Article 23 is "anticompetitive" because it delays Metso's ability to sell a complete TAD machine to Clearwater for a period of time reflects flawed economic reasoning.

> **B.** **The Potential Economic Benefits from Exclusivity Agreements May Be Seen in Many Different Settings**

13. One example of how exclusivity arrangements can enhance the incentives to innovate may be seen in the biotech industry. Specifically, biotechnology companies may exclusively license their intellectual property to pharmaceutical manufacturers. The licensed intellectual property may represent unique discoveries that provide the licensee with improved competitive positioning in the marketplace.

14. There are a number of recent instances of the use of exclusive licenses in the biotech industry. For example, on January 24, 2012, BioLineRx, an Israeli biotech firm, announced it had signed a worldwide exclusive agreement with the French firm Genoscience to develop and commercialize a treatment for Hepatitis C based on a patented Genoscience treatment, BL-8020. The CEO of BioLineRx reported, "Current therapies are characterized by numerous severe side effects, long treatment duration and development of resistance. In these respects, BL-8020 . . . may shorten therapy duration and may combat resistance by acting as an add-on platform which can potentially be combined with other oral Hepatitis C therapies to

increase their efficacy."[7]  On November 1, 2011, Hawaii Biotech (HBI) announced that it had

acquired an exclusive license for tick-borne encephalitis and malaria virus from Merck. "These

licenses will enable HBI to proceed with the development of vaccines for TBE, malaria, and

potentially other subunit vaccines for important emerging and re-emerging infectious diseases"

said HBI's CEO. [8]  On September 7, 2011, the Swiss biotech firm Debiopharm Group entered

into an exclusive agreement with the Pennsylvania-based biotech firm Ascenta Therapeutics, Inc.

for the development and commercialization of a Debiopharm protein inhibitor AT-406.

According to the president of Debiopharm, "it should be possible to combine AT-406 . . . with

other pro-apoptotic agents, which can potentially bring huge benefits to patients by enhancing

the efficiency of the treatment."[9]

15.    The ability of a supplier, such as a biotechnology company, to capitalize on its

technology investments by licensing the technology exclusively potentially enhances incentives

to innovate.  Moreover, pharmaceutical manufacturers that can exclusively license an innovative

technology may invest more to deliver that technology to the market (than if it were widely

available for any competitor to use).  This dynamic indicates that part of the economic value

that pharmaceutical manufacturers and biotechnology companies earn from innovation can come

from the ability to control dissemination of that new technology (e.g., by not supplying every

[7] "BioLineRx Signs Exclusive License Agreement for BL-8020, an Oral Treatment for Hepatitis C," Fierce Biotech, January 24, 2012, http://www.fiercebiotech.com/press-releases/biolinerx-signs-exclusive-license-agreement-bl-8020-oral-treatment-hepatiti-0

[8] "Hawaii Biotech Licenses Vaccine Technology From Merck," Marketwire, November 01, 2011. http://www.marketwire.com/press-release/hawaii-biotech-licenses-vaccine-technology-from-merck-1580113.htm

[9] Business Wire article published by Swiss Biotech, "Debiopharm and Ascenta Therapeutics, Inc. announce an exclusive license agreement for the development and commercialization of the Inhibitor of Apoptosis Protein (IAP) Inhibitor AT-406 (called Debio 1143 by Debiopharm) for the treatment of various tumors," July 09, 2011. http://www.swissbiotech.org/php5/aa2/index.php?l=1&id=327396

potential buyer of that technology). In the current matter, although Article 23 does not grant FQT full exclusivity, the structure of the contract indicates that Metso received some compensation from FQT under the premise that Metso had (and has) control over its equipment sales, and therefore would limit some sales of TAD equipment. That is, Metso agreed to limit sales according to the terms of Article 23 and charge the prices delineated in the contract.

16. The availability of time-limited exclusivity rights produces procompetitive incentives for investments in other settings. One example of how exclusivity periods (which might limit some aspect of competition in the short run) are used to enhance competitive outcomes is provided by the Hatch-Waxman Amendments to the Food, Drug and Cosmetic Act. The amendments grant generic drug manufacturers an exclusive period to market a drug if they successfully challenge a patent on an existing drug.[10] In particular, the "first-to-file" generic drug manufacturer receives a 180-day exclusivity period in which it faces no competition from other generic drug manufacturers following a successful lawsuit to challenge the patent on an existing drug.[11] In other words, the Act, through a time-limited exclusivity provision, creates incentives for generic manufacturers to invest in challenging the validity of a drug patent, and such investment involves substantial diligence and litigation expenses. The generic challenger benefits from the exclusive period of limited direct competition, and consumers benefit from greater availability of generic substitutes in the short (180 days with one additional manufacturer) and long terms (unlimited generic manufacturers).

17. The direct incentives created under the act have been explicitly recognized. For

---

[10] There are also other conditions in which a generic drug manufacturer may be granted exclusivity versus other generic manufacturers.

