**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ANDERSON DIVISION**

| | |
|---|---|
| First Quality Tissue SE, LLC, | |
| Plaintiff, | C.A. No. 8:11-cv-2457-KFM |
| vs. | |
| Metso Paper USA, Inc., | **REPLY OF DEFENDANT**<br>**METSO PAPER USA, INC.**<br>**IN SUPPORT OF ITS MOTION FOR**<br>**SUMMARY JUDGMENT** |
| Defendant, | |
| and | |
| Clearwater Paper Corporation, | |
| Defendant-Intervenor. | |

Metso Paper USA, Inc. ("Metso") submits this Reply in Support of its Motion for Summary Judgment. FQT's Opposition is remarkable – more for what it does not say than for what it does. FQT's brief is filled with accusations that Metso has "mischaracterized" FQT's position and "misrepresented" important matters, but is short on any demonstration that FQT's position or any particular fact is, or has been, other than as Metso described it.

FQT's discussion focuses on matters that are not at all material to this Motion – such as the obvious fact that Article 23(A) was negotiated by the parties. That is, of course, true, but not at all legally germane to the Court's inquiry. Metso seeks nothing more than to have this Court apply the legal framework that New York and South Carolina courts apply to cases in the very situation where the clauses *were* negotiated between businesses.

Perhaps most significantly, FQT never addresses – nor indeed even acknowledges – a number of the independent grounds that Metso identified, each of which compels summary

judgment in favor of Metso.  Not the least of these is FQT's own testimony demonstrating that it is not damaged by Metso's sale of a TAD machine to Clearwater.  FQT admitted in deposition that before it signed the contract at issue with Metso, FQT knew that Clearwater planned to open a competing TAD tissue plant in Shelby.  And it conceded that it would face the same competition from Clearwater in North Carolina, whether Clearwater bought its TAD machine from Metso or from Andritz.  By not responding at all, FQT fails to carry its burden required under Supreme Court precedent to avoid summary judgment.[1]

What is more, FQT declines to address other deficiencies in Article 23(A) that Metso raised and that make it plain that the clause cannot pass muster under New York or South Carolina law.  Nowhere does FQT address the overbreadth of Article 23 in restricting transactions in which FQT has no interest whatever.  Not a word is said in FQT's Opposition to explain the justification for a clause that bars the sale of Metso's standard TAD machine, to say nothing about the restraint that prohibits the sale of components that are not a part of the FQT machine.  Nor is anything said to justify the provisions that preclude the sale and delivery of automation systems that are entirely different from the system on the FQT machine.  Metso briefly addresses each of these in this Reply.

> **A.**      **As in *Baker's Aid*, the Fact that Two Corporate Parties Negotiated the Clause in Question is Assumed and Irrelevant to the Court's Analysis**

Both in the briefing on this Motion for Summary Judgment and in the Preliminary Injunction briefs earlier in this case, both parties cited the New York *Baker's Aid II* case as setting forth the operative legal framework.  In *Baker's Aid v. Hussmann Foodservice Co.,* 730 F. Supp. 1209 (E.D.N.Y. 1990) ("*Baker's Aid II*"), the court explained the history and rationale of the test under which New York courts consider the enforceability of restrictive clauses where

---

[1] *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

those clauses did not involve an individual's personal liberties but rather a contract negotiated by two businesses. The court acknowledged that enforcement of this kind of restrictive clause implicates a tension between two competing policies: "When determining whether to enforce non-competition agreements not involving employment relationships or the sale of a business, courts must balance the competing public policies in favor of robust competition and freedom of contract." *Baker's Aid II*, 730 F. Supp. at 1214.

Taking those competing interests into account, the court articulated the framework that defines the applicable standard in such cases: "Because the covenant is the result of a bargained for exchange, it should be enforced so long as it is reasonable and is no larger than necessary to protect legitimate business interests of [plaintiff]." *Id.* And, as to the requirement that the clause be "reasonable," the court said, "In New York, a restrictive covenant is 'reasonable' if it is not excessive 'as to time, scope and area and is not unduly burdensome.'" *Id.* All Metso is asking in this case is that the Court apply this standard – the one specifically derived by the New York courts to apply to clauses like Article 23(A) that were negotiated as part of a commercial contract. Sitting in diversity, this Court is obliged to apply the framework as a court would in South Carolina, *i.e.*, to test the clause under the New York framework (in light of the New York choice of laws clause) and then measure its enforceability under South Carolina law. *Stonhard, Inc. v. Carolina Flooring Specialists, Inc.*, 366 S.C. 156, 159, 621 S.E.2d 352, 353 (2005).

