# EXHIBIT A

**DEPOSITION EXCERPTS
OF FREDRICK FLYER. PH. D.**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION
CIVIL ACTION FILE NO. 8:11-cv-2457-KFM

FIRST QUALITY TISSUE SE, LLC,
    Plaintiff,
    vs.
METSO PAPER USA, INC.,
    Defendant,
    and
CLEARWATER PAPER CORPORATION,
    Defendant-Intervenor.

---

DEPOSITION OF
FREDRICK FLYER, PH.D.

---

DATE TAKEN:    Wednesday, April 18, 2012
TIME BEGAN:    9:53 a.m.
TIME ENDED:    5:35 p.m.
LOCATION:      Wyche, Burgess, Freeman & Parham
               44 East Camperdown Way
               Greenville, South Carolina 29601

REPORTED BY:   TARI B. KRAMER, RMR, CRR
               GALLAGHER COURT REPORTING
               864-234-5744

```
 1        Exhibit 120, you mention you had -- you did a
 2        report for the -- an expert report was filed on
 3        behalf of the Federal Trade Commission in the
 4        FTC versus Laboratory Corporation of America --
 5   A.   Yeah. That's a matter I initially started to
 6        refer to, but I think I confused that with
 7        another matter. I'm not sure if that report
 8        is -- would be allowed to be released or not.
 9   Q.   It might be?
10   A.   As far as I know, yes.
11   Q.   All right. Have you ever done any work in the
12        paper industry?
13   A.   In the paper industry.
14   Q.   Uh-huh. Outside of your present engagement in
15        this case, I'll add.
16   A.   I understood that. I don't recall -- just going
17        through my CV to see if there's anything that
18        would be -- as I sit here, I don't recall having
19        worked in the paper industry, but.
20   Q.   Have you ever had any employment outside of
21        working in academics and in your current
22        consulting job?
23   A.   I had summer employment when I was a student,
24        those types of things. I also worked as a
25        research assistant when I was getting my PhD.
```

1         talked to -- I think Kirupa Ramaiah is another.
2   Q.   Would you spell that name?
3   A.   K-i-r-u-p-a. And Ramaiah, R-a-m-a-i-a-h.
4   Q.   And who is that?
5   A.   He's an economist at Lexecon. Compass Lexecon.
6   Q.   And what were you talking to him about?
7   A.   About the exclusivity literature, about
8         different types of exclusivity restrictions that
9         he's encountered and knows about.
10 Q.   Have you talked to anyone else besides the
11        people you've listed?
12 A.   I don't think so, but it's not impossible that I
13        did. Those are -- that's who comes to mind as I
14        sit here.
15 Q.   Now, we know Mr. Ludovina works in the tissue
16        industry; right?
17 A.   That's my understanding.
18 Q.   Did you talk to anybody else who works in the
19        tissue industry or has worked in it?
20 A.   Not that I recall.
21 Q.   I have to tell you, when you wrote in your
22        report on page two, line 20, that you had
23        reviewed statements made by business
24        representatives, and you listed Mr. Ludovina's
25        declaration, it didn't tell us that you had

1     products?
2  A. Well, you gave me the oil example and I was
3     referring to that.
4  Q. But over a long time with oil, when the price
5     of -- supply of oil, the crude oil is restricted
6     over the long time -- not even on a spot market,
7     over the long term -- what we pay for gasoline
8     is going to go up, isn't it?
9  A. If supply is restricted, all else equal, the
10    prices will go up.
11 Q. When the refineries are knocked out in the Gulf
12    during a hurricane and that restricts the supply
13    of gasoline to the -- I end up paying more as a
14    consumer, don't I?
15 MR. BRILLE:
16    Objection to form.
17 A. Well, during a hurricane in the short run,
18    you're likely to pay more. In the long run,
19    it's a much more complicated answer; because if
20    you -- higher prices attracts resources and that
21    could actually increase long-run supplies. So
22    in the short run, yes.
23 Q. So in --
24 A. That's why I restricted it to a spot market.
25    But in the long run, the dynamic model, it's

```
 1         the covenant, are you?
 2   A.    No. All I'm saying is -- you asked the
 3         question -- is the only information that's being
 4         conveyed and you gave some description of that.
 5         I was saying no, it's potentially much broader
 6         than that.
 7         What the justifications were and exactly what
 8         their largest concerns were and how important
 9         each concern was, that's something that somebody
10         at First Quality's going to have to testify to.
11         I don't know the answer to that with those
12         questions.
13   Q.    Now, you said you've never worked in the TAD
14         business or in the tissue business.
15   A.    I looked at -- I was looking through my resume
16         when you asked the question. I continued to
17         look and I didn't find anything. And I don't
18         recall anything. I've worked on a lot of cases,
19         though. Sometimes I think of things afterwards
20         like, Oh, geez, I kind of worked on that. But I
21         don't recall working on anything --
22   Q.    How many times have you actually testified in a
23         federal or state trial, Dr. Flyer?
24   A.    Deposition or --
25   Q.    No. In the courtroom.
```

1  A.  I wouldn't say that. I've been retained on
2      matters, and based on my analysis of the
3      matters, I was retained subsequently to help
4      them with pricing models.
5  Q.  But never in the TAD business. Never in the
6      paper business.
7  A.  Never in the paper business.
8  Q.  And so you -- when you criticize Mr. Perkowski's
9      analysis, you are not able to say that his
10     analysis is not consistent with what the
11     industry does to decide how to add capacity or
12     not add capacity and how to price its products?
13  A.  I am not prepared to say that what he does is
14     inconsistent or consistent with what the
15     industry does to make determinations of adding
16     capacity. That's not a anti-competitive
17     analysis. Adding capacity is a separate
18     question from whether there will be consumer
19     harm.
20     You can make an investment decision based on a
21     hunch or on whether or not there's a sufficient
22     return. And that return may be sufficient,
23     regardless of the effect on the market.
24     The question I try to address in a competitive
25     analysis is what happens to price in the market.