[11] Although, based on my understanding, the branded manufacturer may be able to promote a generic version of its branded drug during this 180-day exclusivity period.

example, the FDA states that the Hatch-Waxman Amendments balanced two public policy goals:

> *First, drug manufacturers need meaningful market protection incentives to encourage the development of valuable new drugs. Second, once the statutory patent protection and marketing exclusivity for these new drugs has expired, the public benefits from the rapid availability of lower priced generic versions of the innovator drug.*[12]

18.     Further, the FTC conducted research on the effects of the Hatch-Waxman amendments and found that the amendments led to a large increase in the number of "Paragraph IV" generic filings (the type of filings that the exclusivity period in the amendments targeted). The FTC in reviewing the analysis states:

> *The share of [new drug applications to the FDA] with paragraph IV certifications – compared to all [new drug applications] filed (those with paragraph I-IV certifications) -- has increased significantly since Hatch-Waxman was enacted. According to the data provided by the FDA, during the 1980s (1984-89), only 2 percent of [new drug applications] contained paragraph IV certifications. This share increased to approximately 12 percent for the 1990s, and it has increased substantially in the last few years: from 1998-2000, approximately 20 percent of [new drug applications] contained paragraph IV certifications.*[13]

19.     Like a first-moving generic drug manufacturer, I understand that FQT was the first predominantly private-label tissue manufacturer to recognize and substantially invest in the business advantage of using Metso technology. I also understand that FQT was concerned that once it announced its choice of tissue machine supplier for the South Carolina plant, it likely would signal to the market that Metso was the best tissue machine manufacturer. Absent Article 23 (in both the First and Second contract), other firms could easily replicate FQT's approach. As

---

[12] U.S. Food & Drug Administration, "Small Business Assistance: 180-Day Generic Drug Exclusivity. Report last updated April 15, 2009 (as of 2/6/2012)
http://www.fda.gov/Drugs/DevelopmentApprovalProcess/SmallBusinessAssistance/ucm069964.htm
[13] Federal Trade Commission, *Generic Drug Entry Prior to Patent Expiration: An FTC Study*, July 2002. ("FTC Report"). Available at http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf.

discussed previously, Article 23 does not prevent Metso from selling their TAD machines to a competitor who had already investigated using Metso TAD machines (by engaging in "substantial" sales talks) prior to FQT's decision. Thus, it appears to limit sales only to firms that previously had not invested substantial resources in researching and negotiating a transaction for Metso's TAD machines as early as FQT.

20.    If FQT's choice indeed served as a signal to competitors, it could create a "free riding" problem. Economists say that free riding occurs when Party A is able to benefit from Party B's action in a manner Party B cannot prevent, while not being required to compensate Party B. Free riding creates a market failure – the market does not produce the efficient quantity, making consumers (as well as the firm free-ridden upon) worse off. In the present matter, Article 23 potentially might limit these types of free-riding inefficiencies.

21.    In general, economists have documented a number of circumstances in which exclusive contracts can be used to mitigate free riding problems. For example, Carlton and Perloff recount the story of a discounter that opened next door to a retailer in Berkley, California. The retailer sold high-end stereo equipment, using a well-trained sales staff and expensive testing equipment. The discounter put up a handwritten sign that read, "Go next door, see what equipment you want, then come here for a lower price." The price could be lower, of course, because the discounter did not provide sales staff or testing rooms –that is, it could free ride off its neighbor's efforts. But if customers took the discounter's advice seriously, the well-staffed and well-equipped retailer eventually may go out of business and customers who wanted technical advice or to test equipment would have to search elsewhere for these services.[14]

---

[14] Carlton & Perloff, Modern Industrial Organization, 4th Edition, p. 420.

12

22.    The issue of free riding also occurs in manufacturer-to-manufacturer relationships. For example, Masten and Snyder (1993) discuss how the United Shoe Machinery (USM) Corporation faced the problem that its efforts to train customers to use its machines also benefitted its rivals, because the customers could apply what they learned from USM to its rivals' machines, too. [15] Such free riding may be reduced via contracts that mandate exclusive territory or exclusive dealings. Exclusive territories specify that only one party will be dealt with within a given geographic area, while exclusive dealings specify that one party will purchase or sell only the other party's product. [16] In the presence of free-riding, less than the efficient quantity of a good is produced, which makes consumers worse off. Exclusive contracts that reduce free-riding thus can improve market outcomes and make consumers better off.[17]

23.    I highlight these examples to illustrate how exclusivity restrictions that lead to improved product offerings provide benefits to consumers that purchase in the market in which these improved offerings are sold. Enhancing consumer welfare by using exclusivity provisions to motivate firms' investment is a widely understood and applied principle in economics.

24.    Metso's allegation that Article 23 restricts, or even harms, competition does not consider any of the potential procompetitive benefits that might flow from the provision's terms. In particular, the investments in TAD equipment (and other procompetitive actions) that the

---

[15] Masten S.E. and E.A. Snyder. 1993. "United States versus United Shoe Machinery Corporation: On the Merits", Journal of Law and Economics, 36: 33-70.

[16] If there is only one retailer, for example, it will have no one on whom to free ride, and its incentives to provide customer service will be improved. See Carlton & Perloff, Modern Industrial Organization, 4th Edition, pp. 416-424. If a firm purchases from only one equipment manufacturer, it cannot employ what it learns on another manufacturer's equipment. Carlton & Perloff, Modern Industrial Organization, 4th Edition, p. 424; and Marvel, H.P. 1982. "Exclusive Dealing", Journal of Law and Economics 25: 1-25.

[17] A related justification for exclusive contract is the protection of trade secrets. Cooperation between firms may require revealing confidential information that would be of benefit to competitors. An exclusive contract is a means of ensuring that any secrets learned will be kept within the relationship.

article might have incentivized would need to be considered in a reliable economic analysis of the competitive effects.