FQT ignores the fact that every decision in which a court strikes down a restrictive clause in a case involving either a sale of a business or sale of commercial property *by definition* involves, as this case does, a clause that was negotiated between two businesses. The fact that the clauses have been negotiated is an integral part of balancing that resulted in the framework articulated in *Baker's Aid II.* Courts in New York, South Carolina and elsewhere strike down

overbroad restrictions, even where they are in commercial contracts. *See, e.g.*, *Somerset v. Reyner,* 233 S.C. 324, 104 S.E.2d 344 (1958) (striking down restrictive clause in agreement for sale of business);[2] *American Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382 (2d Cir. 1982) (striking down restrictive clause in contract between two businesses); *KW Plastics v. United States Can Co.*,  Case No. CIV. A. 99–D–286–N, 2001 WL 135722, *15-16 (M.D. Ala. Feb. 2, 2001) (refusing to enforce provisions that were overbroad).[3]

Moreover, FQT's attempt to paint Metso as backing away from a commitment is unfair and inaccurate.  First, Metso has always believed that its sale to Clearwater is permitted by the exceptions to Article 23(A) expressed in Article 23(C).  To the extent that FQT seeks to leverage its own interpretation of the language of the restriction to preclude a sale to Clearwater, Metso is justified in seeking to have such an anticompetitive interpretation and result voided.  Second, as FQT well knows based on unrefuted deposition testimony, Metso has deferred substantial sales to other potential customers that Metso did not in good faith believe would fall into any of the Article 23(C) exceptions.  (Marcheggiani Dep. at 143:8-146:2, Ex. A.)

---

[2]  In *Somerset* the South Carolina Supreme Court recognized that the State of South Carolina, as a matter of its public policy, had a stake in the outcome of any decision whether to enforce a restrictive covenant and that it should not be viewed merely as a matter of the parties' agreement.  There the Court wrote:

> The further contention is made that plaintiff is estopped to attack the validity of the covenant upon the ground that it covers a greater territory than necessary. This defense is based upon the testimony of Reyner that in his discussion with plaintiff of the area to be included, plaintiff told him, 'you can make it for the whole State', as he had no intention of going back in the business. No authority has been cited by counsel for Reyner, and we have found none, sustaining this plea of estoppel. The reason why such covenants are held to be unenforceable is that unless they meet certain criteria, they constitute a restraint upon trade which is against public policy. The general rule is that an agreement void as against public policy cannot be rendered valid by invoking the doctrine of estoppel.

233 S.C. at 330; 104 S.E. 2d at 347.

[3]  A copy of this decision and the other unreported and out of jurisdiction decisions are included in Ex. J.

### B.     What FQT Declined to Address

#### 1.     FQT Concedes That It Suffers No Damage as a Result of the Sale by Metso to Clearwater

Metso demonstrated in its Memorandum in Support of Summary Judgment ("Metso Mem."), Dkt. 147-1, that the unequivocal testimony of FQT's own witnesses proves that FQT has not been and will not be harmed as a result of Clearwater having bought a TAD machine from Metso (an alleged violation of the contract) instead of from Andritz (undisputed compliance with the contract). (Metso Mem., Dkt. 147-1 at 29-31.) Metso also demonstrated, as FQT has acknowledged, that FQT knew before it signed the contract at issue that Clearwater had publicly announced plans to open a new TAD plant in North Carolina. (Metso Mem., Dkt. 147-1 at 30; Damaghi Dep. at 133:9-135:15, Ex. B.) Thus, when FQT entered into the contract with Metso, it knew it would be facing new competition from Clearwater in the TAD private label market – and that competition could be in the form of either a Metso or Andritz TAD machine.

FQT acknowledges (Dkt.162 at 33) that it would have had "no quarrel" with Clearwater obtaining a TAD machine from Andritz or any of Metso's other competitors. Both Messrs. Damaghi and Crownover acknowledged that FQT expected that the product it produced from its Lock Haven (Andritz) and Anderson (Metso) facilities would be interchangeable. (Damaghi Dep. at 84:2-19, Ex. B; Crownover Dep. at 237:11-17, Ex. C.) And, as Metso referenced in its memorandum, FQT's top marketing officer, Scott Crownover, could not identify any way in which FQT would be any better off from a competitive standpoint if Clearwater had purchased its TAD machine from Andritz. (Crownover Dep. at 281:22-282:8. Ex. C.) And nowhere has FQT even suggested that it has been harmed by the release of any confidential information.[4]

---

[4]  Counsel for FQT has advised that FQT is not any longer pursuing a claim that the TAD machine sold to Clearwater is substantially similar to the TAD machine sold to FQT. It is anticipated that a stipulation to this effect will be submitted to the Court promptly.