1  Q.   But you -- you're not in a position to question
2       the fact that Mr. Perkowski's approach might be
3       used in the TAD industry and that he might be
4       paid regularly by important customers to analyze
5       the things that he analyzed in his report?
6  A.   I'm not disputing that fact but I'm saying, that
7       analysis on whether to determine is there a
8       sufficient demand to justify capacity expansion
9       isn't the same question as to what effect --
10      what competitive effects are there in the
11      market.  The competitive effects analysis is a
12      separate question that's different and,
13      actually, much more complex.
14 Q.   And you're not really saying that
15      Mr. Perkowski's conclusions are wrong.  You're
16      just saying they're unreliable.
17 MR. BRILLE:
18      Object to the form.
19 A.   Ultimately, whatever the competitive analysis
20      will show, it will show.  I don't think it's
21      been done here.  I don't have a basis to say
22      they're absolutely wrong or right.  I know that
23      there's not sufficient evidence that would
24      support the conclusions he draws.  And I don't
25      draw the conclusions that he does, based on what

1   MR. BRILLE:
2       Same objection.
3   A.  Again, I'm not saying that the conclusions
4       ultimately would be wrong or right if you did
5       the analysis. But there's no basis to draw --
6       there's no reliable basis from which to draw
7       those conclusions.
8   Q.  And you're saying he should use a type of
9       analysis that you talked about in your reports?
10  A.  The type of analysis that's standard in
11      antitrust analysis. The type of analysis that's
12      used by the Federal Trade Commission. The type
13      of analysis I use in almost every case I bring
14      to them.
15      In fact, the Federal Trade Commission -- it's
16      not my analysis. They actually outline the
17      analyses in various documents in their
18      evaluation of collaborations, in their merger
19      review process. There's something called the
20      merger guidelines. There's something called the
21      outline -- if you're going to use a rule of
22      reason to assess competitive effects associated
23      with different types of transactions or
24      agreements, how to weigh the pro-competitive and
25      anti-competitive effects and what you need to

1         here right now; correct?
2   A.   That's what I came up with. Yes.
3   Q.   There was a lot of testimony before about the
4         effect of increased capacity on prices. Do you
5         remember all of that?
6   A.   Uh-huh.
7   Q.   I'm not talking about capacity, I'm talking
8         about actual supply in the marketplace.
9   A.   Uh-huh.
10   Q.   All else being equal, does increased supply tend
11         to create a pro-competitive benefit?
12   A.   It can, because -- it depends -- all else equal,
13         if all you do is change the supply, you lower
14         the price, which is typically a benefit. But
15         all else isn't all else equal always. So you
16         could also discourage new investment. There's
17         a -- in economics, there's an ambiguous result
18         in that. In a dynamic model, it's not clear
19         that a perfectly competitive industry leads to
20         more innovation than a industry with -- where
21         firms have market power. So it's not clear that
22         in a dynamic world that lower pricing will
23         actually result in innovation. So the answer
24         is, all else equal, if nothing else changes in
25         terms of incentive, yes, it could lower prices

1    indications of things that suggest that there
2    are different product markets, is one of the
3    things you look at is how people in the industry
4    describe their markets?
5  A. (Nods head up and down.) I think industry
6    participants understand the markets and
7    typically -- I'll tell you what I look at, since
8    I work with mergers most frequently. There's
9    several sources of information I look at; one,
10   is what the business people think about
11   competition and who they think constrains their
12   pricing and what's reflected in their business
13   documents or ordinary course documents, that's
14   one aspect. Two, is I like to get industry
15   data, pricing data particularly to see whether
16   or not price reductions in one product affect
17   the sales of another. And essentially an
18   econometric analyses. And thirdly, if it's an
19   industry with sophisticated buyers of the
20   product, what the buyers say, what their choices
21   are. You know, if the consumers in the market
22   say, this is what we're choosing between, we
23   think there's only these providers, they will
24   tell you a lot about substitution in the market.
25 Q. And if there's a significant difference in

1 Irving have any different situation than FQT
2 has?
3 A. No. I don't know the answer to that. If
4 Clearwater and Kruger are not market leaders and
5 FQT is indeed a market leader and if people are
6 trying to follow FQT, yes, they could have
7 different incentives than other private label
8 manufacturers.
9 Q. But you wouldn't expect that they would have
10 different incentives about shared learnings and
11 resource availability, would you?
12 A. Assuming they were the first mover? If they
13 were the first mover, then they may have those
14 concerns. My understanding is they weren't the
15 first mover and, therefore, their decisions may
16 be not entirely the same as First Quality. If
17 First Quality was the first to implement the
18 Metso machine and first to implement the
19 strategy that it's implemented, their strategic
20 positioning may be different. Again, it's --
21 somebody in the industry would be in a better
22 position to answer that than I am.
23 Q. When you're looking at a restraint like Article
24 23, and you're trying to figure out what it
25 does, don't you want to assess the fit between