## IV. METSO DOES NOT PROVIDE RELIABLE EVIDENCE TO SUPPORT ITS CLAIM THAT ARTICLE 23 RESULTS IN ANY "ANTICOMPETITIVE" HARM

25. Clearwater and Metso appear to be claiming that an "anticompetitive" effect of Article 23 is the alleged harm that they themselves would suffer. Based on my review, I find that neither Metso nor Clearwater has made a specific claim of harm to consumers. Moreover, neither Metso nor Clearwater has provided reliable empirical support for the allegation that the restrictions in Article 23 would result in harm to consumers even if they were to ultimately make such a claim. Without reliable economic analysis of the relevant market, competitors in that market, the long-term impact of Article 23 on competition in that market, and, ultimately, a showing of harm to consumers in the market in which the alleged reduction in competition would occur, Metso offers no reliable basis from which to conclude that Article 23 is anticompetitive.

26. To date, I have not seen any analysis by Metso which defines a relevant product and geographic market in which competition will be allegedly harmed by the limitations agreed to in Article 23. A key reason to evaluate the scope of the relevant product market is to understand the availability of substitute products in the market in which the alleged reduction in competition would occur. Important aspects of a competitive impact analysis include determining: 1) whether Clearwater's offerings in this relevant market would be significantly changed; 2) whether competitive substitutes are available to consumers; and 3) whether any potential entry or expansion by current competitors would occur during the period of any contractual limitations.

14

Further, a competitive analysis would define the extent of the geographic market to help determine which group of customers would experience harm. For example, if the relevant market includes many close substitutes for the tissue products produced by FQT on Metso machines, then any contractual restriction that could potentially adversely affect the availability of Metso machines to new tissue product competitors would not necessarily translate into consumer harm as the available alternative substitute services could readily "fill in" for these adversely affected tissue products.

27. While the current case involves an agreement between a supplier of a technology input and a manufacturer, the antitrust authorities' evaluation methodology for assessing the competitive effects of agreements between two competitors is informative.[18] Specifically, this provides a useful framework from which to understand the economic rationale employed by the antitrust agencies and the tools used to evaluate competitive effects of various business arrangements.

28. The DOJ/FTC Antitrust Guidelines for Collaboration among Competitors ("Joint Venture Guidelines") describe the focus of the U.S. antitrust agencies as encouraging competition to prevent harm to consumers.[19] Under the Guidelines, evaluating whether a joint venture between competitors is likely to cause consumer harm requires consideration of both the potential costs and benefits associated with the joint venture. In other words, the U.S. antitrust agencies focus on an agreement's overall effect on competition. This overall effect depends on the anticompetitive effects of the joint venture (which might reduce innovation, quality, service,

---

[18] I understand that FQT and Metso viewed their business relationship as having aspects of a partnership or joint venture, and not just a vendor/buyer relationship. See FQT / Metso Business Relationship Discussion, October 9, 2007.

[19] "Antitrust Guidelines for Collaborations Among Competitors", Federal Trade Commission and U.S. Department of Justice, *www.ftc.gov/os/2000/04/ftcdojguidelines.pdf*

or lead to higher prices) and its procompetitive effects (which might include increased innovation, quality, service, or lower prices).[20]

29.    This is a standard framework to assess competitive effects. Whether Article 23 is likely to harm tissue product consumers (in a reliably-defined antitrust market) involves evaluating a number of conditions. Namely, to reliably support the proposition that enforcement of Article 23 means that consumers of tissue products would suffer harm in the relevant markets involves establishing that the quality-adjusted price for these products would increase. This involves showing that: 1) Clearwater will have had a significant impact in the relevant market with its tissue products produced on Metso TAD equipment; 2) Clearwater has no available alternative equipment to produce the equivalent products; 3) alternative tissue suppliers will not offer close substitutes to any Clearwater products that will not come to market as a result of Article 23; 4) these affected products are valued by consumers; and 5) whether FQT will provide the same quantity of product absent its agreement on Article 23 with Metso.

30.    Further, even in the event that evidence could be assembled to establish the above conditions, a comprehensive competitive analysis would have to consider the increased competitive positioning of FQT in the relevant market, particularly relative to the dominant position of the manufacturers of higher-priced "branded" products. As stated previously, if Article 23 encouraged more aggressive investment by FQT, the benefits of these investments to consumers would need to be weighed against alleged anticompetitive harm. Nothing that I have reviewed to date from Metso or Clearwater comes anywhere close to such an analysis.

---

[20] *Ibid,* p. 4.

## V. METSO'S ALLEGATIONS CONFUSE HARM TO A COMPETITOR OR SUPPLIER WITH HARM TO COMPETITION

### A. Lower Profits to Metso and/or Clearwater do not Equate to Competitive Harm

31. The standard for anticompetitive harm in the United States is harm to consumers, not harm to other competitors. The FTC explicitly states:

> *Agreements not challenged as per se illegal are analyzed under the rule of reason to determine their overall competitive effect. Rule of reason analysis focuses on the state of competition with, as compared to without, the relevant agreement. The central question is whether the relevant agreement likely harms competition by increasing the ability or incentive profitably to raise price above or reduce output, quality, service, or innovation below what likely would prevail in the absence of the relevant agreement.*[21]

In other words, the FTC finds harm to competition when consumers in the relevant market face higher prices and/or lower quality products as a result of an agreement.

32. By this logic, individual firms may experience losses in the competitive marketplace, without harm to consumers. Innovation, investment and vigorous competition may cause competitors to lose market share, lose profits, or even exit markets, without harm to consumers. In short, showing harm to Metso or Clearwater from the enforcement of Article 23 is not equivalent to, or even a reliable basis from which to conclude, that Article 23 is anticompetitive.