In short, Metso's memorandum identified – based on the testimony of FQT's senior executives – the facts that show that FQT has not suffered, and will not suffer, damage from Metso's sale to Clearwater, much less irreparable damage.  To defeat Metso's motion, FQT had to come forward with evidence that would create an issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  FQT not only failed to come forward with evidence that created an issue of fact, *it failed to come forward with any evidence whatsoever on this point*, not to mention others.  FQT's complete failure to put forth any specific facts in its Opposition to support the essential element of damages "renders all other facts immaterial" and alone entitles Metso to judgment as a matter of law.  *Id.*

Beyond failing to respond to Metso's recitation of FQT's own executives conceding facts showing that FQT would suffer no damage from Clearwater's purchase of a TAD machine from Metso, FQT also failed to respond to Metso's argument that, even if there were any damage, it could be quantified.  (Metso Mem. at 30, Dkt. 147-1.)  Of course, where damages can be quantified, FQT would have an adequate remedy at law and injunctive relief is not available.  *AJG Holdings, LLC. v. Dunn*, 382 S.C. 43, 51, 674 S.E.2d, 505, 508 (Ct. App. 2009).

Although a party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," that burden "may be discharged by 'showing' that there is an absence of evidence to support the nonmoving party's case."  *Celotex,* 477 U.S. at 323, 325; *see also Cray Communications, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 393-94 (4th Cir. 1994) (noting that "under *Celotex*, 'the moving party on a summary judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case'" (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720, at 10 (2d ed. Supp. 1994))).

Once Metso made that showing, as it has done here (Metso Mem., Dkt 147-1 pp. 29-31), the burden shifted to FQT to demonstrate genuine issues of material fact that would support a claim of damage. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–88 (1986). "This obligation is particularly strong when the non-moving party bears the burden of proof" at trial as FQT does for each of the elements of its breach of contract claim here. *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir. 1990) (citing *Celotex*, 477 U.S. at 322-323) ("the plain language of Rule 56(c) mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.").

The party opposing a properly supported motion for summary judgment may not rest – as FQT has done in its Opposition – upon the allegations of its pleading, unsupported speculation, or rhetoric in its briefing; but, under the plain language of Rule 56(e) "must come forward with '*specific facts*'" demonstrating that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 587 (emphasis added); *Ash v. UPS,* 800 F.2d 409, 411-12 (4th Cir. 1986) (per curiam) ("unsupported speculation ... is not sufficient to defeat a summary judgment motion.").

FQT acknowledges that irreparable harm is an element, and that the relative harm from enforcement (or not) of Article 23 is the final element of the analysis in this case. (FQT Opp. at 31, Dkt. 162.) Remarkably, in response to Metso's detailed explanation why FQT was, by its own admission, no worse off as a result of the alleged breach of this provision (acquisition by Clearwater of a Metso TAD machine as compared to an Andritz TAD machine), FQT does not address that evidence at all. It does not even try to counter Mr. Crownover's observation that Clearwater would have presented the same competitive threat in North Carolina regardless of whether it purchased its machine from Metso or from Andritz. (*See* Crownover Dep. at 281:22-

282:8, Ex. C.)  Nor does it offer any facts – indeed even argue – that the Metso machine as opposed to an Andritz machine gave Clearwater any advantage.

FQT's only response is to try to redirect attention from the critical issue of harm (or lack thereof) to *FQT* if the sale to Clearwater is not enjoined and to try to refocus the Court on the question of harm to *Metso* and *Clearwater*.  Regarding the harm to Metso, FQT brusquely dismisses the importance of any such harm from cancellation of the sale (Metso had its "eyes wide open" (FQT Opp. at 33)), and then, as to Clearwater, is equally dismissive, blaming Metso and/or Clearwater itself for any "costs of delay or need to reconfigure its facility" (*Id.*).  But the issue Metso raised in its motion was not the extent of Metso's or Clearwater's damages if the sale to Clearwater were enjoined (which are undeniably substantial); rather, it was the lack of any harm to FQT relative to what it acknowledges would have happened in any event.

Finally, in the last paragraph of its entire argument, FQT's only passing glance at Metso's damages argument is the conclusory statement that FQT "would be irreparably harmed by a failure to enforce Article 23." (FQT Opp. at 34, Dkt. 162.)  FQT then does nothing more than reiterate the concerns it claims to have had in 2007 but recounts not a single fact whatsoever that even purports to evidence any harm that has, or will, befall FQT as a result of Clearwater contracting with Metso rather than with Andritz.  FQT's failure even to address this argument amounts to a concession.  Metso challenged FQT's ability to proffer evidence of any damage as a result of the alleged breach of contract on which FQT bases its sole claim in this case, and FQT has failed to come forward with any evidence – not a shred.  Accordingly, FQT's complete failure to proffer in its Opposition any evidence showing damages by itself "mandates the entry of summary judgment" against FQT.  *Celotex*, 477 U.S. at 322-323.