### B. Metso Does Not Provide Reliable Evidence That Its Business Was Harmed By Article 23

33. Metso does not even demonstrate that its own business was harmed by the restrictions in Article 23. For Metso to be acting rationally in its best interest by agreeing to the terms of the contract, the expected benefits FQT provided in return for the Article 23 restrictions

---

[21] *Ibid*, p. 4.

must outweigh the costs of these restrictions. I have seen no analysis provided by Metso that considers how the incremental benefits received by Metso from the inclusion of Article 23 offsets some, if not all, of the harm it purports to be incurring from not being able to sell a TAD machine to Clearwater.

Respectfully submitted this the 6th day of February, 2012.

_____  _____

Frederick A. Flyer          Date

FREDRICK A. FLYER                                      January 2012

Senior Vice President
Compass Lexecon
332 South Michigan Avenue
Chicago, Illinois 60604-4937
(312) 322-0231 (direct)
(312) 322-0218 (fax)
fflyer@compasslexecon.com

## AREAS OF SPECIALIZATION

Applied Microeconomics and Econometrics, with a focus on antitrust, industrial organization, labor, valuation analysis and intellectual property. These economic analyses have been conducted for litigation, federal commission filings, corporate and governmental entities, and for publication in scholarly journals.

## EDUCATION

Ph.D., University of Chicago, Economics, August 1993.

M.S., University of Illinois at Urbana-Champaign, Labor and Industrial Relations, May 1988.

B.S., University of Wisconsin-Madison, Economics, December 1985.

## HONORS AND FELLOWSHIPS

Stern Faculty Research Stipend, Stern School of Business, 1995-1998

Research Fellowship, New York University, 1994-1996, 1998

Research Grant, Russell Sage Foundation, 1994

Research Fellowship, National Opinion Research Center 1990-1993

Center for the Study of the Economy and the State Doctoral Fellowship, University of Chicago, 1989-91

Bradley Fellowship, Bradley Foundation 1991-92

UU/Phoenix Fellowship, University of Chicago, 1989-92

McNatt Award in Labor Economics, University of Illinois, 1988

## PROFESSIONAL EXPERIENCE

Compass Lexecon, Chicago, Illinois (1999 - present): Current Position: Senior Vice President

New York University, New York, New York; (1993 - 1997 and 1998 - 1999): Assistant Professor in Economics at the Stern School of Business, with a research emphasis in industrial organization, labor, and applied microeconomic analysis. Courses Taught – Masters and Ph.D. Level: Microeconomic Theory and Application, Econometric Theory and Application

Northwestern University, Evanston, Illinois (1997 – 1998): Visiting Professor in the Department of Economics, with a research emphasis in industrial organization, labor, and applied microeconomic analysis. Courses Taught – Advanced and Introductory Level: Microeconomic Theory and Application, Labor Economics Theory and Application

University of Chicago, Chicago, Illinois (1990 – 1993): Lecturer in the Department of Economics. Courses Taught - Undergraduate Microeconomic Theory and Application

## ARTICLES

The New Economics of Teachers and Education, co-authored with Sherwin Rosen, *National Bureau of Economics Research*, Paper No. W4828, August 1994.
Reprinted in: *The National Opinion Research Center*, ERC-Paper Series, 94-1.
Summarized by Lindley H. Clark Jr. in: *The Wall Street Journal*, "Speaking of Business: The High Cost of High (and Lower) Schools", Pg. A18, October 4, 1994.

Some Economics of Precollege Teaching, co-authored with Sherwin Rosen, in *Assessing Educational Practices: The Contribution of Economics*, edited by William Baumol and William Becker, MIT Press: 1995.

Technical Standards Coalitions for Network Goods, co-authored with Nicholas Economides, *The Study of Financial Markets and Institutions*, Salomon Center Press: November 1995.

The Economics of Education, co-authored with Sherwin Rosen, *Journal of Labor Economics*, January 1997.

The Influence of Higher Moments of Earning Distributions On Career Decisions, *Journal of Labor Economics*, October 1997.

Agglomeration Economies, Heterogeneity, and Firm Location Choice, co-authored with Myles Shaver, December 1997, Paper IB-97-10, *Stern School of Business*, New York University

Compatibility and Market Structure for Network Goods, co-authored with Nicholas Economides, February 1998, Paper EC-98-02, *Stern School of Business*, New York University.

Equilibrium Coalition Structures in Markets for Network Goods, co-authored with Nicholas Economides, *Annales d'Economie et de Statistique*, July 1998.

Parental Optimizing Behavior and the Measurement of School Quality, joint with Paul Wachtel, Working Paper, August 2000.

Agglomeration Economies, Firm heterogeneity, and Foreign Direct Investment in the United States, co-authored with Myles Shaver, *Strategic Management Journal*, December 2000.

Location Choices Under Agglomeration Externalities and Strategic Interaction, co-authored with Myles Shaver, *Advances in Strategic Management*, Vol. 20, August 2003.

Spillovers from Local Market Human Capital and the Spatial Distribution of Productivity in Malaysia, co-authored with Timothy Conley and Grace Tsiang, *Advances in Economic Analysis and Policy*, Vol. 3, December 2003.

Compatibility and Market Structure for High-Technology Goods, co-authored with Nicholas Economides, currently under second-round review at the *Journal of Industrial Economics*.