2.     **Article 23 Prohibits the Sale of Metso's Standard TAD Machine And Even Components And Automation Systems That Are Not on FQT's TAD Machine**

Metso has demonstrated that Article 23(A) was overly broad in multiple respects.  FQT's witnesses admitted that, insofar as its (now) stated interest in securing its confidences and "shared learnings" was concerned, Article 23(A) was completely redundant of other industry standard confidentiality provisions in the Metso Contract.   FQT's officers also admitted in depositions that the clause on its face prevented sales of both TAD machine components and automation systems that were not even used on FQT's uniquely custom configured machine.  And Metso showed that Article 23(A) proscribed the sale of Metso's standard TAD machine, a machine in which FQT played no role whatsoever.  Metso demonstrated in its initial memorandum that in each of these respects, Article 23(A) was on its face overly broad, and therefore neither "reasonable" under New York law nor no "broader than necessary" to protect FQT's "legitimate business interests."  *Baker's Aid II*, 730 F. Supp. at 1217.

FQT of course does not (and could not) dispute that Article 23(A) facially precludes Metso from selling any TAD machine components in all of North America, whether the component was used on FQT's machine or not.  Nor does it dispute that Article 23(A) precludes Metso from selling any Metso TAD automation systems and that it bans the sale of Metso's standard TAD machine, in which FQT had no role in the development, design or manufacture.  No one on behalf of FQT has articulated any legitimate reason why these bans on sales of standard machines, components, and automation systems are of any value to FQT.  Indeed, as Metso highlighted in its Motion, even FQT's industry expert, Mr. Christiansen, acknowledged that FQT had no interest in stopping such sales.  (Metso's Mem. at 25-26, Dkt. 147-1), citing Christiansen Dep. at 44:3-24; 46:2-15, Ex. D).

Metso's witnesses have explained, without contradiction, that the TAD automation systems (the software that is instrumental in monitoring and operating the TAD machines) are individually and uniquely developed and calibrated specifically for the machine on which each is to be used.  Mr. Phillip Warren, Director of Product Management and Support for Metso Automation, explained that the software for any particular TAD machine could not be used for another machine.  As Mr. Warren explained, "[FQT] stayed with what is called Collection 2010. Clearwater and Kruger are both Collection 2011 so the FQT software wouldn't even run on their system…."  (Warren Dep. at 59:3-7, Ex. E.)

Indeed, Mr. Warren testified further that the automation system software is tailored not only to reflect the unique configurations of individual components of a TAD machine's instrumentation.  Even the precise altitude at which a machine is physically located makes a difference. "Unless you build it in the exact same place at the exact same altitude on the exact same soil, there would be differences.  The fact Clearwater is building it in North Carolina and FQT is in South Carolina, completely different."  (Warren Dep. at 125:23-126:2, Ex. E.)  He explained further that these differences mean that the automation systems are incompatible:

> Every paper mill is an individual and, you know, the tanks are different, the different processes, the pipes are different, run different ways.  There is really no two things that are exact, okay?
>
> So we have to accommodate those specific needs in the way we configure the software.  The process dynamics, in other words, how that tank fills is different if it's five feet tall versus ten feet tall.  If it's shaped this way, shaped that way, we have to build around that.
>
> ***

So we customize our software to their specific needs, their application at the site. (Warren Dep. at 120:7-17; 121:1-2, Ex. E.)[5] FQT nevertheless demanded Article 23(A)'s broad restriction, despite the strict confidentiality obligations, including those related specifically to automation systems, in the contract.

FQT no doubt declined to respond to Metso's demonstration of the facial overbreadth of Article 23(A) in these respects because there really is no response. FQT has no remotely plausible justification for these prohibitions, which makes it plain that there is no basis on which the enforceability of Article 23(A) could be upheld.

### 3.    FQT's Executives Conceded That There Was No Reason for the Ban on "Sales"

In its initial memorandum, Metso recounted Mr. Damaghi's testimony conceding that FQT has no interest in restricting sales in the territory defined in Article 23(A) – thereby making that restriction unnecessary and unenforceable. FQT responded, "Metso makes much ado about nothing." (FQT Opp. at 30, Dkt 162.) Rather than showing facts that demonstrate that the ban on "sales" is needed, FQT offers nothing but surmise about the way paper machines are bought and sold across the globe. Mr. Damaghi's testimony on this point is dispositive. If there is no legitimate justification for banning "sales," the restrictive covenant reaches too far and is unenforceable. *See e.g., Bakers Aid II*, 730 F. Supp. at 1214.