An Assessment of Causal Inferences in Smoking Initiation Research and a Framework for Future Research, co-authored with James Heckman and Colleen Loughlin, *Economic Inquiry,* Vol. 46, January 2008.

Agglomeration Economies, Firm heterogeneity, and Foreign Direct Investment, co-authored with Myles Shaver, *Multinational Enterprise Theory*, Vol. 1, edited by Jeffrey A. Krug and John D. Daniels, SAGE Publications: 2008.

Some of the Economics Behind the Proposed Horizontal Merger Guidelines, *Antitrust Update*, Weil Gotshal, Spring/Summer 2010.

Economic Analysis at the Outset of Merger Review: Using Diversion Ratios to Evaluate Unilateral Effects, *The Threshold*, Volume XI, Number 1, Fall 2010.


## EXPERT RETENTION, REPORTS AND TESTIMONY

In Re: *Maher Terminals, LLC vs. The Port Authority of New York and New Jersey;* Before The Federal Maritime Commission. Expert Report provided in June 2011 on behalf of the Port Authority. Evaluated competitive implication of the thirty-year terminal lease Maher signed with the Port Authority. Deposition in August of 2011.

In Re: *Federal Trade Commission vs. Laboratory Corporation of America;* Before The US Federal Trade Commission, Docket No. 9345. Expert Report provided in March 2011 on behalf of the Federal Trade Commission. Evaluated antitrust implications of the acquisition of Westcliff Medical Laboratories by Laboratory Corporation of America.

In Re: *Federal Trade Commission vs. Laboratory Corporation of America;* US District Court for the Central District of California Southern Division. Declarations filed in December 2010 on behalf of

the Federal Trade Commission. Evaluated antitrust implications of the acquisition of Westcliff Medical Laboratories by Laboratory Corporation of America. Deposition in January of 2011.

In Re: *Emigra Group, LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP, et al;* US District Court for the Southern District of New York. Expert Report filed in June 2008 on behalf of Emigra Group. Evaluated Plaintiff's claims of anti-competitive harm due to Fragomen's business practices.

In Re: *United States of America v. National Association of Realtors;* US District Court for the Northern District of Illinois Eastern Division. Expert Reports filed in August 2007 and in February of 2008 on behalf of National Association of Realtors. Evaluated claims of anti-competitive harm due to rules and policies promulgated by National Association of Realtors. Depositions in October of 2007 and in April of 2008.

In Re: *Copper Tubing Litigation (Class Action); U.S.* District Court for the Western District of Tennessee, Expert Report filed in November 2006 on behalf of defendants (Mueller Industries, Inc. and other copper tubing manufacturers). Provided an economic evaluation of the evidence regarding alleged collusive pricing by the defendants. Also, evaluated the implications for the U.S. marketplace of the EU's Decision on conspiratorial pricing for European copper plumbing tubing sales by these manufacturers.

In Re: *P.J. Carroll & Co. and other tobacco companies v. The Minister For Health And Children, The Attorney General And The Office Of Tobacco Control of Ireland;* The High Court - Commercial, Dublin, Ireland. Testimony provided in November 2006 on behalf of British American Tobacco. Evaluated the impact of the government's proposed bans on tobacco company promotional activities on market competition, industry profitability and aggregate sales of cigarettes.

In Re: *Spartanburg Regional Healthcare Systems and the other class members. v. Hillenbrand Industries Inc, Hill-Rom Inc., and Hill-Rom Co. Inc.;* U.S. District Court for the District of South Carolina, Declaration filed in October 2005 on behalf of Plaintiff. Conducted various statistical analyses on Hill-Rom economic data.

In Re: *Great Lakes Chemical Corp. v. Arkansas Oil and Gas Commission;* Circuit Court Of Union County, Arkansas, Expert Report filed in July 2005 on behalf of Great Lakes Chemical Corp. Deposition in August 2005. Analyzed the economic efficiency of Final Order No. 2-2003-01 of the Arkansas Oil and Gas Commission.

In Re: *Regulatory Inquiry of Penn National Gaming, Inc.'s Acquisition of Argosy Gaming Co.;* Illinois Gaming Board ("IGB"), Expert Report filed in May 2005 on behalf of Penn National. Analyzed the effects that the acquisition would have on gaming competition in Illinois in response to Section 3000.232 of the IGB Regulations.

In Re: *Teva Pharmaceuticals v. Pfizer Inc;* U.S. District Court for the District of Columbia, Affidavit filed in October 2004 on behalf of Teva Pharmaceuticals. Analyzed the effects that Pfizer's introduction of a generic version of Neurontin during the 180-exclusivity period would have on competitive entry in Gabapentin market.

Appendix A

In Re: *Generic Drug Manufactures v. Lester M. Crawford (Acting Commissioner of the U.S. Food and Drug Administration), the U.S. Food and Drug Administration ("FDA"), and Tommy G. Thompson (Secretary of Health and Human Services)*; U.S. District Court for the District of Columbia, Affidavit filed in October 2004 on behalf of Teva Pharmaceuticals. Analyzed how the FDA's denial of a Citizens Petition to limit entry of branded-generics after successful Paragraph IV filings would affect competition in current and future markets for generic drugs.

In Re: *Tribune Co. v. Internal Revenue Service*; U.S. Tax Court, Expert Report filed July 2004 and Rebuttal Report filed August 2004, both on behalf of the Tribune Co. Testified in trial December 2004. Analyzed the economics of the Matthew Bender transaction between Times Mirror and Reed Elsevier.