### 4.    FQT Never Even Suggests that a Shred of its Confidential Information Has Been Revealed, or is Likely to be Revealed

To the extent that there is a consistent theme in FQT's brief, it is that Metso has unfairly "mischaracterized" FQT's business purpose behind Article 23.[6] After insisting (under oath) that

---

[5]    After preparing and delivering the automation software to FQT, Metso did not keep a copy even as an historical reference or backup. (Warren Dep. at 180:7-16. Ex. E.)

[6]    *See* FQT Opp. at 2 (Dkt. 162) (Metso's "straw-man mischaracterizations"); 3 (Metso's "false characterization"); 17 (Metso's "mischaracterizations"); 18 (Metso's "assertions are patently false"); and 22 (Metso's "mischaracterizations").

the purpose was "absolutely not" to limit competition, FQT now spurns Metso's description of

FQT's purpose – to protect FQT's confidential information ("shared learnings") and access to

resources – although the description was drawn straight from Mr. Damaghi's and Mr.

Oppenheimer's deposition testimony.  (Damaghi Dep. at 144:19-145:21, Ex. B; Oppenheim Dep.

at 109:8-22, Ex. F).  But curiously, when FQT finally comes out and describes its purpose in its

own, presumably carefully chosen, words (Opp. at 19), that purpose sounds remarkably like the

purpose that Metso described in its Motion.  FQT says:

> First Quality required Article 23 to prevent unfair competition by restricting
> Metso's sales of TAD machines to new customers during the period of time it
> would be possible for them to free ride on First Quality's coattails and quickly
> gain the benefits of the lessons Metso learned during the set up, installation and
> initial operation of the machines First Quality purchased.

This concept that FQT's concern revolved around the possibility of Metso leaking proprietary

information gained during its work for FQT is precisely what Metso addressed in its Motion.

It is precisely this sort of communally developed "know how" that FQT now confirms it

sought to protect, which Mr. Ludovina conceded at his deposition was already protected through

the contractual confidentiality provisions.  Such provisions, he explained, included Appendix 14,

which (pursuant to Article 24.4) detailed the specific "know how" or "Process Improvements"

that FQT wanted to protect and which the parties could supplement as additional proprietary

information was developed.  (Ludovina Dep. at 132:13-17; 134:1-4, Ex. G.)  Indeed, Mr.

Ludovina also conceded that there was no additional confidential technical information that FQT

would include on Appendix 14.  (Ludovina Dep. at 134:6-135:21, Ex. G.)  More fundamentally,

however, in light of FQT's concern regarding the protection of these confidences, Mr. Ludovina

admitted that he was unaware of any of FQT's confidential information having been leaked.  (*Id.*

at 136:6-10, Ex. G.)  Nor does FQT cite any other evidence to suggest that there has been any

leakage.  Nor has FQT proffered any facts suggesting that such a leak is even remotely likely.[7]

FQT suggests that its purpose was broader than the mere protection against disclosure of

confidential information insofar as it sought protection from "unfair competition."  But that

concept is no broader here than protecting confidential information.  FQT sidesteps that "unfair

competition" under New York law involves either "palming off" (not an issue here) or

"misappropriation."  *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476 (2007) ("We have long

recognized two theories of common-law unfair competition: palming off and

misappropriation."); *Bangkok Crafts Corporation v. Capitolo di San Pietro in Vaticano*, 331 F.

Supp. 2d 247, 255 (S.D.N.Y. 2004) ("Under New York law, 'the gravamen of a claim of unfair

competition is the bad faith misappropriation of a commercial advantage belonging to another by

infringement or dilution of a trademark or trade name or by exploitation of proprietary

information or trade secrets.").  So protection from unfair competition, a legitimate purpose

under New York law, is simply another way of saying that a party may protect itself from

misappropriation of confidential information. And Metso has amply demonstrated that Article

23(A) is not narrowly tailored to protect confidential business information.