In Re: *Teva Pharmaceuticals v. Pfizer Inc.*; U.S. District Court of New Jersey; Affidavit filed in June 2004 on behalf of Teva Pharmaceuticals. Analyzed how Pfizer's marketing of a branded-generic version of Accupril affects competition in the market for generic quinapril during the 180-exclusivity period (granted to successful Abbreviated New Drug Applications with Paragraph IV certifications).

In Re: *AT&T Broadband v. CSG Systems, Inc.*, American Arbitration Association, Denver Colorado; Report filed January 2003, Declaration filed March 2003, Rebuttal Report filed March 2003 all on behalf of CSG Systems, Inc., Deposition in March 2003. Conducted an analysis to evaluate the allegation of a MFN violation.

In Re: *Relafen Antitrust Litigation*, U. S. District Court of Massachusetts; Retained in January 2003 by Teva Pharmaceuticals. Evaluated damages from the delay in the launch of generic Nabumetone associated with GlaxoSmithKline PLC's invalid patent claim.

In Re: *Elizabeth Sadati vs. Ameritech Inc. et. al.*, Circuit Court of Cook County, Illinois, Expert Findings filed June 2002 on behalf of Ameritech. Conducted an analysis to determine level of damages.

In Re: *David E. Crooke vs. Value City Furniture*, U.S. District Court for the Northern District of Illinois, Eastern Division; Expert Report filed February 2002 on behalf Plaintiff, Deposition in May 2002. Conducted an analysis to determine level of damages.

In Re: *Linda Cichowski vs. Evanston Northwestern Healthcare*, Circuit Court of the Nineteenth Judicial Circuit of Illinois, Expert Findings filed October 2001 on behalf of Evanston Northwestern Healthcare. Conducted an analysis to determine level of damages.

In Re: *Carletta L. Martinsen vs. Lockheed-Martin*, U.S. District Court for the Eastern District of Wisconsin, Expert Report filed November 2000 on behalf of Lockheed-Martin. Conducted a statistical analysis on company data to determine whether there was evidence of age discrimination.

In Re: *Nine West Shoes Antitrust Litigation (Class Action)*, U.S. District Court for the Southern District of New York. Prepared affidavit in July 2000 on behalf of Nine West Shoes. My analysis

5

addressed whether there was any statistical evidence of a pricing conspiracy between Nine West Shoes and other major retailers regarding certain lines of women shoes.

## *Merger Analyses During Government Regulatory Reviews*

*H&R Block Inc. Attempted Acquisition of 2nd Story Software, 2011.* On behalf of H&R Block, conducted economic analyses of the antitrust implications of the proposed transaction and presented these analyses to the DOJ during the merger review process.

*DAK Americas Acquisition of Eastman Chemical Co's PET, PTA and related performance polymers businesses, 2010.* On behalf of DAK, conducted an economic analysis of the antitrust implications of the proposed transaction and presented this analysis to the FTC.

*Avaya Inc. Acquisition of Nortel Networks Corp, 2009.* On behalf of Avaya, conducted economic analyses of the antitrust implications of the transaction and presented these analyses to the DOJ during the merger review process.

*Walgreens Co. Acquisition of Duane Reade Holdings Inc., 2009.* On behalf of Walgreens, conducted an economic analysis of the antitrust implications of the proposed transaction and presented this analysis to the FTC and the New York Attorney General's office.

*Microsoft Corp. Search Outsourcing Agreement with Yahoo Inc., 2009.* On behalf of Microsoft, conducted economic analyses of the antitrust implications of the proposed transaction the during the DOJ's antitrust review process.

*Google, Inc. Attempted Search Outsourcing Agreement with Yahoo Inc., 2008.* On behalf of Microsoft, conducted various economic analyses of the antitrust implications of the proposed transaction, and presented these analyses to the Competition, Competition Bureau and the DOJ during the antitrust review process.

*Walgreens Co. Proposed Acquisition of Longs Drug Stores Corp., 2008.* On behalf of Walgreens, conducted an economic analysis of the antitrust implications of the proposed transaction and presented this analysis to the FTC.

*CCS Corporation Attempted Acquisition of Newpark Environmental Services, 2008.* On behalf of the FTC, conducted various econometric analyses of the antitrust implications of the transaction during the FTC's merger review process.

*Microsoft Corp. Attempted Acquisition of Yahoo Inc., 2008.* On behalf of Microsoft, conducted various economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*Thomson Corp. Merger with Reuters Group, PLC, 2008.* On behalf of the companies, conducted various economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*Houghton Mifflin Co. Acquisition of Harcourt Publishing Co, 2007.* On behalf of Houghton Mifflin, conducted various economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*Staples Inc. Acquisition of Corporate Express, 2007.* On behalf of Staples, conducted various econometric analyses of the antitrust implications of the transaction during the FTC's merger review process.

*Monsanto Company Acquisition of Delta & Pine Land Co., 2007.* On behalf of Monsanto, conducted economic analyses of prospective efficiencies of the transaction during the DOJ's merger review process.

*Sherwin-Williams Co. Acquisition of MAB Paints, 2007.* On behalf of Sherwin-Williams, conducted economic analyses of the antitrust implications for various local markets during the FTC's merger review process.

*Getty Images Acquisition of MediaVast (WireImages), 2007.* On behalf of Getty Images, conducted economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*Hoover Co. Acquisition by Techtronic Industries Co. Ltd. (TTI), 2007.* On behalf of Whirlpool (Hoover), conducted economic analyses of the antitrust implications of the transaction during the DOJ's and State of Ohio's merger review process.