### 5.     FQT Provides Neither Legal Nor Factual Support for its "First to Market" Rationale Because There is None

FQT also attempts to tie its purported need for protection from "unfair competition" to a

claimed right to protect its "first mover" or "first to market" advantage.  (*See e.g.*, FQT Opp. at

18-20, Dkt. 162.)  FQT claims that it was the first to invest in a TAD machine for the purpose of

---

[7]   The closest FQT comes to suggesting even the possibility that a leak could occur is its observation that there was an overlap in the personnel who worked on the Clearwater and FQT projects insofar as Messrs. Auffant and Beaumont worked on both and were not made part of the "Dedicated Team."  Mr. Auffant is Metso's in-house lawyer, and Mr. Beaumont is a Senior Vice President who is involved at a high level in Metso's North American sales.  Neither is shown to have any FQT confidential information.  If the suggestion is that these two individuals are a risk to violate Metso's contractual confidentiality obligations and that justifies a multi-year broad anti-competitive restriction on sales that suggestion is, most charitably, far too thin a reed to justify those restraints.

serving the private label market with 2-ply product, and as such, had a right to protect that "first mover" advantage for a period of years. The problem with this argument is that it is wrong, both legally and factually. Notably, FQT cites no law to support a right to protect a "first to market" by limiting competition during any period. And the only "facts" it cites do not support its claim.

First, even assuming that FQT had been the first to dedicate a TAD machine to the private label TAD market, it started operations at its first mill in Lock Haven in January 2005. (Damaghi Dep. at 18:5-8, Ex. B.) So if FQT was *ever* a "first mover," it was over seven years ago, in January 2005. It cannot plausibly suggest that today it enjoys any special status relative to the competition simply because it claims to have been the first entrant many years ago. (*E.g.*, *KW Plastics*, 2001 WL 135722, at *10 (decision striking down overbroad restrictions even where confidential information was alleged to have been misappropriated, noting that five years later, "any alleged misappropriated information has become stale"). Second, it is undisputed that Clearwater's predecessor, Potlatch Corporation, had opened a TAD mill in Nevada in 2004. (Ludovina Dep. at 42:4-22; 43:7-8, Ex. G.) They therefore acknowledge that FQT was not the first entrant in the private label TAD market.

It was disappointing to note, as well, that FQT cited deposition testimony of Mr. Perkowski supposedly for his acknowledging that FQT enjoyed a unique position in the private label TAD market. FQT cited his testimony to suggest that Clearwater was not an original competitor in the TAD market, but that it rather competed only with "conventional tissue products" which were "not quite as good as TAD." (FQT Opp. at 13, Dkt. 162.) In fact, that statement was taken out of context, and it ignored Mr. Perkowski's testimony to precisely the *opposite* of what FQT suggests in its brief. He explained at Perkowski Dep. at 50:3-16, Ex. H:

> Q. [by FQT] And to state it another way, Clearwater was not
>    yet producing an ultra premium TAD product that

was either in the tissue or towel market, correct?

A.  No, they were competing in that segment with
both conventional and TAD products.

Q.  Maybe I didn't phrase it the right way.
They weren't producing an ultra premium product?

A.  Yes, they were.

Q.  They were.  Where were they producing that?

A.  That was at their Las Vegas facility, which is
their TAD facility and that produced TAD
products, primarily paper towels.…

Perhaps more fundamentally, however, FQT's suggestion that it needed Article 23(A) to

protect its business or secret "first mover" market strategy from those who would copy it simply

ignores the facts that FQT itself proffers.  Ironically, FQT references the report of Mr.

Perkowski, an industry expert whom Clearwater hired to analyze FQT's business in 2009.  (*See*

FQT Opp. at 12-13 and Exh. Q, Dkt. 162.)  FQT appears to argue that – somehow – the fact that

Mr. Perkowski prepared an analysis of FQT on behalf of Clearwater, as FQT states, "prior to

Clearwater having entered into discussions with Metso," proves FQT's vulnerability.  (FQT Opp.

at 12, Dkt. 162.)  FQT then tells the Court that "Unsurprisingly, on the heels of Mr. Perkowski's

analysis, Clearwater …chose to follow in First Quality's footsteps by choosing Metso (First

Quality's professed partner) as its supplier."  (*Id.* at 13.)

FQT's argument is wrong on multiple levels.  First, Mr. Perkowski's report did indeed

analyze FQT's market and business strategy in detail, advising on its technology, market

strategy, customer breakdown, and even transportation network.  (*See* Exh. Q to FQT Opp., Dkt.

162.)  But, in addressing FQT's expansion to a second site (which was then still described as a

"western site" as FQT initially planned the Anderson facility for Utah), Mr. Perkowski advised

Clearwater that FQT was expected to acquire its new TAD machines from Andritz, not Metso. As he reported, "The facility plan will be virtually identical to the Lock Haven plan with the first TAD (similar Andritz design) [paper machine] starting up in 2011 followed by the second [paper machine] in 2013." (Perkowski Rept., FQT Opp. Exh. Q, at 39, Dkt. 162.)