*EnergySolutions Acquisition of Duratek, 2006.* On behalf of EnergySolutions (Envirocare of Utah), conducted economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*Whirlpool Corp. Acquisition of Maytag Corp., 2006.* On behalf of Whirlpool, conducted economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*The Home Depot Acquisition of Hughes Supply, 2006.* On behalf of both parties, conducted economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*SemGroup Proposed Acquisition of TransMontaigne, 2006.* On behalf of SemGroup, conducted economic analyses of the antitrust implications of the transaction during the FTC's merger review process.

Appendix A

*Teva Pharmaceuticals Acquisition of Ivax Corp., 2005.* On behalf of the merging parties, conducted economic analyses of the antitrust implications relating to the acquisition during the FTC's merger review process.

*GameStop Corp. Acquisition of Electronics Boutique Holdings Corp ("EB"), 2005.* On behalf of EB, conducted an economic analysis of the antitrust implications relating to the acquisition during the FTC merger investigation.

*Kodak Polychrome Graphics ("KPG") Acquisition of Creo Inc., 2005.* On behalf of KPG, conducted an economic analysis of the antitrust implications relating to the acquisition during the U. S. Department of Justice ("DOJ") and European Union ("EU") merger investigation.

*Crompton Corp. Acquisition of Great Lake Chemical's Corp, 2005.* On behalf of Crompton, conducted an economic analysis of the antitrust implications relating to the acquisition during the FTC and EU merger investigation.

*Reuters Group PLC. Acquisition of Moneyline Telerate, 2005.* On behalf of Reuters, conducted an economic analysis of the antitrust implications relating to the acquisition during the DOJ and EU merger investigation.

*Sherwin-Williams Co. Acquisition of Duron Inc., 2004.* On behalf of both companies, conducted an economic analysis of the antitrust implications relating to Sherwin-Williams' proposed acquisition of Duron's paint distribution business during the FTC investigation.

*FTC investigation of Itron Inc. acquisition of SEM,* Retained in January 2004 by the U.S. Federal Trade Commission ("FTC") to provide an analysis and testimony regarding the antitrust implications of the proposed acquisition.

*Vestas Wind Systems A/S Acquisition of NEG Micon A/S, 2004.* On behalf of both companies, conducted and presented an economic analysis of the antitrust implications relating to Vestas' proposed acquisition of NEG Micon's wind turbine business during the DOJ and EU investigation.

*Kluwer Academic Publisher's Acquisition of Bertelsmann AG's academic publishing division, 2003.* On behalf of Kluwer, conducted and presented an economic analysis of the business rationale and antitrust implications relating to Kluwer's proposed acquisition of Bertelsmann's academic journal publishing division during the DOJ investigation.

*Pfizer Inc. Acquisition of Pharmacia Corp., 2002.* On behalf of Pfizer, conducted an economic analysis on the antitrust implications associated with the merger and various licensing agreements during the FTC investigation.

*Medtronic Inc. Acquisition of Spinal Dynamics Corp., 2002.* On behalf of Medtronics, conducted an economic analysis of the business rationale and antitrust implications of the acquisition regarding the companies' artificial cervical disc businesses during the FTC investigation.

*EBay Inc.'s Acquisition of PayPal Inc.*, 2002. On behalf of EBay, conducted and presented an economic analysis of the business rationale and antitrust implications of EBay's acquisition of PayPal's electronic payment system during the DOJ investigation.

*Zebra Technology Corp.'s Proposed Acquisition of Fargo Electronics Inc.*, 2001. On behalf of both companies, conducted and presented an economic analysis on the acquisition's antitrust implications for ID printers during the FTC and EU investigation.

*Bayer Aktiengesellschaft Acquisition of Lyondell Chemical Co.'s Polyether Polyols Division, 2000.* On behalf of the companies, conducted an economic analysis on the acquisition's antitrust implications for the polyol industry during the FTC and EU investigation.

## *Other Significant Engagements*

In Re: *United States Food and Drug Administration's Tobacco Products Scientific Advisory Committee (TPSAC) hearing,* February 2011. Conducted and presented an economic analysis on behalf of Lorillard Tobacco Co. estimating the potential size of a black market in menthol cigarettes emanating from a federal ban on menthol cigarette sales.

In Re: *Maine Yankee Atomic Power Co. v. United States,* United States Court of Federal Claims, Conducted an economic analysis on behalf of the DOJ and U.S. Department of Energy to assess the efficiency and estimated pricing of Plaintiff's economics experts proposed waste disposal scheme.

In Re: *CSC Holdings, Inc. v. Yankees Entertainment and Sports, LLC.,* American Arbitration Association, New York NY; Arbitration Proceeding in March 2004. On behalf of Yankees Entertainment and Sports, help develop and evaluate survey of New York area cable viewers. Analyzed CSC's economic experts' reports and testimony.

*Relevant Antitrust Market for PepsiCo Products,* 2004. On behalf of the company conducted an econometric analysis to assess the relevant markets for some of its drink and food offerings.

*Relevant Antitrust Market for Purdue Pharma L.P Products,* 2001. On behalf of the company conducted an analysis to assess the relevant market for its drug offerings.

In Re: *Falise, et al. vs. American Tobacco Co., et al.,* U.S. District Court for the Eastern District of New York. Conducted a statistical analysis supporting Nobel Laureate James Heckman's expert report and testimony regarding the responsiveness of smoker's initiation and quit rates to information regarding the dangers of smoking. Report filed on behalf of the cigarette companies in June 2000.