If anything, Mr. Perkowski's 2009 report demonstrates vividly (i) that Clearwater was aggressively researching FQT's market strategy, and understood it, well before FQT ever contracted with Metso; (ii) that the details of FQT's market strategy were no secret; and (iii) that those details were known to Clearwater independent of any contact with Metso. In short, Mr. Perkowski's 2009 report evidences the fact that Clearwater was actively pursuing its own private label TAD strategy and that by 2009 – if not before – FQT's market strategy was well known in the industry wholly independent of FQT's contacts with Metso. In these circumstances, by 2010 when the contract at issue was signed, even if FQT's "first to market" strategy had been protectable in the 2004-2005 period, by 2010 that information was stale and no longer protectable. *See KW Plastics* 2001 WL 135722 at *10, *15

### 6.    FQT Does Not Attempt to Distinguish *Baker's Aid*

Metso has shown the parallels between the *Baker's Aid II* case and this case, and how *Baker's Aid II* makes clear that Article 23(A) must be invalidated. (*See e.g.*, Metso's Mem. at 17-20, Dkt. 147-1.) Again because FQT has no response to Metso's arguments based on *Baker's Aid II*, FQT proffered none. In *Baker's Aid II* the court struck down a provision that precluded the defendant from selling its rack ovens generally in the United States and Canada but upheld the much more limited provision that precluded only the sale of ovens that were based on the same proprietary specifications that were developed for, and purchased by, the plaintiff.

FQT cites *Baker's Aid II* as representing the applicable law. (FQT Opp. at 15, 30, Dkt. 162.) Indeed, FQT even cites *Baker's Aid II* for the proposition that, "where a restrictive

16

covenant contains both reasonable and overbroad provisions, this Court may 'make use of the tool of severance, paring an unreasonable restraint down to appropriate size and enforcing it.'" (FQT Opp. at 30, Dkt. 162, quoting *Baker's Aid II* at 1216.)).  FQT suggests that the Court could merely "modify the provision" geographically in such a way that Clearwater's North Carolina plant would still be within the restricted Territory.  But FQT fails to address the fact that, within that very framework, the New York court did not carve up the *Baker's Aid II* clause geographically.  Rather, it did precisely what Metso seeks here:  finding unenforceable the broad prohibition on sales and deliveries without eliminating either the clause that precludes sale of "substantially similar" TAD machines or the clauses protecting FQT's confidential information.

FQT never attempts in any way to distinguish the case, or to explain how this Court, applying New York law, could justifiably reach a result different from that in *Baker's Aid II*.[8] FQT's silence amounts to an acknowledgment that there really is no legitimate distinction between this case and *Baker's Aid II*.

7.    **FQT Effectively Concedes that Article 23 is Geographically Overly Broad.**

Lastly, in its memorandum, Metso demonstrated that Article 23 is geographically overbroad.  FQT's lead counsel in drafting Article 23, Moshe Oppenheim, conceded that FQT made the portion of the United States that is subject to the restriction in Article 23(A) much broader in its contract with Metso than it had been in FQT's contract to buy TAD machines from Andritz, which covered only the "Continental United States." As a result of this expansion of the definition of Territory, FQT's contract with Metso applies its restrictions to all of the territories and possessions of the United States – even territories as remote as Guam.  (Oppenheim Dep. at

---

[8]   The cases cited by FQT at page 30 of its Opposition are all consistent with *Baker's Aid II* in that they, as allowed by New York law, invalidate and sever unnecessary – overbroad – restrictions while upholding others that are narrowly tailored to address a legitimate business interest.

134:16-135:5, Ex. F).  FQT concedes, as it must, that it does no business in the U.S. Virgin Islands, American Samoa, the Northern Mariana Islands, or Guam, all territories or possessions of the United States,[9] and it has offered no basis to think that a mill in any of them – especially the ones in the South Pacific such as Guam – would be competition for a mill in Anderson. FQT's industry expert testified that FQT would have no interest in preventing the sale or delivery of a TAD machine in Guam.  (Metso's Mem. at 28 (Dkt. 147-1); Christiansen Dep. at 46:16-23, Ex. D.)  Nonetheless, Article 23(A) sweeps all of that territory – from Guam to the far reaches of northwest Canada and to the southern corners of Mexico[10] – into its restrictive scope.

In response, FQT does not suggest that there is any justification for including many of those geographic regions within the restricted Territory as FQT did when it expanded the definition of Territory in its contract with Metso.  Instead, FQT argues that Metso's position "makes no sense and is inconsistent with the relevant legal standard…."  (FQT Opp. at 29, Dkt. 162.) FQT says that Metso's example of Guam is an "obscure region" and argues that "Metso has failed to cite a single case invalidating a restrictive covenant on such grounds."  (*Id.*)

FQT failed to notice *Lampman v. DeWolff, Boberg & Assocs.*, 319 Fed. App'x. 293, 302 (4th Cir. 2009), discussed in Metso's Mem. at 26-28, Dkt. 147-1.In *Lampman*, the Fourth Circuit struck down a non-competition clause, which it found  overbroad. It reversed this Court, which had enforced the clause.  The Fourth Circuit disagreed, citing the acknowledged fact that, although the clause prohibited Lampman from providing competitive services in Zimbabwe, the defendant, who purported to have a global business, conducted no business in Zimbabwe.