In Re: *Blue Cross and Blue Shield of New Jersey vs. Philip Morris Inc. et al.,* U.S. District Court For the Eastern District of New York. Conducted a statistical analysis in support of Nobel Laureate James Heckman's expert report and testimony on behalf of the cigarette companies. Report filed October 1999.

## RESEARCH PRESENTED AT THE FOLLOWING PROFESSIONAL SEMINARS

### *CONFERENCE PROCEEDINGS*

*Atlantic Economics Society Conference*, Philadelphia, Pennsylvania, October 1993.

*Conference in Memory of Yoram Ben Porath*, Jeruslem, Israel, October 1993.

*Conference on the Interoperability and the Economics of Information Infrastructure*, Strasbourg, France, June 1996.

*Telecommunications Policy Research Conference*, Alexandria, Virginia, September 1997.

*Academy of International Business Annual Meetings*, Monterrey, Mexico, October 1997.

*Econometrica North American Summer Meetings*, Montreal, Canada, June 1998.

*Western Economic Association Summer Meetings*, San Diego, California, July 2006. Chaired session on the empirical evidence linking cigarette advertising to youth smoking.

### *UNIVERSITY SEMINARS 1993-PRESENT*

Baruch College
Columbia University
Duke University
Harvard University
Michigan State University
New York University
Northwestern University
Princeton University
Stanford University
State University of New York-Albany
University of Alberta
University of California-Berkley
University of California-Irvine
University of Chicago
University of Miami
University of Michigan-Ann Arbor
University of Wisconsin-Madison
Western Ontario University

## *PRESENTATIONS AT OTHER RESEARCH INSTITUTIONS 1993-PRESENT*

U.S. Department of Labor - Bureau of Labor Statistics

Rand Corporation

American Medical Association

U.S. Department of Justice

U. S. Federal Trade Commission

## PROFESSIONAL MEMBERSHIP AND SERVICES

### *MEMBERSHIP IS PROFESSIONAL SOCIETIES*

American Bar Association

American Economic Association

Atlantic Economic Society (1993-1994)

Society of Labor Economists (1996-1997)

### *REFEREE FOR THE FOLLOWING PROFESSIONAL JOURNALS (1995-PRESENT):*

Atlantic Economic Journal

Journal of Political Economy

Journal of Labor Economics

International Journal of Industrial Organization

Quarterly Journal of Economics

Review of Economics and Statistics

Journal of Human Resources

Journal of Law and Economics

Journal of Industrial Economics

Japan and the World Economy

# Reliance List

## Motions, Declarations and Complaints

Affidavit of Moshe R. Oppenheim, August 2, 2011.

Consent Motion to Amend Complaint, October 20, 2011.

First Quality Tissue SE, LLC's Motion for Expedited Trial, October 20, 2011.

First Quality Tissue SE, LLC's Motion for a Preliminary Injunction, October 20, 2011.

Metro Paper USA, Inc's Opposition to Plaintiff's Motion for Preliminary Injunction, November 22, 2011.

Declaration of Donald F. Beaumont in Opposition to Plaintiff's Motion for Preliminary Injunction, November 22, 2011.

Declaration of Frank Ludovina, November 29, 2011.

Motion Hearing Transcripts, January 4, 2012.

Clearwater Paper Corporation's Answer and Affirmative Defenses to First Quality Tissue SE, LLC's Amended Complaint, January 18, 2012.

## Presentations

FQT/Metso Business Relationship Discussion, October 9, 2007.

## Books

Carlton & Perloff, Modern Industrial Organizations, 4th Edition.

## News Articles and Press Releases

Marvel, H.P. 1982. "Exclusive Dealing", Journal of Law and Economics 25: p. 1-25.

Masters S.E. and E.A. Snyder. 1993. "United States versus United Shoe Machinery Corporation: On the Merits", Journal of Law and Economics, 36: p. 33-70.

Federal Trade Commission and U.S. Department of Justice, *Antitrust Guidelines for Collaboration Among Competitors*, April 2000.

Federal Trade Commission, *Generic Drug Entry Prior to Patent Expiration: An FTC Study*, July 2002.

U.S. Food & Drug Administration, *Small Business Assistance: 180-Day Generic Drug Exclusivity*. Report last updated April 15, 2009 (as of 2/6/2012).

Business Wire article published by Swiss Biotech, "Debiopharm and Ascenta Therapeutics, Inc. announce an exclusive license agreement for the development and commercialization of the Inhibitor of Apoptosis Protein (IAP) Inhibitor AT-406 (called Debio 1143 by Debiopharm) for the treatment of various tumors." July 09, 2011.

Marketwire, "Hawaii Biotech Licenses Vaccine Technology From Merck." November 01, 2011.

FierceBiotech, "BioLineRx Signs Exclusive License Agreement for BL-8020, and Oral Treatment for Hepatitis C." January 25, 2012.

### Correspondence

Email re: Metso, from Donald Beaumont to Kambiz Marcheggiani, June 4, 2007.

Email re: Slides from meeting, from Jan Larson to Frank Ludovina and Paul Vandette, October 10, 2007.

Emails between Auffant and Oppenheim regarding sale to Clearwater, dated March 28, 2011 to May 4, 2011.

Emails to and from FQT and Metso regarding Kruger release, dated August 23, 2011 to October 18, 2011.

Emails to and from FQT and Metso dated November 12, 2009 to November 19, 2009.