---

[9]  The possessions of the United States also include the Midway Atolls, Navassa Island, Johnston Island, the Wake Islands and Howland, Baker and Jarvis Islands.  None are claimed by FQT to be a place where it does business or from which a competitor could launch a competitive threat to FQT's Anderson mill.

[10]  FQT's contract with Metso also expanded the portion of Mexico subject to the restriction.  In the Andritz contract the restriction was limited to only the northern half of Mexico, *i.e.*, "north of Mexico City." (Oppenheim Dep. at 69:2-13. Ex. F.)

The Fourth Circuit explained, "[t]he non-competition clause thus would prohibit Lampman from working for a 'competitor' in Zimbabwe, even though DBA does not provide services in that country and has no legitimate interest in prohibiting Lampman from working there." *Lampman*, 319 Fed. App'x. at 302.  There was no suggestion that Lampman actually wanted to take a job in Zimbabwe, just as there is no suggestion that Metso necessarily wants to sell a TAD machine in Guam, or in northern Canada, or southern Mexico.

Thus, contrary to FQT's contention that Metso has not cited any support for its position with respect to Article 23's geography, Metso cited *Lampman*, which is precisely such a case. And FQT failed to address it.  As in *Lampman*, Article 23 is on its face geographically overbroad because it is not "reasonably limited in its operation with respect to time and place," and therefore "void as a matter of law."  *Id.*; *see also Somerset* 233 S.C. at 330, 104 S.E.2d at 347, where the South Carolina Supreme Court invalidated a restriction that covered the entire state of South Carolina even when the party subject to the restriction had said that he had no intention of conducting business anywhere in South Carolina.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment in Metso's favor.

Dated:  April 16, 2012                    Respectfully submitted,


                                          s/Henry L. Parr, Jr.
                                          _____
                                          Henry L. Parr, Jr. (4340)
                                          David H. Koysza (73027)
                                          WYCHE, P.A.
                                          44 East Camperdown Way
                                          Greenville, South Carolina 29601
                                          Telephone: (864) 242-8209
                                          Facsimile:  (864) 235-8900
                                          Email:hparr@wyche.com; dkoysza@wyche.com
                                          *Attorneys for Defendant Metso Paper USA, Inc.*

*Of Counsel*

Michael Evan Jaffe
Deborah B. Baum
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, N.W.
Washington, D.C.  20037-1122
Telephone: (202) 663-8000
Facsimile:  (202) 354-5261
Email: mjaffe@pillsburylaw.com; deborah.baum@pillsburylaw.com

Jason S. Bell
Smith, Gambrell & Russell, LLP
Promenade II, Suite 3100
1230 Peachtree Street N.E.
Atlanta, GA  30309-3592
Telephone:  (404) 815-3619
Facsimile:   (404) 685-3619
Email:  jbell@sgrlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of April 2012, I electronically filed the foregoing

Reply of Defendant Metso Paper USA, Inc. in Support of Its Motion for Summary Judgment

with the Clerk of Court using the CM/ECF system which will automatically send email

notification of such filing to the following attorneys of record:

Samuel W. Outten, Esq.
Catherine R. Atwood, Esq.
Megan Hanley Baer, Esq.
WOMBLE CARLYLE SANDRIDGE & RICE
A Professional Limited Liability Company
550 South Main Street
Suite 400
Greenville, SC  29601
soutten@wcsr.com
catwood@wcsr.com
mbaer@wcsr.com

Michael A. Brille, Esq.
Neal C. Hannan, Esq.
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW
Suite 800
Washington, D.C. 20015
mbrille@bsfllp.com
nhannan@bsfllp.com

*Attorneys for First Quality Tissue SE, LLC*

Beattie B. Ashmore, Esq.
BEATTIE B. ASHMORE P.A.
650 E. Washington Street
Greenville, SC 29601
beattie@beattieashmore.com

Jeffrey S. Cashdan, Esq.
Sarah E. Statz, Esq.
King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, GA 30309
jcashdan@kslaw.com
sstatz@kslaw.com

*Attorneys  for Clearwater Paper Corporation*

s/Henry L. Parr, Jr.
_____
Henry L. Parr, Jr.

.